UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DESIGNATION FORM
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: _180 Genesee Street, New Hartford, New York  13413_

Address of Defendant: _Voegele Mechanical, Inc. 2170 Bennett Rd., Philadelphia, PA  19116_
_McDonald Building Company, LLC,  470 Norristown Rd., Suite 380, Blue Bell, PA  19422_

Place of Accident, Incident or Transaction: _Philadelphia, PA_

---

**RELATED CASE, IF ANY:**

Case Number: _____     Judge: _____     Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?     Yes ☐     No ☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?     Yes ☐     No ☒

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?     Yes ☐     No ☒

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?     Yes ☐     No ☒

I certify that, to my knowledge, the within case ☐ is / ☐ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: _9/13/18_          _____          _84536_
                         *Attorney-at-Law / Pro Se Plaintiff*          *Attorney I.D. # (if applicable)*

---

**CIVIL:** (Place a √ in one category only)

**A.     Federal Question Cases:**

☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
☐ 2. FELA
☐ 3. Jones Act-Personal Injury
☐ 4. Antitrust
☐ 5. Patent
☐ 6. Labor-Management Relations
☐ 7. Civil Rights
☐ 8. Habeas Corpus
☐ 9. Securities Act(s) Cases
☐ 10. Social Security Review Cases
☐ 11. All other Federal Question Cases
(Please specify): _____

**B.     Diversity Jurisdiction Cases:**

☒ 1. Insurance Contract and Other Contracts
☐ 2. Airplane Personal Injury
☐ 3. Assault, Defamation
☐ 4. Marine Personal Injury
☐ 5. Motor Vehicle Personal Injury
☐ 6. Other Personal Injury (Please specify): _____
☐ 7. Products Liability
☐ 8. Products Liability – Asbestos
☐ 9. All other Diversity Cases
(Please specify): _____

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, _Eric Brown_____, counsel of record *or pro se plaintiff*, do hereby certify:

☐ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

☒ Relief other than monetary damages is sought.

DATE: _9/13/18_          _____          _84536_
                         *Attorney-at-Law / Pro Se Plaintiff*          *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

*Civ. 609 (5/2018)*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### CASE MANAGEMENT TRACK DESIGNATION FORM

| | | |
|---|---|---|
| UTICA MUTUAL INSURANCE COMPANY | : | CIVIL ACTION |
| v. | : | |
| VOEGELE MECHANICAL, INC. AND<br>McDONALD BUILDING COMPANY, LLC | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.                          ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
    and Human Services denying plaintiff Social Security Benefits.                                ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.   ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
    exposure to asbestos.                                                                        ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
    commonly referred to as complex and that need special or intense management by
    the court.  (See reverse side of this form for a detailed explanation of special
    management cases.)                                                                           ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.               (✓)

| | | |
|---|---|---|
| September 13, 2018 | Eric R. Brown, Esquire | Utica Mutual Insurance Company |
| **Date** | **Attorney-at-law** | **Attorney for** |
| 215-575-2620 | 215-575-0856 | erbrown@mdwcg.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

UTICA MUTUAL INSURANCE COMPANY

**(b)** County of Residence of First Listed Plaintiff  ONEIDA
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Eric R. Brown, Esquire, Marshall Dennehey Warner Coleman & Goggin, 2000 Market Street, Philadelphia, PA 19103  (215)575-2620

## DEFENDANTS

VOEGELE MECHANICAL, INC. and
McDONALD BUILDING COMPANY, LLC

County of Residence of First Listed Defendant  PHILADELPHIA
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1  U.S. Government Plaintiff | ☐ 3  Federal Question *(U.S. Government Not a Party)* |
| ☐ 2  U.S. Government Defendant | ☒ 4  Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                    *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☒ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| | | | ☐ 791 Employee Retirement Income Security Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:

Brief description of cause:   INSURANCE COVERAGE DECLARATORY JUDGMENT

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $  NONE

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE                                             DOCKET NUMBER

DATE  9/13/18

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #              AMOUNT              APPLYING IFP              JUDGE              MAG. JUDGE

## IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UTICA MUTUAL INSURANCE COMPANY
Plaintiff

v.

VOEGELE MECHANICAL, INC AND
MCDONALD BUILDING COMPANY, LLC

Defendants

DOCKET NO:

## COMPLAINT

AND NOW, comes plaintiff, Utica Mutual Insurance Company ("Utica"), by and through its undersigned counsel and hereby files this Complaint and in support thereof avers as follows:

### I.     THE PARTIES

1.     Plaintiff, Utica Mutual Insurance Company is a New York Corporation with its principle place of business located at 180 Genesee Street, New Hartford, New York 13413.

2.     Defendant, Voegele Mechanical, Inc. is, upon information and belief, a Pennsylvania corporation with its principle place of business located at 2170 Bennett Road, Philadelphia, Pennsylvania 19116.

3.     Defendant, McDonald Building Company, LLC is, upon information and belief, a limited liability company registered in Pennsylvania with a principle place of business located at 470 Norristown Road, Suite 380, Blue Bell, Pennsylvania 19422.

## II.   VENUE AND JURISDICTION

4.      This Honorable Court has jurisdiction over this matter by virtue of diversity jurisdiction pursuant to 28 U.S.C. §1332 by reason of diversity of citizenship and an amount in controversy alleged to be in excess of $75,000, exclusive of interests and costs.

5.      Venue properly lies in this judicial district pursuant to 28 U.S.C. §1391 as the principle places of business of the defendants seeking coverage is located in this judicial district and the policy of insurance at issue was issued in this judicial district.

## III.   OPERATIVE FACTS

6.      The instant insurance coverage dispute arises from a demand for arbitration and statement of claim filed before the American Arbitration Association by claimant, Pine Run Retirement Community naming McDonald Building Company, LLC as the sole respondent.

7.      On June 29, 2018, McDonald joined Voegele Mechanical as an additional Respondent in the AAA Arbitration and sought additional insured coverage under the policy of insurance issued by Utica to Voegele Mechanical.

8.      The AAA arbitration statement of claim alleges the following:

   4.     On June 28, 2013, Pine Run and McDonald entered into the
          American Institute of Architect's Agreement Between
          Owner and Construction Manager as Constructor ALAI
          Document A133 — 2009 ("the Construction Agreement"), [1]
          (See Exhibit A)

   10.    Under the Construction Agreement, McDonald was
          required to serve as construction manager and constructor
          for a project that included extensive renovations to Pine
          Run's existing five-story Health Center.

   11.    As part of the project, McDonald undertook extensive
          renovations to the facility.

2

12. The renovations included:

a. Enclosing the original fourth-floor balconies with facades and roofs;

b. Replacing facade cladding on portions of the fifth-floor exterior walls;

c. Installing new and replacing original window systems;

d. Replacing storefronts and entrances;

e. Installing and replacing all original PTAC2 units and sleeve penetrating the existing and new perimeter walls; and

f. Integrating the new construction and replacement components with the original construction.

15. McDonald also "warrant[ed] that the Work will conform to the requirements of the Contract Documents and will be free from defects, except for those inherent in the quality of the Work the Contract Documents require or permit. Work, materials, or equipment not conforming to these requirements may be considered defective." (See id, at § 3.5; Exhibit A).

18. After installation of the PTAC units, a Pine Run housekeeper noticed water damage in three patient rooms (Rooms 413, 415, 420).

19. Pine Run found similar damage in other rooms that have PTAC units installed by McDonald.

20. In November 2016, the ongoing problem was evidenced by the PTAC unit in Room 531 leaking into Room 426.

22. TBS determined that McDonald improperly installed the packing, fabricated pans, flashing and related material during the installation of the new PTAC units:

The water testing included testing of the metal PTAC sleeve (Test Location #1) and the exterior louver (Test Location #2). We tested to the metal PTAC sleeve first to determine if the metal sleeve had any deficiencies that may be contributing to the water infiltration noted on the interior. We noted water was able to flow through the metal PTAC sleeve when the weeps were sealed. This water discharged to the exterior, at various points and the space below, through a gap in the floor system. There may be water infiltration occurring behind the original louver, We

believe that water collected in the pan does not drain continuously to the exterior due to the lack of the 2″ end dam at the metal flashing pan and sealant at the leading edge of the metal flashing pan.

We note that the new GE PTAC unit was installed in the rough opening of the previous PTAC unit. We believe that the previous PTAC unit was larger than the new GE PTAC unit. In order to install the new GE PTAC unit, wood blocking, sealant and metal flashing was installed at the exterior wall behind the original louver. However, we are not able to confirm the installation of exterior sheathing and the tie-in of the weather resistive barrier. We were able to observe daylight within the wood blocking assembly. We also were able to note daylight below the PTAC unit from the interior.

We were able to review the GE PTAC unit installation instructions as provided in submittal package 15740-0101, dated 13 September 2013. We are unaware of any other shop drawings or other submittals for the PTAC installation, The installation instructions recommend providing a metal pan with 2″ end dam extending the depth of the flashing pan. The metal PTAC sleeve is to be installed on top of this pan in a bed of sealant. We did not observe the 2″ end dam or the bed of sealant at the PTAC sleeve at Test Location #1 and #2 as recommended by the GE installation instructions.

The water test at Location #2 was conducted to test the original louver in an event of a rainstorm. Our nozzle, held at 60 degrees was intended to replicate a rain storm event. Within 10 minutes of testing, we noted 2 quarts of water in a bucket in the space below Room 415, The path of water was similar to the Test Location #1. We believe that the water is traveling through the gap in the floor at the wood blocking pack out. From our tests we conclude that the wood blocking assembly installed to pack out and seal the reduced rough opening at the new PTAC unit is not water tight.

(See January 19, 2016 TBS Report at pp. 4-5; Exhibit B).

23.     TBS recommended further investigation that included forensic removal of the PTAC and associated components to understand McDonald's installation and to generate project-specific details to remedy the situation. (See id. at p. 5).

28.     On June 29, 2016, TB S returned to Pine Run to visually inspect two additional PTAC locations on the second and third floors of the Health Center.

29.     TBS determined that McDonald engaged in the same
        negligent workmanship and installation of these PTAC
        units:

During our visit, we reviewed existing conditions of the PTAC units at
Rooms 224 and 322. In our limited visual review of the units in these
rooms, we noted similar conditions to those noted in our report dated
January 19, 2016. Such conditions include: no sealant noted below the
bottom pan flashing, gaps in the perimeter sealant, and noted paths to
daylight from the interior. While we understand that no water infiltration
issues have been reported, our limited visual inspection of the PTAC units
in Rooms 224 and 322 revealed similar issues to those outlined in our
previous report dated January 19, 2016 which include: no sealant at the
base of the flashing pan, no upturned leg on the metal pan flashing per
GE's recommended installation instructions, and a lack of continuity in the
weather resistive barrier. We recommend that these issues be addressed in
a similar fashion to the remedial work detailed for the PTAC unit at Room
518, We recommend reviewing other PTAC locations throughout the
facility to ensure a water tight condition exists at the PTA C units.

(See TBS Report dated August 3, 2016; Exhibit B).

30.     Despite the fact that an independent third party has
        determined that McDonald defectively installed the PTAC
        units, McDonald has refused to correct the defects at its
        cost as required by the Construction Agreement.

32.     Pine Run's continued inspection of the property has
        revealed water penetration at multiple other PTAC
        locations.

33.     Functional drainage flashing and weather-resistive barrier
        seals at the PTAC sleeve are deficient, allowing water and
        air penetration.

34.     No weather-resistive bather exists behind the stucco finish
        on the plywood panel at the fifth floor PTAC units.

35.     The fifth floor PTAC sleeve flashing is deficient, allowing
        water infiltration at the fourth floor ceiling.

36.     Pine Run believes, and therefore alleges, that the systemic
        defects in McDonald's installation of the PTACs was so
        fundamentally deficient that there is water damage at all
        PTAC locations.

### E. Pine Run Discovers Other Construction Defects

37. McDonald's defective installation of the PTAC units prompted Pine Run to perform additional inspections of the Health Center to determine if other construction work performed by McDonald was defective.

38. These inspections revealed multiple, substantial construction defects resulting in extensive damage to the facility, including:

a. Metal base flashing between the third floor brick wall and the fourth floor fiber cement cladding is deficient.

b. The weather-resistive barrier installed behind the fiber cement cladding uses improper flashing tape and flashing details at the terminations.

c. The fourth floor windows were improperly installed and poorly sealed, the fifth floor window flashing is deficient.

d. Deficient or missing insulation and non-conforming soffit construction was identified in the fourth floor at the wall interface, increasing air infiltration and poor thermal performance.

e. Missing moisture barrier at the fourth floor soffit.

f. Discontinuity of the moisture barrier behind the fifth floor metal column covers allows water penetration.

g. Roof expansion joints are discontinuous at the fourth floor and fifth floor roof edge, which do not accommodate anticipated movement and expose the roof components to damage and water infiltration.

h. Failure along the fifth floor roof gravel stop.

i. Multiple leaks in the fourth floor patient room ceilings, resulting in mold and other evidence of water-related deterioration of interior building components.

j. Fourth floor roof bases flashing and termination bars are improperly anchored into Gypsum sheathing and not a structural material.

k.    The as-built gutter attachment at the fourth floor roof is not in compliance with industry standards.

l.    Perimeter fire safeing(sic) is missing at the edge of the fifth floor slab.

39.    Further testing revealed substantial and widespread water infiltration and mold in patient rooms throughout the Health Center.

40.    McDonald's negligent and faulty work also caused damage to the Health Center's Roof. There is roof damage caused by leakage from the PTAC installation in Room 518. Room 518 is immediately above Room 413, There is a flat roof wrapped from Room 413 up to Room 518. When a roofer cut into the flat roof membrane to investigate the damage caused by the leak, not only was the leak from Room 518 identified, but sawdust and other waste construction materials which should have been cleaned out before the membrane was installed were discovered, so that the membrane would not seal to the plywood base. The water underneath the roof from the PTAC leak had frozen and cracked the roof which now needs to be replaced.

(A copy of the arbitration demand is attached hereto as Exhibit "A").

9.    As a result of those factual allegations, the plaintiff, Pine Run Retirement asserted three (3) causes of action; Count I is titled "Breach of Contract"; Count II is titled "Breach of Implied Warranties", and; Count III is titled "Breach of Expressive Warranties." (See Exhibit "A").

10.    There is no separate Complaint joining Voegele Mechanical as an additional respondent to the arbitration, as McDonald contends that under Article XVII of McDonald's contract between McDonald and Voegele Mechanical, Voegele Mechanical has allegedly agreed to be joined as a party in any litigation, arbitration or proceeding involving the contractor.

11.     Utica issued a Commercial Package Policy to Voegele Mechanical Inc. as its first named insured for the policy period of March 1, 2016 through March 1, 2017.  (A copy of the policy is attached as Exhibit "B").[1]

12.     The insuring agreement for the policy reads, in pertinent part, as follows:

COVERAGE A BODILY INJURY AND PROPERTY DAMAGE
LIABILITY

1. Insuring Agreement

a.     We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. . . .

b.     This insurance applies only to "bodily injury" or "property damage" only if:

(1)     The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

(2)     The "bodily injury" or "property damage" occurs during the policy period;  . . .

(See Exhibit "B", at 1 of 16).

13.     The policy contains the following definition: "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (See Exhibit "B", at 15 of 16).

---

[1] Utica insured Voegele from March 1, 2011 through March 1, 2017.  Utica refers to the last policy period as that appears to be the time frame when the damage became apparent as alleged in the AAA complaint.  The pertinent language from the insuring agreement and definition cited *supra* is identical in all of the policies.

## COUNT I – DECLARATORY RELIEF

## UTICA MUTUAL INSURANCE COMPANY V. MCDONALD BUILDING COMPANY AND VOEGELE MECHANICAL

14.     The Policy provides coverage for damages caused by an "occurrence" which is defined, in short, as an "accident".

15.     The alleged damages in the underlying actions were allegedly caused by the faulty, deficient, or otherwise defective workmanship performed by McDonald and/or its subcontractors.

16.     Under Pennsylvania Law, faulty workmanship is not an accident and therefore, not an "occurrence" under a general liability insurance policy.

17.     Further, under Pennsylvania Law, failure to meet contractual obligations or to honor express and implied warranties is not considered an accident and, therefore, is not an "occurrence".

18.     Liability insurance policies do not provide coverage for claims in an underlying action which arise out of, and relate to, the contract between the parties.

19.     The underlying actions do not allege an "occurrence" or accident under the policy at issue.

20.     As a result, the claims set forth in the underlying actions do not fall within the insuring agreement of the policy and Utica has no duty to defend Voegele or McDonald for the claims asserted in the AAA Arbitration.

21.     Moreover, because Utica has no duty to defend those parties for the claims asserted in the AAA Arbitration, Utica has no duty to indemnify them either.

WHEREFORE, Utica Mutual Insurance Company respectfully requests judgment in its favor, along with a declaration that it owes no obligation to defend or indemnify its named insured, Voegele Mechanical or putative additional insured McDonald Building Company.

## COUNT II – DECLARATORY RELIEF

## UTICA MUTUAL INSURANCE COMPANY V. MCDONALD BUILDING COMPANY

22.     Plaintiff incorporates the preceding paragraphs as though fully set forth at length herein.

23.     The policy includes an endorsement titled "Additional Insured-Owners, Lessees Or Contractors-Completed Operations", which includes in the schedule "all persons or organizations you had a contract in place prior to a loss requiring that they be named as an additional insured under this policy," which reads as follows:

> A. Section II – Who Is An Insured is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for a "bodily injury" or "property damage" caused, in whole or in part, by "your work" at the location designated and described in the Schedule of this endorsement performed for that additional insured and included in the "Products-Completed Operations Hazard".

> However:

> 1. The insurance afforded to such additional insured only applies to the extent permitted by law; and

> 2. If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such an additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

24.     In the event that the Court finds an "occurrence" may have been alleged in the AAA Arbitration complaint, Utica seeks a declaration that McDonald does not qualify as an additional insured for the purposes of providing a defense to that action.

25.     The AAA complaint does not make any assertion that the damage at issue was caused in whole or in part by the work of Utica's named insured, Voegele, which is a necessary prerequisite to trigger additional insured coverage under the endorsement.

WHEREFORE, Utica Mutual Insurance Company respectfully requests judgment in its favor, along with a declaration that it owes no additional insured coverage to McDonald Building Company.

**MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN**

BY:  Eric R. Brown, Esquire
ID 84530
2000 Market Street
Philadelphia, PA  19103
215-575-2600
Attorney for Plaintiff, Utica Mutual Insurance Company

DATE: 9/18/18

LEGAL/118031646.v1

11

# EXHIBIT A

BEFORE THE
AMERICAN ARBITRATION ASSOCIATION
(Construction Industry Rules)

| | | |
|---|---|---|
| PINE RUN RETIREMENT COMMUNITY, a division of DOYLESTOWN HOSPITAL | : : : : | CASE NO. _____ |
| Claimant, | : : | |
| v. | : : : | Claim for Breach of Contract, Breach of Implied Warranty, Breach of Express Warranty |
| MCDONALD BUILDING COMPANY LLC | : : : | |
| Respondent. | : | |

## DEMAND FOR ARBITRATION & STATEMENT OF CLAIM

Claimant, Pine Run Retirement Community, a division of Doylestown Hospital

("Pine Run"), demands arbitration and states its claims against Respondent, McDonald

Building Company LLC ("McDonald"). In support, Pine Run states:

## I.   PARTIES AND REPRESENTATIVES

1.     Pine Run, a division of Doylestown Hospital, is one of the nation's first

retirement communities. Pine Run is located at 777 Ferry Road, Doylestown,

Pennsylvania 18901.

2.     McDonald is a Pennsylvania limited liability company located at 470

Norristown Road, Suite 380, Blue Bell, PA 19422.

3.     McDonald is represented by two attorneys whose contact information is

as follows:

Jeffrey D. Grossman, Esquire
Stradley Ronon
2005 Market Street, Suite 2600
Philadelphia, PA 19103-7018
Email: jgrossman@stradley.com
Telephone: (215) 564-8061
Fax: (215) 564-8120

William F. Sweeney, Esquire
Law Offices of Styliades & Jackson
9000 Midlantic Drive, Suite 105
MT. Laurel, NJ 08054
Email: William.sweeney@libertymutual.com
Telephone: (215) 446-8161
Fax: (603) 334-7569

## II.    ARBITRATION AGREEMENT

4.    On June 28, 2013, Pine Run and McDonald entered into the American

Institute of Architect's Agreement Between Owner and Construction Manager as

Constructor – AIA Document A133 – 2009 ("the Construction Agreement").[1]  (See

Exhibit A)

5.    Article 9.1 of AIA Document A133 – 2009 provides that "[a]ny claim

between [Pine Run] and [McDonald] shall be resolved in accordance with the

provisions set forth in this Article 9 and Article 15 of A201-2007."  (Id.)

6.    Under Article 9.2 of AIA Document A133-2009, the parties chose

"Arbitration pursuant to Section 15.4 of AIA Document A201-2007" to resolve any

claim not resolved by mediation.  (Id.)

---

[1] The Construction Agreement included forms AIA Document A133-2009 and AIA
Document A201-2007 (General Conditions of the Contract for Construction).

7.      On June 17, 2016, the parties participated in an unsuccessful mediation before the project's architect.

8.      Article 15.4.1 of A201-2007 provides that "[i]f the parties have selected arbitration as the method for binding dispute resolution in the Agreement, any Claim subject to, but not resolved by, mediation shall be subject to arbitration which, unless the parties mutually agree otherwise, shall be administered by the American Arbitration Association in accordance with its Construction Industry Arbitration Rules in effect on the date of the Agreement." (Id.)

9.      Claimant demands arbitration in accordance with the parties' agreement to arbitrate in the Philadelphia locale.

## III.    STATEMENT OF FACTS

### A.      Construction Agreement

10.     Under the Construction Agreement, McDonald was required to serve as construction manager and constructor for a project that included extensive renovations to Pine Run's existing five-story Health Center.

11.     As part of the project, McDonald undertook extensive renovations to the facility.

12.     The renovations included:

    a.      Enclosing the original fourth-floor balconies with facades and roofs;

    b.      Replacing facade cladding on portions of the fifth-floor exterior walls;

    c.      Installing new and replacing original window systems;

    d.      Replacing storefronts and entrances;

      e.    Installing and replacing all original PTAC[2] units and sleeves penetrating the existing and new perimeter walls; and

      f.    Integrating the new construction and replacement components with the original construction.

13.    Under the Construction Agreement:

"[McDonald] accept[ed] the relationship of trust and confidence established by [the] Agreement and covenant[ed] with [Pine Run] to cooperate with the Architect and exercise the Construction Manager's skill and judgment in furthering the interests of the Owner; to furnish efficient construction administration, management services and supervision; to furnish at all times an adequate supply of workers and materials; and to perform the Work in an expeditious and economical manner consistent with [Pine Run's] interests."

(See AIA A133-2009 at §1.2; Exhibit A).

14.    Under the Construction Agreement, McDonald also assumed the duties and responsibilities of a construction manager, including but not limited to the following:

(a)    Provide recommendations consistent with the Project requirements to Pine Run and the Architect on constructability; and availability of materials and labor. (See id. at § 2.1.2; Exhibit A);

(b)    Perform the work in accordance with the Contract Documents. (See AIA Document A201-2007 at § 3.1.2; Exhibit A);

(c)    Carefully study and compare the various Contract Documents relative to that portion of the Work, as well as information furnished by the Owner pursuant to Section 2.2.3, to facilitate coordination and

---

[2] PTAC stands for "package terminal air conditioner." A PTAC is a self-contained air conditioning system found in hotels, motels, senior housing facilities, hospitals and apartment buildings.

-4-

construction by the Contractor. (See id. at § 3.2.2; Exhibit A);

(d)    Promptly report to the Architect any errors, inconsistencies or omissions discovered by or made known to the Contractor as a request for information in such form as the Architect may require. (See id. at § 3.2.2; Exhibit A);

(e)    Supervise and direct the work, using the Contractor's best skill and attention. (See id. at § 3.3.1; Exhibit A);

(f)    Sole responsibility and control over construction means, methods, techniques, sequences, procedures and coordination of all portions of the Work under the Contract, unless the Contract Documents give other specific instructions concerning these matters. (See id. at § 3.3.1; Exhibit A);

(g)    Responsibility to Pine Run for acts and omissions of McDonald's employees, subcontractors and their agents and employees and other persons or entities performing portions of the work for, or on behalf of, McDonald or any of its Subcontractors. (See id. at § 3.3.2; Exhibit A);

(h)    Responsibility for inspection of portions of Work already performed to determine that such portions are in proper condition to receive subsequent work. (See id. at § 3.3.3; Exhibit A);

(i)    Make no changes or substitutions without the consent of Pine Run, after evaluation by the Architect and in accordance with a Change Order or Construction Change Directive. (See id. at §3.4.2; Exhibit A); and

(j)    Responsibility for cutting, fitting or patching required to complete the Work or to make its parts fit together properly. All areas requiring cutting, fitting and patching shall be restored to the condition existing prior to the cutting, fitting and patching, unless otherwise required by the Contract Documents. (See id. at § 3.13.1; Exhibit A)

15.     McDonald also "warrant[ed] that the Work will conform to the requirements of the Contract Documents and will be free from defects, except for those inherent in the quality of the Work the Contract Documents require or permit. Work, materials, or equipment not conforming to these requirements may be considered defective." (See id. at § 3.5; Exhibit A).

16.     The Construction Agreement provides that, in the event that McDonald's work is rejected by the Architect or fails to conform to the requirements of the Contract Documents, whether discovered before or after Substantial Completion and whether or not fabricated, installed or completed, McDonald agrees to promptly correct the work. (See id. at § 12.2.1; Exhibit A).

17.     McDonald also agreed that costs of correcting such work "including additional testing and inspections, the cost of uncovering and replacement, and compensation for the Architect's services and expenses made necessary thereby, shall be at McDonald's expense." (See id.).

**B.      An Independent Third Party – TBS - Determined That McDonald's Negligent Installation of the PTAC Units Caused Water Damage to Patient Rooms**

18.     After installation of the PTAC units, a Pine Run housekeeper noticed water damage in three patient rooms (Rooms 413, 415, 420).

19.     Pine Run found similar damage in other rooms that have PTAC units installed by McDonald.

20.     In November 2016, the ongoing problem was evidenced by the PTAC unit in Room 531 leaking into Room 426.

-6-

21.    Pine Run engaged an independent third party, TBS, to investigate and

determine the cause of the water damage observed in patient rooms.

22.    TBS determined that McDonald improperly installed the packing,

fabricated pans, flashing and related material during the installation of the new PTAC

units:

> The water testing included testing of the metal PTAC
> sleeve (Test Location #1) and the exterior louver (Test
> Location #2). We tested to the metal PTAC sleeve first to
> determine if the metal sleeve had any deficiencies that
> may be contributing to the water infiltration noted on the
> interior. We noted water was able to flow through the
> metal PTAC sleeve when the weeps were sealed. This
> water discharged to the exterior, at various points and the
> space below, through a gap in the floor system. There
> may be water infiltration occurring behind the original
> louver. We believe that water collected in the pan does
> not drain continuously to the exterior due to the lack of
> the 2" end dam at the metal flashing pan and sealant at the
> leading edge of the metal flashing pan.
>
> We note that the new GE PTAC unit was installed in the
> rough opening of the previous PTAC unit. We believe
> that the previous PTAC unit was larger than the new GE
> PTAC unit. In order to install the new GE PTAC unit,
> wood blocking, sealant and metal flashing was installed at
> the exterior wall behind the original louver. However, we
> are not able to confirm the installation of exterior
> sheathing and the tie-in of the weather resistive barrier.
> We were able to observe daylight within the wood
> blocking assembly. We also were able to note daylight
> below the PTAC unit from the interior.
>
> We were able to review the GE PTAC unit installation
> instructions as provided in submittal package 15740-01-
> 01, dated 13 September 2013. We are unaware of any
> other shop drawings or other submittals for the PTAC
> installation. The installation instructions recommend
> providing a metal pan with 2" end dam extending the
> depth of the flashing pan. The metal PTAC sleeve is to
> be installed on top of this pan in a bed of sealant. We did
> not observe the 2" end dam or the bed of sealant at the

> PTAC sleeve at Test Location #1 and #2 as recommended
> by the GE installation instructions.
>
> The water test at Location #2 was conducted to test the
> original lover in an event of a rainstorm. Our nozzle, held
> at 60 degrees was intended to replicate a rain storm event.
> Within 10 minutes of testing, we noted 2 quarts of water
> in a bucket in the space below Room 415. The path of
> water was similar to the Test Location #1. We believe
> that the water is traveling through the gap in the floor at
> the wood blocking pack out. From our tests we conclude
> that the wood blocking assembly installed to pack out and
> seal the reduced rough opening at the new PTAC unit is
> not water tight.

(See January 19, 2016 TBS Report at pp. 4-5; Exhibit B).

23.    TBS recommended further investigation that included forensic removal

of the PTAC and associated components to understand McDonald's installation and to

generate project-specific details to remedy the situation. (See id. at p. 5).

24.    On March 7, 2016, TBS returned to Pine Run to supervise the forensic

removal of the PTAC units and associated components outside of room 518.

25.    The forensic removal and inspection of McDonald's work further

confirmed that McDonald had defectively installed the PTAC unit, resulting in leakage.

As TBS observed:

> The forensic removal of the existing exterior finishes
> demonstrated the lack of continuity of the weather
> resistive barrier and connection to the metal flashing
> systems. In addition, the lack of properly sealed metal
> flashing at the right jamb provide areas for the water
> intrusion observed by Pine Run Retirement Community.
> Our water testing, conducted on January 5, 2016, showed
> that water traveled through the gaps at the wood blocking
> and into the gap/hole at the floor. This water traveled
> through the gap/hole in the floor and appeared in the
> space below Room 413. The forensic removal
> uncovered improperly terminated flashings. We noted
> gaps and a path for water travel. In addition, there was

> no connection of the weather resistive barrier into the
> rough opening or the PTAC unit. This lack of continuity
> of the between the weather resistive barrier and the
> PTAC flashing allows for water intrusion into the wall
> assembly.

(See TBS March 31, 2016 Report at p. 2; Exhibit B).

26.     TBS recommended multiple remedial measures as detailed in its March

31, 2016 report. (See id.).

27.     Thereafter, Pine Run arranged at its own expense to correct the defective

PTAC units on the fifth floor.

## C.     TBS's Inspection of Additional PTAC Units Revealed the Same Defective Installation

28.     On June 29, 2016, TBS returned to Pine Run to visually inspect two

additional PTAC locations on the second and third floors of the Health Center.

29.     TBS determined that McDonald engaged in the same negligent

workmanship and installation of these PTAC units:

> During our visit, we reviewed existing conditions of the
> PTAC units at Rooms 224 and 322. In our limited visual
> review of the units in these rooms, we noted similar
> conditions to those noted in our report dated January 19,
> 2016. Such conditions include: no sealant noted below
> the bottom pan flashing, gaps in the perimeter sealant, and
> noted paths to daylight from the interior. While we
> understand that no water infiltration issues have been
> reported, our limited visual inspection of the PTAC units
> in Rooms 224 and 322 revealed similar issues to those
> outlined in our previous report dated January 19, 2016
> which include: no sealant at the base of the flashing pan,
> no upturned leg on the metal pan flashing per GE's
> recommended installation instructions, and a lack of
> continuity in the weather resistive barrier. We
> recommend that these issues be addressed in a similar
> fashion to the remedial work detailed for the PTAC unit at
> Room 518. We recommend reviewing other PTAC

> locations throughout the facility to ensure a water tight
> condition exists at the PTAC units.

(See TBS Report dated August 3, 2016; Exhibit B).

30.     Despite the fact that an independent third party has determined that McDonald defectively installed the PTAC units, McDonald has refused to correct the defects at its cost as required by the Construction Agreement.

31.     McDonald also has refused to reimburse Pine Run for any testing to assess whether its negligent installation has resulted in leaking and resultant damage in the remaining PTAC locations, and Pine Run has incurred significant costs in doing so.

### D.     Pine Run Continues to Discover Additional Water Penetration at Multiple Other PTAC Locations

32.     Pine Run's continued inspection of the property has revealed water penetration at multiple other PTAC locations.

33.     Functional drainage flashing and weather-resistive barrier seals at the PTAC sleeve are deficient, allowing water and air penetration.

34.     No weather-resistive barrier exists behind the stucco finish on the plywood panel at the fifth floor PTAC units.

35.     The fifth floor PTAC sleeve flashing is deficient, allowing water infiltration at the fourth floor ceiling.

36.     Pine Run believes, and therefore alleges, that the systemic defects in McDonald's installation of the PTACs was so fundamentally deficient that there is water damage at all PTAC locations.

-10-

**E.    Pine Run Discovers Other Construction Defects**

37.    McDonald's defective installation of the PTAC units prompted Pine Run to perform additional inspections of the Health Center to determine if other construction work performed by McDonald was defective.

38.    These inspections revealed multiple, substantial construction defects resulting in extensive damage to the facility, including:

  a. Metal base flashing between the third floor brick wall and the fourth floor fiber cement cladding is deficient.

  b. The weather-resistive barrier installed behind the fiber cement cladding uses improper flashing tape and flashing details at the terminations.

  c. The fourth floor windows were improperly installed and poorly sealed. The fifth floor window flashing is deficient.

  d. Deficient or missing insulation and non-conforming soffit construction was identified in the fourth floor at the wall interface, increasing air infiltration and poor thermal performance.

  e. Missing moisture barrier at the fourth floor soffit.

  f. Discontinuity of the moisture barrier behind the fifth floor metal column covers allows water penetration.

  g. Roof expansion joints are discontinuous at the fourth floor and fifth floor roof edge, which do not accommodate anticipated movement and expose the roof components to damage and water infiltration.

  h. Failure along the fifth floor roof gravel stop.

  i. Multiple leaks in the fourth floor patient room ceilings, resulting in mold and other evidence of water-related deterioration of interior building components.

  j. Fourth floor roof bases flashing and termination bars are improperly anchored into Gypsum sheathing and not a structural material.

  k. The as-built gutter attachment at the fourth floor roof is not in compliance with industry standards.

  l. Perimeter fire safeing is missing at the edge of the fifth floor slab.

-11-

39.    Further testing revealed substantial and widespread water infiltration and mold in patient rooms throughout the Health Center.

40.    McDonald's negligent and faulty work also caused damage to the Health Center's Roof. There is roof damage caused by leakage from the PTAC installation in Room 518. Room 518 is immediately above Room 413. There is a flat roof wrapped from Room 413 up to Room 518. When a roofer cut into the flat roof membrane to investigate the damage caused by the leak, not only was the leak from Room 518 identified, but sawdust and other waste construction materials which should have been cleaned out before the membrane was installed were discovered, so that the membrane would not seal to the plywood base. The water underneath the roof from the PTAC leak had frozen and cracked the roof which now needs to be replaced.

41.    Pine Run provided McDonald a full and fair opportunity to inspect and test the Health Center.

42.    McDonald participated in several site inspections of the Health Center with its counsel and experts of its own choosing.

43.    After these inspections, McDonald also was afforded another final opportunity to conduct any further testing before Pine Run began repairs and remediation.

**F.    Damages**

44.    As a result of McDonald's negligent defective installation of the PTAC units and refusal to correct the defects, Pine Run has incurred, and continues to incur, significant damages.

-12-

45. Pine Run estimates that it will cost at least $1.8 million just to repair McDonald's faulty work and to remediate the defective building conditions. Remediating the mold in the patient rooms alone will take more than a year and will result in a considerable disruption to Pine Run's ongoing operations.

46. Pine Run also has incurred, and will continue to incur, substantial testing and inspection-related expenses as a result of McDonald's faulty work.

## IV. CAUSES OF ACTION

### A. Count One – Breach of Contract

47. Pine Run realleges all prior paragraphs of this Demand for Arbitration.

48. Pine Run had a Construction Contract with McDonald under which McDonald agreed to perform renovations of the existing-five story Health Center in accordance with the terms of the Construction contract and in a reasonable and workmanlike manner.

49. Pine Run performed its obligations under the Construction Contract.

50. McDonald was negligent and breached the material terms of the Construction Contract and otherwise is liable for various acts and omissions, including but not limited to, the following:

(a)   Permitting the PTAC units to be constructed and installed in such a manner as to permit leaking and water infiltration into the interior of the Health Center;

(b)   Failing to assure proper construction methods were used;

(c)   Failing to report to Pine Run any alleged errors, inconsistencies or omissions in the Contract Documents;

(d)   Failing to properly supervise and/or inspect work on the project;

(e)     Failing to follow manufacturer guidelines and specifications;

(f)     Failing to correct defects in its and its subcontractors' work on the project, including but not limited to defects causing water infiltration into the Health Center;

(g)     Failing to construct and/or install the PTAC units and other construction components and materials in a reasonably workmanlike manner;

(h)     Constructing or installing the PTAC units and other construction components and materials in a manner that caused and/or permitted them to leak;

(i)     Failing to carefully study and compare contract documents and product installation instructions to facilitate coordination and proper construction;

(j)     Failing to inspect all portions of the work associated with the installation of the PTAC units and other construction components and materials to determine that such portions are in proper condition to receive subsequent work;

(k)     Making changes or substitutions to the manufacturer's recommendations and guidelines without the consent of Pine Run or the Architect;

(l)     Failing to file a request for information to address any concerns or issues with regard to the installation of the PTAC units and other construction components and materials;

(m)     Failing to engage in proper cutting, fitting and patching required to complete proper installation of the PTAC units and other construction components and materials to make them water-tight.

(n)     Failing to correct known deficiencies in its work; and

(o)     Failing to pay for the costs of correcting its work, including the cost of testing and inspections, cost of uncovering and replacement and expenses made necessary by its faulty and negligent workmanship.

51.   Pine Run has sustained damages in excess of $1.8 million exclusive of interest, costs and attorneys' fees as a result of McDonald's breach of the Construction Contract.

**B.    Count Two – Breach of Implied Warranties**

52.   Pine Run realleges all prior paragraphs of this Demand for Arbitration.

53.   Implicit in the Construction Contract between Pine Run and McDonald is that McDonald would perform its construction work in a reasonably workmanlike manner.

54.   In undertaking to construct and renovate Pine Run's Health Center, McDonald impliedly warranted: (a) that it would install and/or construct the building materials, construction components, and renovations in accordance with the standard of care expected of those who hold themselves out to the public as qualified to engage in this type of construction; (b) that it would install and/or construct the building materials, construction components, and renovations properly the first time; and (c) that the cost to Pine Run and expenses incurred by it would not include amounts required to be paid by reason of McDonald's failure in the first instance to construct and/or install the foregoing items in accordance with the standard of care expected of those who hold themselves out to the public as qualified to perform this type of construction.

55.   As a direct and proximate result of McDonald's conduct, Pine Run has sustained damages in excess of $1.8 million exclusive of interest, costs and attorneys' fees.

**C.**   **Count Three – Breach of Express Warranties**

56.   Pine Run realleges all prior paragraphs of this Demand for Arbitration.

57.   Under the terms of the Construction Contract, McDonald warranted as

follows:

> **§ 3.5 WARRANTY**
>
> The Contractor warrants to the Owner and Architect that
> materials and equipment furnished under the Contract will be of
> good quality and new unless the Contract Documents require or
> permit otherwise. The Contractor further warrants that the Work
> will conform to the requirements of the Contract Documents and
> will be free from defects, except for those inherent in the quality
> of the Work the Contract Documents require or permit. Work,
> materials, or equipment not conforming to these requirements
> may be considered defective.

(See AIA Document A201-2007 at § 3.5; Exhibit A).

58.   The Construction Contract also provides:

> **§ 3.3.1** The Contractor shall supervise and direct the Work, using
> the Contractor's best skill and attention. The Contractor shall be
> solely responsible for, and have control over, construction means,
> methods, techniques, sequences and procedures and for
> coordinating all portions of the Work under the Contract, unless
> the Contract Documents give other specific instructions
> concerning these matters.

59.   Under the terms of the Construction Contract, McDonald expressly

warranted to Pine Run that the work performed would be free of defects and would be

conducted in a workmanlike manner.

60.   McDonald also expressly warranted that it would comply with the terms

and specifications of the Construction Contract in performing its work and expressly

warranted that it would use the quality of materials required by the Construction

Contract.

61.    McDonald breached its express warranties under the Construction Contract by: (a) failing to perform its work in accordance with the requirements and specifications of the Construction Contract; (b) failing to perform its work "free from defects not inherent in the quality required or permitted;" (c) failing to use the quality and type of material required under the terms and specifications of the Construction Contract; and (d) failing to properly supervise and direct the work, using its best skill and attention.

62.    Pine Run has sustained damages in excess of $1.8 million exclusive of interest, costs and attorneys' fees.

## VI.    **RELIEF REQUESTED**

Pine Run respectfully requests an award in its favor for damages as set forth herein and established at a hearing in this matter, plus costs and expenses as provided by law and any such other relief as the nature of the case may require or as may be determined to be just, equitable or proper by the Panel, including counsel fees as permitted by law and/or the rules of this arbitral forum.

THE TOTH FIRM LLC

BY:   /s/ Kevin Toth
      KEVIN TOTH, ESQUIRE
      1219 Spruce Street
      Philadelphia, PA 19107
      Phone: (215) 990-1196
      Facsimile: (215) 695-5543
      E-mail: Kevin@TothFirm.com

BY:   /s/ Michael Blazick
      MICHAEL BLAZICK, ESQUIRE
      1219 Spruce Street
      Philadelphia, PA 19107
      Phone: (570) 706-5215
      Facsimile: (215) 695-5543
      E-mail: mike@tothfirm.com

# EXHIBIT A

# ▓AIA® Document A133™ – 2009

## Standard Form of Agreement Between Owner and Construction Manager as Constructor where the basis of payment is the Cost of the Work Plus a Fee with a Guaranteed Maximum Price

**AGREEMENT** made as of the Twenty Eighth day of June in the year Two Thousand and Thirteen
*(In words, indicate day, month and year.)*

**BETWEEN** the Owner:
*(Name, legal status and address)*

Pine Run Retirement Community dba Doylestown Hospital
777 Ferry Road
Doylestown, PA 18901

and the Construction Manager:
*(Name, legal status and address)*

McDonald Building Company LLC
470 Norristown Road
Suite 380
Blue Bell, PA 19422

for the following Project:
*(Name and address or location)*

Pine Run Retirement Community
777 Ferry Road
Doylestown, PA 18901

The project includes the renovation of the existing five story Health Center.

The Architect:
*(Name, legal status and address)*

Kramer + Marks Architects
156 S. Bethlehem Pike
Ambler, PA 19002

The Owner's Designated Representative:
*(Name, address and other information)*

Tim Murphy
Senior Director of Plant Operations
Pine Run Retirement Community
777 Ferry Road
Doylestown, PA 18901

The Construction Manager's Designated Representative:

**ADDITIONS AND DELETIONS:**
The author of this document has added information needed for its completion. The author may also have revised the text of the original AIA standard form. An *Additions and Deletions Report* that notes added information as well as revisions to the standard form text is available from the author and should be reviewed. A vertical line in the left margin of this document indicates where the author has added necessary information and where the author has added to or deleted from the original AIA text.

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

AIA Document A201™–2007, General Conditions of the Contract for Construction, is adopted in this document by reference. Do not use with other general conditions unless this document is modified.

**AIA Document A133™ – 2009** (formerly A121™CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. **WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 20:08:37 on 06/28/2013 under Order No.3320282254_1 which expires on 11/01/2013, and is not for resale.
User Notes: (793196658)

Init.

/

1

*(Name, address and other information)*

Paul McDonald
President
McDonald Building Company LLC
470 Norristown Road
Suite 380
Blue Bell, PA 19422

The Architect's Designated Representative:
*(Name, address and other information)*

Jeremy Philo
Kramer + Marks Architects
156 S. Bethlehem Pike
Ambler, PA 19002
Jeremy Philo

The Owner and Construction Manager agree as follows.

AIA Document A133™ – 2009 (formerly A121™CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 20:06:37 on 06/28/2013 under Order No.3320262254_1 which expires on 11/01/2013, and is not for resale.
User Notes:                                                                                                         (793196658)

2

TABLE OF ARTICLES

1    GENERAL PROVISIONS

2    CONSTRUCTION MANAGER'S RESPONSIBILITIES

3    OWNER'S RESPONSIBILITIES

4    COMPENSATION AND PAYMENTS FOR PRECONSTRUCTION PHASE SERVICES

5    COMPENSATION FOR CONSTRUCTION PHASE SERVICES

6    COST OF THE WORK FOR CONSTRUCTION PHASE

7    PAYMENTS FOR CONSTRUCTION PHASE SERVICES

8    INSURANCE AND BONDS

9    DISPUTE RESOLUTION

10   TERMINATION OR SUSPENSION

11   MISCELLANEOUS PROVISIONS

12   SCOPE OF THE AGREEMENT

ARTICLE 1    GENERAL PROVISIONS
§ 1.1 The Contract Documents
The Contract Documents consist of this Agreement, Conditions of the Contract (General, Supplementary and other
Conditions), Drawings, Specifications, Addenda issued prior to the execution of this Agreement, other documents
listed in this Agreement, and Modifications issued after execution of this Agreement, all of which form the Contract
and are as fully a part of the Contract as if attached to this Agreement or repeated herein. Upon the Owner's acceptance
of the Construction Manager's Guaranteed Maximum Price proposal, the Contract Documents will also include the
documents described in Section 2.2.3 and identified in the Guaranteed Maximum Price Amendment and revisions
prepared by the Architect and furnished by the Owner as described in Section 2.2.8. The Contract represents the entire
and integrated agreement between the parties hereto and supersedes prior negotiations, representations or agreements,
either written or oral. If anything in the other Contract Documents, other than a Modification, is inconsistent with this
Agreement, this Agreement shall govern.

§ 1.2 Relationship of the Parties
The Construction Manager accepts the relationship of trust and confidence established by this Agreement and
covenants with the Owner to cooperate with the Architect and exercise the Construction Manager's skill and judgment
in furthering the interests of the Owner; to furnish efficient construction administration, management services and
supervision; to furnish at all times an adequate supply of workers and materials; and to perform the Work in an
expeditious and economical manner consistent with the Owner's interests. The Owner agrees to furnish or approve, in
a timely manner, information required by the Construction Manager and to make payments to the Construction
Manager in accordance with the requirements of the Contract Documents.

§ 1.3 General Conditions
For the Preconstruction Phase, AIA Document A201™–2007, General Conditions of the Contract for Construction,
shall apply only as specifically provided in this Agreement. For the Construction Phase, the general conditions of the
contract shall be as set forth in A201–2007, which document is incorporated herein by reference. The term
"Contractor" as used in A201–2007 shall mean the Construction Manager.

ARTICLE 2    CONSTRUCTION MANAGER'S RESPONSIBILITIES
The Construction Manager's Preconstruction Phase responsibilities are set forth in Sections 2.1 and 2.2. The
Construction Manager's Construction Phase responsibilities are set forth in Section 2.3. The Owner and Construction

AIA Document A133™ – 2009 (formerly A121™CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved.
WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA®
Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.
This document was produced by AIA software at 20:08:37 on 06/28/2013 under Order No.3320262254_1 which expires on 11/01/2013, and is not for resale.
User Notes:                                                                                                    (793195658)

Manager may agree, in consultation with the Architect, for the Construction Phase to commence prior to completion of the Preconstruction Phase, in which case, both phases will proceed concurrently. The Construction Manager shall identify a representative authorized to act on behalf of the Construction Manager with respect to the Project.

### § 2.1 Preconstruction Phase
§ 2.1.1 The Construction Manager shall provide a preliminary evaluation of the Owner's program, schedule and construction budget requirements, each in terms of the other.

### § 2.1.2 Consultation
The Construction Manager shall schedule and conduct meetings with the Architect and Owner to discuss such matters as procedures, progress, coordination, and scheduling of the Work. The Construction Manager shall advise the Owner and the Architect on proposed site use and improvements, selection of materials, and building systems and equipment. The Construction Manager shall also provide recommendations consistent with the Project requirements to the Owner and Architect on constructability; availability of materials and labor; time requirements for procurement, installation and construction; and factors related to construction cost including, but not limited to, costs of alternative designs or materials, preliminary budgets, life-cycle data, and possible cost reductions.

§ 2.1.3 When Project requirements in Section 3.1.1 have been sufficiently identified, the Construction Manager shall prepare and periodically update a Project schedule for the Architect's review and the Owner's acceptance. The Construction Manager shall obtain the Architect's approval for the portion of the Project schedule relating to the performance of the Architect's services. The Project schedule shall coordinate and integrate the Construction Manager's services, the Architect's services, other Owner consultants' services, and the Owner's responsibilities and identify items that could affect the Project's timely completion. The updated Project schedule shall include the following: submission of the Guaranteed Maximum Price proposal; components of the Work; times of commencement and completion required of each Subcontractor; ordering and delivery of products, including those that must be ordered well in advance of construction; and the occupancy requirements of the Owner.

### § 2.1.4 Phased Construction
The Construction Manager shall provide recommendations with regard to accelerated or fast-track scheduling, procurement, or phased construction. The Construction Manager shall take into consideration cost reductions, cost information, constructability, provisions for temporary facilities and procurement and construction scheduling issues.

### § 2.1.5 Preliminary Cost Estimates
§ 2.1.5.1 Based on the preliminary design and other design criteria prepared by the Architect, the Construction Manager shall prepare preliminary estimates of the Cost of the Work or the cost of program requirements using area, volume or similar conceptual estimating techniques for the Architect's review and Owner's approval. If the Architect or Construction Manager suggests alternative materials and systems, the Construction Manager shall provide cost evaluations of those alternative materials and systems.

§ 2.1.5.2 As the Architect progresses with the preparation of the Schematic Design, Design Development and Construction Documents, the Construction Manager shall prepare and update, at appropriate intervals agreed to by the Owner, Construction Manager and Architect, estimates of the Cost of the Work of increasing detail and refinement and allowing for the further development of the design until such time as the Owner and Construction Manager agree on a Guaranteed Maximum Price for the Work. Such estimates shall be provided for the Architect's review and the Owner's approval. The Construction Manager shall inform the Owner and Architect when estimates of the Cost of the Work exceed the latest approved Project budget and make recommendations for corrective action.

### § 2.1.6 Subcontractors and Suppliers
The Construction Manager shall develop bidders' interest in the Project.

§ 2.1.7 The Construction Manager shall prepare, for the Architect's review and the Owner's acceptance, a procurement schedule for items that must be ordered well in advance of construction. The Construction Manager shall expedite and coordinate the ordering and delivery of materials that must be ordered well in advance of construction. If the Owner agrees to procure any items prior to the establishment of the Guaranteed Maximum Price, the Owner shall procure the items on terms and conditions acceptable to the Construction Manager. Upon the establishment of the Guaranteed Maximum Price, the Owner shall assign all contracts for these items to the Construction Manager and the Construction Manager shall thereafter accept responsibility for them.

AIA Document A133™ – 2009 (formerly A121™CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 20:06:37 on 06/28/2013 under Order No.3320262254_1 which expires on 11/01/2013, and is not for resale. User Notes:                                                                                                                                          (793196658)

### § 2.1.8 Extent of Responsibility
The Construction Manager shall exercise reasonable care in preparing schedules and estimates. The Construction Manager, however, does not warrant or guarantee estimates and schedules except as may be included as part of the Guaranteed Maximum Price. The Construction Manager is not required to ascertain that the Drawings and Specifications are in accordance with applicable laws, statutes, ordinances, codes, rules and regulations, or lawful orders of public authorities, but the Construction Manager shall promptly report to the Architect and Owner any nonconformity discovered by or made known to the Construction Manager as a request for information in such form as the Architect may require.

### § 2.1.9 Notices and Compliance with Laws
The Construction Manager shall comply with applicable laws, statutes, ordinances, codes, rules and regulations, and lawful orders of public authorities applicable to its performance under this Contract, and with equal employment opportunity programs, and other programs as may be required by governmental and quasi governmental authorities for inclusion in the Contract Documents.

### § 2.2 Guaranteed Maximum Price Proposal and Contract Time
§ 2.2.1 At a time to be mutually agreed upon by the Owner and the Construction Manager and in consultation with the Architect, the Construction Manager shall prepare a Guaranteed Maximum Price proposal for the Owner's review and acceptance. The Guaranteed Maximum Price in the proposal shall be the sum of the Construction Manager's estimate of the Cost of the Work, including contingencies described in Section 2.2.4, and the Construction Manager's Fee.

§ 2.2.2 To the extent that the Drawings and Specifications are anticipated to require further development by the Architect, the Construction Manager shall provide in the Guaranteed Maximum Price for such further development consistent with the Contract Documents and reasonably inferable therefrom. Such further development does not include such things as changes in scope, systems, kinds and quality of materials, finishes or equipment, all of which, if required, shall be incorporated by Change Order.

§ 2.2.3 The Construction Manager shall include with the Guaranteed Maximum Price proposal a written statement of its basis, which shall include the following:

   .1   A list of the Drawings and Specifications, including all Addenda thereto, and the Conditions of the Contract;

   .2   A list of the clarifications and assumptions made by the Construction Manager in the preparation of the Guaranteed Maximum Price proposal, including assumptions under Section 2.2.2, to supplement the information provided by the Owner and contained in the Drawings and Specifications;

   .3   A statement of the proposed Guaranteed Maximum Price, including a statement of the estimated Cost of the Work organized by trade categories or systems, allowances, contingency, and the Construction Manager's Fee;

   .4   The anticipated date of Substantial Completion upon which the proposed Guaranteed Maximum Price is based; and

   .5   A date by which the Owner must accept the Guaranteed Maximum Price.

§ 2.2.4 In preparing the Construction Manager's Guaranteed Maximum Price proposal, the Construction Manager shall include its contingency for the Construction Manager's exclusive use to cover those costs considered reimbursable as the Cost of the Work but not included in a Change Order.

§ 2.2.5 The Construction Manager shall meet with the Owner and Architect to review the Guaranteed Maximum Price proposal. In the event that the Owner and Architect discover any inconsistencies or inaccuracies in the information presented, they shall promptly notify the Construction Manager, who shall make appropriate adjustments to the Guaranteed Maximum Price proposal, its basis, or both.

§ 2.2.6 If the Owner notifies the Construction Manager that the Owner has accepted the Guaranteed Maximum Price proposal in writing before the date specified in the Guaranteed Maximum Price proposal, the Guaranteed Maximum Price proposal shall be deemed effective without further acceptance from the Construction Manager. Following acceptance of a Guaranteed Maximum Price, the Owner and Construction Manager shall execute the Guaranteed Maximum Price Amendment amending this Agreement, a copy of which the Owner shall provide to the Architect. The

AIA Document A133™ – 2009 (formerly A121™CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 20:08:37 on 06/28/2013 under Order No.3320262254_1 which expires on 11/01/2013, and is not for resale. User Notes:                                                                                                                    (793196658)

Guaranteed Maximum Price Amendment shall set forth the agreed upon Guaranteed Maximum Price with the information and assumptions upon which it is based.

§ 2.2.7 The Construction Manager shall not incur any cost to be reimbursed as part of the Cost of the Work prior to the commencement of the Construction Phase, unless the Owner provides prior written authorization for such costs.

§ 2.2.8 The Owner shall authorize the Architect to provide the revisions to the Drawings and Specifications to incorporate the agreed-upon assumptions and clarifications contained in the Guaranteed Maximum Price Amendment. The Owner shall promptly furnish those revised Drawings and Specifications to the Construction Manager as they are revised. The Construction Manager shall notify the Owner and Architect of any inconsistencies between the Guaranteed Maximum Price Amendment and the revised Drawings and Specifications.

§ 2.2.9 The Construction Manager shall include in the Guaranteed Maximum Price all sales, consumer, use and similar taxes for the Work provided by the Construction Manager that are legally enacted, whether or not yet effective, at the time the Guaranteed Maximum Price Amendment is executed.

§ 2.3 Construction Phase
§ 2.3.1 General
§ 2.3.1.1 For purposes of Section 8.1.2 of A201–2007, the date of commencement of the Work shall mean the date of commencement of the Construction Phase.

§ 2.3.1.2 The Construction Phase shall commence upon the Owner's acceptance of the Construction Manager's Guaranteed Maximum Price proposal or the Owner's issuance of a Notice to Proceed, whichever occurs earlier.

§ 2.3.2 Administration
§ 2.3.2.1 Those portions of the Work that the Construction Manager does not customarily perform with the Construction Manager's own personnel shall be performed under subcontracts or by other appropriate agreements with the Construction Manager. The Owner may designate specific persons from whom, or entities from which, the Construction Manager shall obtain bids. The Construction Manager shall obtain bids from Subcontractors and from suppliers of materials or equipment fabricated especially for the Work and shall deliver such bids to the Architect. The Owner shall then determine, with the advice of the Construction Manager and the Architect, which bids will be accepted. The Construction Manager shall not be required to contract with anyone to whom the Construction Manager has reasonable objection.

§ 2.3.2.2 If the Guaranteed Maximum Price has been established and when a specific bidder (1) is recommended to the Owner by the Construction Manager, (2) is qualified to perform that portion of the Work, and (3) has submitted a bid that conforms to the requirements of the Contract Documents without reservations or exceptions, but the Owner requires that another bid be accepted, then the Construction Manager may require that a Change Order be issued to adjust the Contract Time and the Guaranteed Maximum Price by the difference between the bid of the person or entity recommended to the Owner by the Construction Manager and the amount and time requirement of the subcontract or other agreement actually signed with the person or entity designated by the Owner.

§ 2.3.2.3 Subcontracts or other agreements shall conform to the applicable payment provisions of this Agreement, and shall not be awarded on the basis of cost plus a fee without the prior consent of the Owner. If the Subcontract is awarded on a cost-plus a fee basis, the Construction Manager shall provide in the Subcontract for the Owner to receive the same audit rights with regard to the Subcontractor as the Owner receives with regard to the Construction Manager in Section 6.11 below.

§ 2.3.2.4 If the Construction Manager recommends a specific bidder that may be considered a "related party" according to Section 6.10, then the Construction Manager shall promptly notify the Owner in writing of such relationship and notify the Owner of the specific nature of the contemplated transaction, according to Section 6.10.2.

§ 2.3.2.5 The Construction Manager shall schedule and conduct meetings to discuss such matters as procedures, progress, coordination, scheduling, and status of the Work. The Construction Manager shall prepare and promptly distribute minutes to the Owner and Architect.

AIA Document A133™ – 2009 (formerly A121™CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 20:08:37 on 06/28/2013 under Order No.3320262254_1 which expires on 11/01/2013, and is not for resale.
User Notes:                                                                                                    (783196658)

**§ 2.3.2.6** Upon the execution of the Guaranteed Maximum Price Amendment, the Construction Manager shall prepare and submit to the Owner and Architect a construction schedule for the Work and submittal schedule in accordance with Section 3.10 of A201–2007.

**§ 2.3.2.7** The Construction Manager shall record the progress of the Project. On a monthly basis, or otherwise as agreed to by the Owner, the Construction Manager shall submit written progress reports to the Owner and Architect, showing percentages of completion and other information required by the Owner. The Construction Manager shall also keep, and make available to the Owner and Architect, a daily log containing a record for each day of weather, portions of the Work in progress, number of workers on site, identification of equipment on site, problems that might affect progress of the work, accidents, injuries, and other information required by the Owner.

**§ 2.3.2.8** The Construction Manager shall develop a system of cost control for the Work, including regular monitoring of actual costs for activities in progress and estimates for uncompleted tasks and proposed changes. The Construction Manager shall identify variances between actual and estimated costs and report the variances to the Owner and Architect and shall provide this information in its monthly reports to the Owner and Architect, in accordance with Section 2.3.2.7 above.

**§ 2.4 Professional Services**
Section 3.12.10 of A201–2007 shall apply to both the Preconstruction and Construction Phases.

**§ 2.5 Hazardous Materials**
Section 10.3 of A201–2007 shall apply to both the Preconstruction and Construction Phases.

**ARTICLE 3   OWNER'S RESPONSIBILITIES**
**§ 3.1 Information and Services Required of the Owner**
**§ 3.1.1** The Owner shall provide information with reasonable promptness, regarding requirements for and limitations on the Project, including a written program which shall set forth the Owner's objectives, constraints, and criteria, including schedule, space requirements and relationships, flexibility and expandability, special equipment, systems sustainability and site requirements.

**§ 3.1.2** Prior to the execution of the Guaranteed Maximum Price Amendment, the Construction Manager may request in writing that the Owner provide reasonable evidence that the Owner has made financial arrangements to fulfill the Owner's obligations under the Contract. Thereafter, the Construction Manager may only request such evidence if (1) the Owner fails to make payments to the Construction Manager as the Contract Documents require, (2) a change in the Work materially changes the Contract Sum, or (3) the Construction Manager identifies in writing a reasonable concern regarding the Owner's ability to make payment when due. The Owner shall furnish such evidence as a condition precedent to commencement or continuation of the Work or the portion of the Work affected by a material change. After the Owner furnishes the evidence, the Owner shall not materially vary such financial arrangements without prior notice to the Construction Manager and Architect.

**§ 3.1.3** The Owner shall establish and periodically update the Owner's budget for the Project, including (1) the budget for the Cost of the Work as defined in Section 6.1.1, (2) the Owner's other costs, and (3) reasonable contingencies related to all of these costs. If the Owner significantly increases or decreases the Owner's budget for the Cost of the Work, the Owner shall notify the Construction Manager and Architect. The Owner and the Architect, in consultation with the Construction Manager, shall thereafter agree to a corresponding change in the Project's scope and quality.

**§ 3.1.4 Structural and Environmental Tests, Surveys and Reports.** During the Preconstruction Phase, the Owner shall furnish the following information or services with reasonable promptness. The Owner shall also furnish any other information or services under the Owner's control and relevant to the Construction Manager's performance of the Work with reasonable promptness after receiving the Construction Manager's written request for such information or services. The Construction Manager shall be entitled to rely on the accuracy of information and services furnished by the Owner but shall exercise proper precautions relating to the safe performance of the Work.

**§ 3.1.4.1** The Owner shall furnish tests, inspections and reports required by law and as otherwise agreed to by the parties, such as structural, mechanical, and chemical tests, tests for air and water pollution, and tests for hazardous materials.

Init.

/

AIA Document A133™ – 2009 (formerly A121™CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. **WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 20:06:37 on 06/28/2013 under Order No.3320262254_1 which expires on 11/01/2013, and is not for resale.
User Notes: (793196658)

7

**§ 3.1.4.2** The Owner shall furnish surveys describing physical characteristics, legal limitations and utility locations for the site of the Project, and a legal description of the site. The surveys and legal information shall include, as applicable, grades and lines of streets, alleys, pavements and adjoining property and structures; designated wetlands; adjacent drainage; rights-of-way, restrictions, easements, encroachments, zoning, deed restrictions, boundaries and contours of the site; locations, dimensions and necessary data with respect to existing buildings, other improvements and trees; and information concerning available utility services and lines, both public and private, above and below grade, including inverts and depths. All the information on the survey shall be referenced to a Project benchmark.

**§ 3.1.4.3** The Owner, when such services are requested, shall furnish services of geotechnical engineers, which may include but are not limited to test borings, test pits, determinations of soil bearing values, percolation tests, evaluations of hazardous materials, seismic evaluation, ground corrosion tests and resistivity tests, including necessary operations for anticipating subsoil conditions, with written reports and appropriate recommendations.

**§ 3.1.4.4** During the Construction Phase, the Owner shall furnish information or services required of the Owner by the Contract Documents with reasonable promptness. The Owner shall also furnish any other information or services under the Owner's control and relevant to the Construction Manager's performance of the Work with reasonable promptness after receiving the Construction Manager's written request for such information or services.

**§ 3.2 Owner's Designated Representative**
The Owner shall identify a representative authorized to act on behalf of the Owner with respect to the Project. The Owner's representative shall render decisions promptly and furnish information expeditiously, so as to avoid unreasonable delay in the services or Work of the Construction Manager. Except as otherwise provided in Section 4.2.1 of A201–2007, the Architect does not have such authority. The term "Owner" means the Owner or the Owner's authorized representative.

**§ 3.2.1 Legal Requirements.** The Owner shall furnish all legal, insurance and accounting services, including auditing services, that may be reasonably necessary at any time for the Project to meet the Owner's needs and interests.

**§ 3.3 Architect**
The Owner shall retain an Architect to provide services, duties and responsibilities as described in AIA Document B103™–2007, Standard Form of Agreement Between Owner and Architect, including any additional services requested by the Construction Manager that are necessary for the Preconstruction and Construction Phase services under this Agreement. The Owner shall provide the Construction Manager a copy of the executed agreement between the Owner and the Architect, and any further modifications to the agreement.

**ARTICLE 4    COMPENSATION AND PAYMENTS FOR PRECONSTRUCTION PHASE SERVICES**
**§ 4.1 Compensation**
**§ 4.1.1** For the Construction Manager's Preconstruction Phase services, the Owner shall compensate the Construction Manager as follows:

**§ 4.1.2** For the Construction Manager's Preconstruction Phase services described in Sections 2.1 and 2.2:
*(Insert amount of, or basis for, compensation and include a list of reimbursable cost items, as applicable.)*

Pre-construction services fee shall be reimbursed under a separate contract.

**§ 4.1.3** If the Preconstruction Phase services covered by this Agreement are not completed by 12/31/2012, through no fault of the Construction Manager, the Construction Manager's compensation for Preconstruction Phase services shall be equitably adjusted.

**§ 4.1.4** Compensation based on Direct Personnel Expense includes the direct salaries of the Construction Manager's personnel providing Preconstruction Phase services on the Project and the Construction Manager's costs for the mandatory and customary contributions and benefits related thereto, such as employment taxes and other statutory employee benefits, insurance, sick leave, holidays, vacations, employee retirement plans and similar contributions.

**§ 4.2 Payments**
**§ 4.2.1** Unless otherwise agreed, payments for services shall be made monthly in proportion to services performed.

AIA Document A133™ – 2009 (formerly A121™CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. **WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 20:08:37 on 06/28/2013 under Order No.3320262254_1 which expires on 11/01/2013, and is not for resale.
User Notes:                                                                                                                          (793196658)

**§ 4.2.2** Payments are due and payable upon presentation of the Construction Manager's invoice. Amounts unpaid   ( 30 ) days after the invoice date shall bear interest at the rate entered below, or in the absence thereof at the legal rate prevailing from time to time at the principal place of business of the Construction Manager.
*(Insert rate of monthly or annual interest agreed upon.)*

Prime plus 1 1/2 %

## ARTICLE 5   COMPENSATION FOR CONSTRUCTION PHASE SERVICES
**§ 5.1** For the Construction Manager's performance of the Work as described in Section 2.3, the Owner shall pay the Construction Manager the Contract Sum in current funds. The Contract Sum is the Cost of the Work as defined in Section 6.1.1 plus the Construction Manager's Fee.

**§ 5.1.1** The Construction Manager's Fee:
*(State a lump sum, percentage of Cost of the Work or other provision for determining the Construction Manager's Fee.)*

4% of the final GMP

**§ 5.1.2** The method of adjustment of the Construction Manager's Fee for changes in the Work:

4% of the cost of the change

**§ 5.1.3** Limitations, if any, on a Subcontractor's overhead and profit for increases in the cost of its portion of the Work:

10% overhead, 5% profit

**§ 5.1.4** Rental rates for Construction Manager-owned equipment shall not exceed  one hundred ten percent percent ( 110% %) of the standard rate paid at the place of the Project.

**§ 5.1.5** Unit prices, if any:
*(Identify and state the unit price; state the quantity limitations, if any, to which the unit price will be applicable.)*

| Item | Units and Limitations | Price per Unit ($0.00) |
|------|----------------------|------------------------|
| N/A  |                      |                        |

**§ 5.2 Guaranteed Maximum Price**
**§ 5.2.1** The Construction Manager guarantees that the Contract Sum shall not exceed the Guaranteed Maximum Price set forth in the Guaranteed Maximum Price Amendment, as it is amended from time to time. To the extent the Cost of the Work exceeds the Guaranteed Maximum Price, the Construction Manager shall bear such costs in excess of the Guaranteed Maximum Price without reimbursement or additional compensation from the Owner.
*(Insert specific provisions if the Construction Manager is to participate in any savings.)*

 To the extent that funds are left over in the Construction Contingency account at the completion of the project, the Owner and Construction Manager shall split the savings as follows:

$0-$100,000: Owner 90%, CM 10%
$100,000 - $200,000: Owner 75%, CM 25%
$200,000+: Owner 50%, CM 50%

**§ 5.2.2** The Guaranteed Maximum Price is subject to additions and deductions by Change Order as provided in the Contract Documents and the Date of Substantial Completion shall be subject to adjustment as provided in the Contract Documents.

**§ 5.3 Changes in the Work**
**§ 5.3.1** The Owner may, without invalidating the Contract, order changes in the Work within the general scope of the Contract consisting of additions, deletions or other revisions. The Owner shall issue such changes in writing. The

AIA Document A133™ – 2009 (formerly A121™CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 20:08:37 on 08/28/2013 under Order No.3320282254_1 which expires on 11/01/2013, and is not for resale. User Notes: (793196658)

Architect may make minor changes in the Work as provided in Section 7.4 of AIA Document A201–2007, General Conditions of the Contract for Construction. The Construction Manager shall be entitled to an equitable adjustment in the Contract Time as a result of changes in the Work.

§ 5.3.2 Adjustments to the Guaranteed Maximum Price on account of changes in the Work subsequent to the execution of the Guaranteed Maximum Price Amendment may be determined by any of the methods listed in Section 7.3.3 of AIA Document A201–2007, General Conditions of the Contract for Construction.

§ 5.3.3 In calculating adjustments to subcontracts (except those awarded with the Owner's prior consent on the basis of cost plus a fee), the terms "cost" and "fee" as used in Section 7.3.3.3 of AIA Document A201–2007 and the term "costs" as used in Section 7.3.7 of AIA Document A201–2007 shall have the meanings assigned to them in AIA Document A201–2007 and shall not be modified by Sections 5.1 and 5.2, Sections 6.1 through 6.7, and Section 6.8 of this Agreement. Adjustments to subcontracts awarded with the Owner's prior consent on the basis of cost plus a fee shall be calculated in accordance with the terms of those subcontracts.

§ 5.3.4 In calculating adjustments to the Guaranteed Maximum Price, the terms "cost" and "costs" as used in the above-referenced provisions of AIA Document A201–2007 shall mean the Cost of the Work as defined in Sections 6.1 to 6.7 of this Agreement and the term "fee" shall mean the Construction Manager's Fee as defined in Section 5.1 of this Agreement.

§ 5.3.5 If no specific provision is made in Section 5.1.2 for adjustment of the Construction Manager's Fee in the case of changes in the Work, or if the extent of such changes is such, in the aggregate, that application of the adjustment provisions of Section 5.1.2 will cause substantial inequity to the Owner or Construction Manager, the Construction Manager's Fee shall be equitably adjusted on the same basis that was used to establish the Fee for the original Work, and the Guaranteed Maximum Price shall be adjusted accordingly.

## ARTICLE 6   COST OF THE WORK FOR CONSTRUCTION PHASE
### § 6.1 Costs to Be Reimbursed
§ 6.1.1 The term Cost of the Work shall mean costs necessarily incurred by the Construction Manager in the proper performance of the Work. Such costs shall be at rates not higher than the standard paid at the place of the Project except with prior consent of the Owner. The Cost of the Work shall include only the items set forth in Sections 6.1 through 6.7.

§ 6.1.2 Where any cost is subject to the Owner's prior approval, the Construction Manager shall obtain this approval prior to incurring the cost. The parties shall endeavor to identify any such costs prior to executing Guaranteed Maximum Price Amendment.

### § 6.2 Labor Costs
§ 6.2.1 Wages of construction workers directly employed by the Construction Manager to perform the construction of the Work at the site or, with the Owner's prior approval, at off-site workshops.

§ 6.2.2 Wages or salaries of the Construction Manager's supervisory and administrative personnel when stationed at the site with the Owner's prior approval.
(If it is intended that the wages or salaries of certain personnel stationed at the Construction Manager's principal or other offices shall be included in the Cost of the Work, identify in Section 11.5, the personnel to be included, whether for all or only part of their time, and the rates at which their time will be charged to the Work.)

§ 6.2.3 Wages and salaries of the Construction Manager's supervisory or administrative personnel engaged at factories, workshops or on the road, in expediting the production or transportation of materials or equipment required for the Work, but only for that portion of their time required for the Work.

§ 6.2.4 Costs paid or incurred by the Construction Manager for taxes, insurance, contributions, assessments and benefits required by law or collective bargaining agreements and, for personnel not covered by such agreements, customary benefits such as sick leave, medical and health benefits, holidays, vacations and pensions, provided such costs are based on wages and salaries included in the Cost of the Work under Sections 6.2.1 through 6.2.3.

Init.

/

AIA Document A133™ – 2009 (formerly A121™CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 20:08:37 on 06/28/2013 under Order No.3320262254_1 which expires on 11/01/2013, and is not for resale.
User Notes:                                                                                                                                                   (793196658)

**§ 6.2.5** Bonuses, profit sharing, incentive compensation and any other discretionary payments paid to anyone hired by the Construction Manager or paid to any Subcontractor or vendor, with the Owner's prior approval.

**§ 6.3 Subcontract Costs**
Payments made by the Construction Manager to Subcontractors in accordance with the requirements of the subcontracts.

**§ 6.4 Costs of Materials and Equipment Incorporated in the Completed Construction**
**§ 6.4.1** Costs, including transportation and storage, of materials and equipment incorporated or to be incorporated in the completed construction.

**§ 6.4.2** Costs of materials described in the preceding Section 6.4.1 in excess of those actually installed to allow for reasonable waste and spoilage. Unused excess materials, if any, shall become the Owner's property at the completion of the Work or, at the Owner's option, shall be sold by the Construction Manager. Any amounts realized from such sales shall be credited to the Owner as a deduction from the Cost of the Work.

**§ 6.5 Costs of Other Materials and Equipment, Temporary Facilities and Related Items**
**§ 6.5.1** Costs of transportation, storage, installation, maintenance, dismantling and removal of materials, supplies, temporary facilities, machinery, equipment and hand tools not customarily owned by construction workers that are provided by the Construction Manager at the site and fully consumed in the performance of the Work. Costs of materials, supplies, temporary facilities, machinery, equipment and tools that are not fully consumed shall be based on the cost or value of the item at the time it is first used on the Project site less the value of the item when it is no longer used at the Project site. Costs for items not fully consumed by the Construction Manager shall mean fair market value.

**§ 6.5.2** Rental charges for temporary facilities, machinery, equipment and hand tools not customarily owned by construction workers that are provided by the Construction Manager at the site and costs of transportation, installation, minor repairs, dismantling and removal. The total rental cost of any Construction Manager-owned item may not exceed the purchase price of any comparable item. Rates of Construction Manager-owned equipment and quantities of equipment shall be subject to the Owner's prior approval.

**§ 6.5.3** Costs of removal of debris from the site of the Work and its proper and legal disposal.

**§ 6.5.4** Costs of document reproductions, facsimile transmissions and long-distance telephone calls, postage and parcel delivery charges, telephone service at the site and reasonable petty cash expenses of the site office.

**§ 6.5.5** That portion of the reasonable expenses of the Construction Manager's supervisory or administrative personnel incurred while traveling in discharge of duties connected with the Work.

**§ 6.5.6** Costs of materials and equipment suitably stored off the site at a mutually acceptable location, subject to the Owner's prior approval.

**§ 6.6 Miscellaneous Costs**
**§ 6.6.1** Premiums for that portion of insurance and bonds required by the Contract Documents that can be directly attributed to this Contract. Self-insurance for either full or partial amounts of the coverages required by the Contract Documents, with the Owner's prior approval.

**§ 6.6.2** Sales, use or similar taxes imposed by a governmental authority that are related to the Work and for which the Construction Manager is liable.

**§ 6.6.3** Fees and assessments for the building permit and for other permits, licenses and inspections for which the Construction Manager is required by the Contract Documents to pay.

**§ 6.6.4** Fees of laboratories for tests required by the Contract Documents, except those related to defective or nonconforming Work for which reimbursement is excluded by Section 13.5.3 of AIA Document A201–2007 or by other provisions of the Contract Documents, and which do not fall within the scope of Section 6.7.3.

AIA Document A133™ – 2009 (formerly A121™CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 20:08:37 on 06/28/2013 under Order No.3320262254_1 which expires on 11/01/2013, and is not for resale.
User Notes:                                                                                                           (793190658)

§ 6.6.5 Royalties and license fees paid for the use of a particular design, process or product required by the Contract Documents; the cost of defending suits or claims for infringement of patent rights arising from such requirement of the Contract Documents; and payments made in accordance with legal judgments against the Construction Manager resulting from such suits or claims and payments of settlements made with the Owner's consent. However, such costs of legal defenses, judgments and settlements shall not be included in the calculation of the Construction Manager's Fee or subject to the Guaranteed Maximum Price. If such royalties, fees and costs are excluded by the last sentence of Section 3.17 of AIA Document A201–2007 or other provisions of the Contract Documents, then they shall not be included in the Cost of the Work.

§ 6.6.6 Costs for electronic equipment and software, directly related to the Work with the Owner's prior approval.

§ 6.6.7 Deposits lost for causes other than the Construction Manager's negligence or failure to fulfill a specific responsibility in the Contract Documents.

§ 6.6.8 Legal, mediation and arbitration costs, including attorneys' fees, other than those arising from disputes between the Owner and Construction Manager, reasonably incurred by the Construction Manager after the execution of this Agreement in the performance of the Work and with the Owner's prior approval, which shall not be unreasonably withheld.

§ 6.6.9 Subject to the Owner's prior approval, expenses incurred in accordance with the Construction Manager's standard written personnel policy for relocation and temporary living allowances of the Construction Manager's personnel required for the Work.

§ 6.7 Other Costs and Emergencies
§ 6.7.1 Other costs incurred in the performance of the Work if, and to the extent, approved in advance in writing by the Owner.

§ 6.7.2 Costs incurred in taking action to prevent threatened damage, injury or loss in case of an emergency affecting the safety of persons and property, as provided in Section 10.4 of AIA Document A201–2007.

§ 6.7.3 Costs of repairing or correcting damaged or nonconforming Work executed by the Construction Manager, Subcontractors or suppliers, provided that such damaged or nonconforming Work was not caused by negligence or failure to fulfill a specific responsibility of the Construction Manager and only to the extent that the cost of repair or correction is not recovered by the Construction Manager from insurance, sureties, Subcontractors, suppliers, or others.

§ 6.7.4 The costs described in Sections 6.1 through 6.7 shall be included in the Cost of the Work, notwithstanding any provision of AIA Document A201–2007 or other Conditions of the Contract which may require the Construction Manager to pay such costs, unless such costs are excluded by the provisions of Section 6.8.

§ 6.8 Costs Not To Be Reimbursed
§ 6.8.1 The Cost of the Work shall not include the items listed below:

.1  Salaries and other compensation of the Construction Manager's personnel stationed at the Construction Manager's principal office or offices other than the site office, except as specifically provided in Section 6.2, or as may be provided in Article 11;

.2  Expenses of the Construction Manager's principal office and offices other than the site office;

.3  Overhead and general expenses, except as may be expressly included in Sections 6.1 to 6.7;

.4  The Construction Manager's capital expenses, including interest on the Construction Manager's capital employed for the Work;

.5  Except as provided in Section 6.7.3 of this Agreement, costs due to the negligence or failure of the Construction Manager, Subcontractors and suppliers or anyone directly or indirectly employed by any of them or for whose acts any of them may be liable to fulfill a specific responsibility of the Contract;

.6  Any cost not specifically and expressly described in Sections 6.1 to 6.7;

.7  Costs, other than costs included in Change Orders approved by the Owner, that would cause the Guaranteed Maximum Price to be exceeded; and

.8  Costs for services incurred during the Preconstruction Phase.

Init.

/

AIA Document A133™ – 2009 (formerly A121™CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 20:08:37 on 05/28/2013 under Order No.3320262254_1 which expires on 11/01/2013, and is not for resale.
User Notes:                                                                                                              (793196658)

12

## § 6.9 Discounts, Rebates and Refunds
§ 6.9.1 Cash discounts obtained on payments made by the Construction Manager shall accrue to the Owner if (1) before making the payment, the Construction Manager included them in an Application for Payment and received payment from the Owner, or (2) the Owner has deposited funds with the Construction Manager with which to make payments; otherwise, cash discounts shall accrue to the Construction Manager. Trade discounts, rebates, refunds and amounts received from sales of surplus materials and equipment shall accrue to the Owner, and the Construction Manager shall make provisions so that they can be obtained.

§ 6.9.2 Amounts that accrue to the Owner in accordance with the provisions of Section 6.9.1 shall be credited to the Owner as a deduction from the Cost of the Work.

## § 6.10 Related Party Transactions
§ 6.10.1 For purposes of Section 6.10, the term "related party" shall mean a parent, subsidiary, affiliate or other entity having common ownership or management with the Construction Manager; any entity in which any stockholder in, or management employee of, the Construction Manager owns any interest in excess of ten percent in the aggregate; or any person or entity which has the right to control the business or affairs of the Construction Manager. The term "related party" includes any member of the immediate family of any person identified above.

§ 6.10.2 If any of the costs to be reimbursed arise from a transaction between the Construction Manager and a related party, the Construction Manager shall notify the Owner of the specific nature of the contemplated transaction, including the identity of the related party and the anticipated cost to be incurred, before any such transaction is consummated or cost incurred. If the Owner, after such notification, authorizes the proposed transaction, then the cost incurred shall be included as a cost to be reimbursed, and the Construction Manager shall procure the Work, equipment, goods or service from the related party, as a Subcontractor, according to the terms of Sections 2.3.2.1, 2.3.2.2 and 2.3.2.3. If the Owner fails to authorize the transaction, the Construction Manager shall procure the Work, equipment, goods or service from some person or entity other than a related party according to the terms of Sections 2.3.2.1, 2.3.2.2 and 2.3.2.3.

## § 6.11 Accounting Records
The Construction Manager shall keep full and detailed records and accounts related to the cost of the Work and exercise such controls as may be necessary for proper financial management under this Contract and to substantiate all costs incurred. The accounting and control systems shall be satisfactory to the Owner. The Owner and the Owner's auditors shall, during regular business hours and upon reasonable notice, be afforded access to, and shall be permitted to audit and copy, the Construction Manager's records and accounts, including complete documentation supporting accounting entries, books, correspondence, instructions, drawings, receipts, subcontracts, Subcontractor's proposals, purchase orders, vouchers, memoranda and other data relating to this Contract. The Construction Manager shall preserve these records for a period of three years after final payment, or for such longer period as may be required by law.

## ARTICLE 7   PAYMENTS FOR CONSTRUCTION PHASE SERVICES
### § 7.1 Progress Payments
§ 7.1.1 Based upon Applications for Payment submitted to the Architect by the Construction Manager and Certificates for Payment issued by the Architect, the Owner shall make progress payments on account of the Contract Sum to the Construction Manager as provided below and elsewhere in the Contract Documents.

§ 7.1.2 The period covered by each Application for Payment shall be one calendar month ending on the last day of the month, or as follows:

§ 7.1.3 Provided that an Application for Payment is received by the Architect not later than the last day of a month, the Owner shall make payment of the certified amount to the Construction Manager not later than the last day of the following month. If an Application for Payment is received by the Architect after the application date fixed above, payment shall be made by the Owner not later than thirty ( 30 ) days after the Architect receives the Application for Payment.
*(Federal, state or local laws may require payment within a certain period of time.)*

AIA Document A133™ – 2009 (formerly A121™CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 20:08:37 on 08/26/2013 under Order No.3320262254_1 which expires on 11/01/2013, and is not for resale. User Notes: (793196658)

§ 7.1.4 With each Application for Payment, the Construction Manager shall submit payrolls, petty cash accounts, receipted invoices or invoices with check vouchers attached, and any other evidence required by the Owner or Architect to demonstrate that cash disbursements already made by the Construction Manager on account of the Cost of the Work equal or exceed progress payments already received by the Construction Manager, less that portion of those payments attributable to the Construction Manager's Fee, plus payrolls for the period covered by the present Application for Payment.

§ 7.1.5 Each Application for Payment shall be based on the most recent schedule of values submitted by the Construction Manager in accordance with the Contract Documents. The schedule of values shall allocate the entire Guaranteed Maximum Price among the various portions of the Work, except that the Construction Manager's Fee shall be shown as a single separate item. The schedule of values shall be prepared in such form and supported by such data to substantiate its accuracy as the Architect may require. This schedule, unless objected to by the Architect, shall be used as a basis for reviewing the Construction Manager's Applications for Payment.

§ 7.1.6 Applications for Payment shall show the percentage of completion of each portion of the Work as of the end of the period covered by the Application for Payment. The percentage of completion shall be the lesser of (1) the percentage of that portion of the Work which has actually been completed, or (2) the percentage obtained by dividing (a) the expense that has actually been incurred by the Construction Manager on account of that portion of the Work for which the Construction Manager has made or intends to make actual payment prior to the next Application for Payment by (b) the share of the Guaranteed Maximum Price allocated to that portion of the Work in the schedule of values.

§ 7.1.7 Subject to other provisions of the Contract Documents, the amount of each progress payment shall be computed as follows:

.1 Take that portion of the Guaranteed Maximum Price properly allocable to completed Work as determined by multiplying the percentage of completion of each portion of the Work by the share of the Guaranteed Maximum Price allocated to that portion of the Work in the schedule of values. Pending final determination of cost to the Owner of changes in the Work, amounts not in dispute shall be included as provided in Section 7.3.9 of AIA Document A201–2007;

.2 Add that portion of the Guaranteed Maximum Price properly allocable to materials and equipment delivered and suitably stored at the site for subsequent incorporation in the Work, or if approved in advance by the Owner, suitably stored off the site at a location agreed upon in writing;

.3 Add the Construction Manager's Fee, less retainage of ten percent ( 10 %). The Construction Manager's Fee shall be computed upon the Cost of the Work at the rate stated in Section 5.1 or, if the Construction Manager's Fee is stated as a fixed sum in that Section, shall be an amount that bears the same ratio to that fixed-sum fee as the Cost of the Work bears to a reasonable estimate of the probable Cost of the Work upon its completion;

.4 Subtract retainage of ten percent ( 10 %) from that portion of the Work that the Construction Manager self-performs;

.5 Subtract the aggregate of previous payments made by the Owner;

.6 Subtract the shortfall, if any, indicated by the Construction Manager in the documentation required by Section 7.1.4 to substantiate prior Applications for Payment, or resulting from errors subsequently discovered by the Owner's auditors in such documentation; and

.7 Subtract amounts, if any, for which the Architect has withheld or nullified a Certificate for Payment as provided in Section 9.5 of AIA Document A201–2007.

§ 7.1.8 The Owner and Construction Manager shall agree upon (1) a mutually acceptable procedure for review and approval of payments to Subcontractors and (2) the percentage of retainage held on Subcontracts, and the Construction Manager shall execute subcontracts in accordance with those agreements.

§ 7.1.9 Except with the Owner's prior approval, the Construction Manager shall not make advance payments to suppliers for materials or equipment which have not been delivered and stored at the site.

§ 7.1.10 In taking action on the Construction Manager's Applications for Payment, the Architect shall be entitled to rely on the accuracy and completeness of the information furnished by the Construction Manager and shall not be deemed to represent that the Architect has made a detailed examination, audit or arithmetic verification of the documentation submitted in accordance with Section 7.1.4 or other supporting data; that the Architect has made

AIA Document A133™ – 2009 (formerly A121™CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 20:08:37 on 06/28/2013 under Order No.3320262254_1 which expires on 11/01/2013, and is not for resale.
User Notes:                                                                                                                          (793196668)

exhaustive or continuous on-site inspections; or that the Architect has made examinations to ascertain how or for what purposes the Construction Manager has used amounts previously paid on account of the Contract. Such examinations, audits and verifications, if required by the Owner, will be performed by the Owner's auditors acting in the sole interest of the Owner.

**§ 7.2 Final Payment**
**§ 7.2.1** Final payment, constituting the entire unpaid balance of the Contract Sum, shall be made by the Owner to the Construction Manager when

    .1    the Construction Manager has fully performed the Contract except for the Construction Manager's responsibility to correct Work as provided in Section 12.2.2 of AIA Document A201–2007, and to satisfy other requirements, if any, which extend beyond final payment;

    .2    the Construction Manager has submitted a final accounting for the Cost of the Work and a final Application for Payment; and

    .3    a final Certificate for Payment has been issued by the Architect.

The Owner's final payment to the Construction Manager shall be made no later than 30 days after the issuance of the Architect's final Certificate for Payment, or as follows:

**§ 7.2.2** The Owner's auditors will review and report in writing on the Construction Manager's final accounting within 30 days after delivery of the final accounting to the Architect by the Construction Manager. Based upon such Cost of the Work as the Owner's auditors report to be substantiated by the Construction Manager's final accounting, and provided the other conditions of Section 7.2.1 have been met, the Architect will, within seven days after receipt of the written report of the Owner's auditors, either issue to the Owner a final Certificate for Payment with a copy to the Construction Manager, or notify the Construction Manager and Owner in writing of the Architect's reasons for withholding a certificate as provided in Section 9.5.1 of the AIA Document A201–2007. The time periods stated in this Section supersede those stated in Section 9.4.1 of the AIA Document A201–2007. The Architect is not responsible for verifying the accuracy of the Construction Manager's final accounting.

**§ 7.2.3** If the Owner's auditors report the Cost of the Work as substantiated by the Construction Manager's final accounting to be less than claimed by the Construction Manager, the Construction Manager shall be entitled to request mediation of the disputed amount without seeking an initial decision pursuant to Section 15.2 of A201–2007. A request for mediation shall be made by the Construction Manager within 30 days after the Construction Manager's receipt of a copy of the Architect's final Certificate for Payment. Failure to request mediation within this 30-day period shall result in the substantiated amount reported by the Owner's auditors becoming binding on the Construction Manager. Pending a final resolution of the disputed amount, the Owner shall pay the Construction Manager the amount certified in the Architect's final Certificate for Payment.

**§ 7.2.4** If, subsequent to final payment and at the Owner's request, the Construction Manager incurs costs described in Section 6.1.1 and not excluded by Section 6.8 to correct defective or nonconforming Work, the Owner shall reimburse the Construction Manager such costs and the Construction Manager's Fee applicable thereto on the same basis as if such costs had been incurred prior to final payment, but not in excess of the Guaranteed Maximum Price. If the Construction Manager has participated in savings as provided in Section 5.2.1, the amount of such savings shall be recalculated and appropriate credit given to the Owner in determining the net amount to be paid by the Owner to the Construction Manager.

**ARTICLE 8   INSURANCE AND BONDS**
For all phases of the Project, the Construction Manager and the Owner shall purchase and maintain insurance, and the Construction Manager shall provide bonds as set forth in Article 11 of AIA Document A201–2007.
*(State bonding requirements, if any, and limits of liability for insurance required in Article 11 of AIA Document A201–2007.)*

| Type of Insurance or Bond | Limit of Liability or Bond Amount ($0.00) |
|---|---|
| See attached Exhibit A – Certificate of Insurance | |

AIA Document A133™ – 2009 (formerly A121™CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. **WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 20:08:37 on 08/28/2013 under Order No.3320262254_1 which expires on 11/01/2013, and is not for resale.
User Notes:                                                                                                  (793198658)

### ARTICLE 9   DISPUTE RESOLUTION

§ 9.1 Any Claim between the Owner and Construction Manager shall be resolved in accordance with the provisions set forth in this Article 9 and Article 15 of A201–2007. However, for Claims arising from or relating to the Construction Manager's Preconstruction Phase services, no decision by the Initial Decision Maker shall be required as a condition precedent to mediation or binding dispute resolution, and Section 9.3 of this Agreement shall not apply.

§ 9.2 For any Claim subject to, but not resolved by mediation pursuant to Section 15.3 of AIA Document A201–2007, the method of binding dispute resolution shall be as follows:
*(Check the appropriate box. If the Owner and Construction Manager do not select a method of binding dispute resolution below, or do not subsequently agree in writing to a binding dispute resolution method other than litigation, Claims will be resolved by litigation in a court of competent jurisdiction.)*

    [ X ]    Arbitration pursuant to Section 15.4 of AIA Document A201–2007

    [   ]    Litigation in a court of competent jurisdiction

    [   ]    Other: *(Specify)*

### § 9.3 Initial Decision Maker

The Architect will serve as the Initial Decision Maker pursuant to Section 15.2 of AIA Document A201–2007 for Claims arising from or relating to the Construction Manager's Construction Phase services, unless the parties appoint below another individual, not a party to the Agreement, to serve as the Initial Decision Maker.
*(If the parties mutually agree, insert the name, address and other contact information of the Initial Decision Maker, if other than the Architect.)*

### ARTICLE 10   TERMINATION OR SUSPENSION

§ 10.1 Termination Prior to Establishment of the Guaranteed Maximum Price

§ 10.1.1 Prior to the execution of the Guaranteed Maximum Price Amendment, the Owner may terminate this Agreement upon not less than seven days' written notice to the Construction Manager for the Owner's convenience and without cause, and the Construction Manager may terminate this Agreement, upon not less than seven days' written notice to the Owner, for the reasons set forth in Section 14.1.1 of A201–2007.

§ 10.1.2 In the event of termination of this Agreement pursuant to Section 10.1.1, the Construction Manager shall be equitably compensated for Preconstruction Phase services performed prior to receipt of a notice of termination. In no event shall the Construction Manager's compensation under this Section exceed the compensation set forth in Section 4.1.

§ 10.1.3 If the Owner terminates the Contract pursuant to Section 10.1.1 after the commencement of the Construction Phase but prior to the execution of the Guaranteed Maximum Price Amendment, the Owner shall pay to the Construction Manager an amount calculated as follows, which amount shall be in addition to any compensation paid to the Construction Manager under Section 10.1.2:

    .1    Take the Cost of the Work incurred by the Construction Manager to the date of termination;

    .2    Add the Construction Manager's Fee computed upon the Cost of the Work to the date of termination at the rate stated in Section 5.1 or, if the Construction Manager's Fee is stated as a fixed sum in that Section, an amount that bears the same ratio to that fixed-sum Fee as the Cost of the Work at the time of termination bears to a reasonable estimate of the probable Cost of the Work upon its completion; and

    .3    Subtract the aggregate of previous payments made by the Owner for Construction Phase services.

The Owner shall also pay the Construction Manager fair compensation, either by purchase or rental at the election of the Owner, for any equipment owned by the Construction Manager which the Owner elects to retain and which is not

**Init.**

**/**

AIA Document A133™ – 2009 (formerly A121™CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. **WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 20:08:37 on 06/26/2013 under Order No.3320262254_1 which expires on 11/01/2013, and is not for resale. User Notes: (793196658)

**16**

otherwise included in the Cost of the Work under Section 10.1.3.1. To the extent that the Owner elects to take legal assignment of subcontracts and purchase orders (including rental agreements), the Construction Manager shall, as a condition of receiving the payments referred to in this Article 10, execute and deliver all such papers and take all such steps, including the legal assignment of such subcontracts and other contractual rights of the Construction Manager, as the Owner may require for the purpose of fully vesting in the Owner the rights and benefits of the Construction Manager under such subcontracts or purchase orders. All Subcontracts, purchase orders and rental agreements entered into by the Construction Manager will contain provisions allowing for assignment to the Owner as described above.

If the Owner accepts assignment of subcontracts, purchase orders or rental agreements as described above, the Owner will reimburse or indemnify the Construction Manager for all costs arising under the subcontract, purchase order or rental agreement, if those costs would have been reimbursable as Cost of the Work if the contract had not been terminated. If the Owner chooses not to accept assignment of any subcontract, purchase order or rental agreement that would have constituted a Cost of the Work had this agreement not been terminated, the Construction Manager will terminate the subcontract, purchase order or rental agreement and the Owner will pay the Construction Manager the costs necessarily incurred by the Construction Manager because of such termination.

### § 10.2 Termination Subsequent to Establishing Guaranteed Maximum Price
Following execution of the Guaranteed Maximum Price Amendment and subject to the provisions of Section 10.2.1 and 10.2.2 below, the Contract may be terminated as provided in Article 14 of AIA Document A201–2007.

### § 10.2.1 If the Owner terminates the Contract after execution of the Guaranteed Price Amendment, the amount payable to the Construction Manager pursuant to Sections 14.2 and 14.4 of A201–2007 shall not exceed the amount the Construction Manager would otherwise have received pursuant to Sections 10.1.2 and 10.1.3 of this Agreement.

### § 10.2.2 If the Construction Manager terminates the Contract after execution of the Guaranteed Maximum Price Amendment, the amount payable to the Construction Manager under Section 14.1.3 of A201–2007 shall not exceed the amount the Construction Manager would otherwise have received under Sections 10.1.2 and 10.1.3 above, except that the Construction Manager's Fee shall be calculated as if the Work had been fully completed by the Construction Manager, utilizing as necessary a reasonable estimate of the Cost of the Work for Work not actually completed.

### § 10.3 Suspension
The Work may be suspended by the Owner as provided in Article 14 of AIA Document A201–2007. In such case, the Guaranteed Maximum Price and Contract Time shall be increased as provided in Section 14.3.2 of AIA Document A201–2007, except that the term "profit" shall be understood to mean the Construction Manager's Fee as described in Sections 5.1 and 5.3.5 of this Agreement.

### ARTICLE 11    MISCELLANEOUS PROVISIONS
### § 11.1 Terms in this Agreement shall have the same meaning as those in A201–2007.

### § 11.2 Ownership and Use of Documents
Section 1.5 of A201–2007 shall apply to both the Preconstruction and Construction Phases.

### § 11.3 Governing Law
Section 13.1 of A201–2007 shall apply to both the Preconstruction and Construction Phases.

### § 11.4 Assignment
The Owner and Construction Manager, respectively, bind themselves, their agents, successors, assigns and legal representatives to this Agreement. Neither the Owner nor the Construction Manager shall assign this Agreement without the written consent of the other, except that the Owner may assign this Agreement to a lender providing financing for the Project if the lender agrees to assume the Owner's rights and obligations under this Agreement. Except as provided in Section 13.2.2 of A201–2007, neither party to the Contract shall assign the Contract as a whole without written consent of the other. If either party attempts to make such an assignment without such consent, that party shall nevertheless remain legally responsible for all obligations under the Contract.

### § 11.5 Other provisions:

11.5.1 Upon reaching fifty percent completion of each phase of construction, retainage shall be reduced from ten

AIA Document A133™ – 2009 (formerly A121™CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 20:08:37 on 06/26/2013 under Order No.3320262254_1 which expires on 11/01/2013, and is not for resale.
User Notes:                                                                                                              (793106658)

percent (10%) to five percent (5%). Five percent (5%) retainage shall be held on all subsequent Applications for Payment up to Substantial completion.

## ARTICLE 12   SCOPE OF THE AGREEMENT

§ 12.1 This Agreement represents the entire and integrated agreement between the Owner and the Construction Manager and supersedes all prior negotiations, representations or agreements, either written or oral. This Agreement may be amended only by written instrument signed by both Owner and Construction Manager.

§ 12.2 The following documents comprise the Agreement:

    .1    AIA Document A133–2009, Standard Form of Agreement Between Owner and Construction Manager as Constructor where the basis of payment is the Cost of the Work Plus a Fee with a Guaranteed Maximum Price

    .2    AIA Document A201–2007, General Conditions of the Contract for Construction

    .3    AIA Document E201™–2007, Digital Data Protocol Exhibit, if completed, or the following:

    .4    AIA Document E202™–2008, Building Information Modeling Protocol Exhibit, if completed, or the following:

    .5    Other documents:
        *(List other documents, if any, forming part of the Agreement.)*

This Agreement is entered into as of the day and year first written above.

| | |
|---|---|
| _____ | _____ |
| OWNER *(Signature)* | CONSTRUCTION MANAGER *(Signature)* |
| Tim Murphy, Senior Director of Plant Operations | Paul McDonald, President |
| Pine Run Retirement Community | McDonald Building Company LLC |
| *(Printed name and title)* | *(Printed name and title)* |

AIA Document A133™ – 2009 (formerly A121™CMc – 2003). Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 20:08:37 on 08/28/2013 under Order No.3320262254_1 which expires on 11/01/2013, and is not for resale.
User Notes:

# ⬛$\mathbf{AIA}^{°}$ Document A133™ – 2009 Exhibit A

## *Guaranteed Maximum Price Amendment*

**for the following PROJECT:**
*(Name and address or location)*

Pine Run Retirement Community
Health Center Renovation
777 Ferry Road
Doylestown, PA 18901

**THE OWNER:**
*(Name, legal status and address)*

Pine Run Community dba Doylestown Hospital
777 Ferry Road
Doylestown, PA 18901

**THE CONSTRUCTION MANAGER:**
*(Name, legal status and address)*

McDonald Building Company LLC
470 Norristown Road
Suite 380
Blue Bell, PA 19422

## ARTICLE A.1
### § A.1.1 Guaranteed Maximum Price
Pursuant to Section 2.2.6 of the Agreement, the Owner and Construction Manager hereby amend the Agreement to establish a Guaranteed Maximum Price. As agreed by the Owner and Construction Manager, the Guaranteed Maximum Price is an amount that the Contract Sum shall not exceed. The Contract Sum consists of the Construction Manager's Fee plus the Cost of the Work, as that term is defined in Article 6 of this Agreement.

**§ A.1.1.1** The Contract Sum is guaranteed by the Construction Manager not to exceed Nine Million, One Hundred Fifty-One Thousand, Three Hundred Thirty-Two Dollars ($ 9,151,332.00 ), subject to additions and deductions by Change Order as provided in the Contract Documents.

**§ A.1.1.2 Itemized Statement of the Guaranteed Maximum Price.** Provided below is an itemized statement of the Guaranteed Maximum Price organized by trade categories, allowances, contingencies, alternates, the Construction Manager's Fee, and other items that comprise the Guaranteed Maximum Price.
*(Provide below or reference an attachment.)*
See Exhibit B - Guaranteed Maximum Price Estimate attached

**§ A.1.1.3** The Guaranteed Maximum Price is based on the following alternates, if any, which are described in the Contract Documents and are hereby accepted by the Owner:
*(State the numbers or other identification of accepted alternates. If the Contract Documents permit the Owner to accept other alternates subsequent to the execution of this*

**ADDITIONS AND DELETIONS:**
The author of this document has added information needed for its completion. The author may also have revised the text of the original AIA standard form. An *Additions and Deletions Report* that notes added information as well as revisions to the standard form text is available from the author and should be reviewed. A vertical line in the left margin of this document indicates where the author has added necessary information and where the author has added to or deleted from the original AIA text.

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

AIA Document A201™–2007, General Conditions of the Contract for Construction, is adopted in this document by reference. Do not use with other general conditions unless this document is modified.

Init.

/

AIA Document A133™ – 2009 Exhibit A. Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 12:12:59 on 07/01/2013 under Order No.3320262254_1 which expires on 11/01/2013, and is not for resale.
User Notes:                                                                                                           (2052159601)

1

*Amendment, attach a schedule of such other alternates showing the amount for each and the date when the amount expires.)*

See Exhibit C - Alternates attached

**§ A.1.1.4** Allowances included in the Guaranteed Maximum Price, if any:
*(Identify allowance and state exclusions, if any, from the allowance price.)*

**Item**                                **Price ($0.00)**
See Exhibit D - Allowances attached

**§ A.1.1.5** Assumptions, if any, on which the Guaranteed Maximum Price is based:

See Exhibit E -Qualifications and Clarifications attached

**§ A.1.1.6** The Guaranteed Maximum Price is based upon the following Supplementary and other Conditions of the Contract:

| **Document** | **Title** | **Date** | **Pages** |
|---|---|---|---|
| N/A | | | |

**§ A.1.1.7** The Guaranteed Maximum Price is based upon the following Specifications:
*(Either list the Specifications here, or refer to an exhibit attached to this Agreement.)*
See Exhibit F – Drawings & Specifications attached

| **Section** | **Title** | **Date** | **Pages** |
|---|---|---|---|

**§ A.1.1.8** The Guaranteed Maximum Price is based upon the following Drawings:
*(Either list the Drawings here, or refer to an exhibit attached to this Agreement.)*
See Exhibit F – Drawings & Specifications attached

| **Number** | **Title** | **Date** |
|---|---|---|

**§ A.1.1.9** The Guaranteed Maximum Price is based upon the following other documents and information:
*(List any other documents or information here, or refer to an exhibit attached to this Agreement.)*

See Exhibit G – Project Schedule attached

**ARTICLE A.2**
**§ A.2.1** The anticipated date of Substantial Completion established by this Amendment:

See Exhibit G -- Project Schedule attached

_____            _____
**OWNER** *(Signature)*                                      **CONSTRUCTION MANAGER** *(Signature)*

Tim Murphy, Senior Director of Plant Operations          Paul McDonald, President
Pine Run Retirement Community                            McDonald Building Company LLC
*(Printed name and title)*                                  *(Printed name and title)*

**Init.**

**/**

AIA Document A133™ – 2009 Exhibit A. Copyright © 1991, 2003 and 2009 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 12:12:59 on 07/01/2013 under Order No.3320262254_1 which expires on 11/01/2013, and is not for resale.
User Notes:                                                                                                    (2052159601)

**2**

# ▓AIA® Document A201™ – 2007

## *General Conditions of the Contract for Construction*

**for the following PROJECT:**
*(Name and location or address)*
Pine Run Retirement Community
Health Center Renovation
777 Ferry Road
Doylestown, PA 18901

**THE OWNER:**
*(Name, legal status and address)*

Pine Run Community dba Doylestown Hospital
777 Ferry Road
Doylestown, PA 18901

**THE ARCHITECT:**
*(Name, legal status and address)*
Kramer + Marks Architects
156 S. Bethlehem Pike
Ambler, PA 19002

**ADDITIONS AND DELETIONS:**
The author of this document has added information needed for its completion. The author may also have revised the text of the original AIA standard form. An *Additions and Deletions Report* that notes added information as well as revisions to the standard form text is available from the author and should be reviewed. A vertical line in the left margin of this document indicates where the author has added necessary information and where the author has added to or deleted from the original AIA text.

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

### TABLE OF ARTICLES

1    GENERAL PROVISIONS

2    OWNER

3    CONTRACTOR

4    ARCHITECT

5    SUBCONTRACTORS

6    CONSTRUCTION BY OWNER OR BY SEPARATE CONTRACTORS

7    CHANGES IN THE WORK

8    TIME

9    PAYMENTS AND COMPLETION

10   PROTECTION OF PERSONS AND PROPERTY

11   INSURANCE AND BONDS

12   UNCOVERING AND CORRECTION OF WORK

13   MISCELLANEOUS PROVISIONS

**Init.**

**/**

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 11:50:14 on 07/01/2013 under Order No.3320262254_1 which expires on 11/01/2013, and is not for resale.
User Notes:                                                                           (1937075786)

**1**

14   TERMINATION OR SUSPENSION OF THE CONTRACT

15   CLAIMS AND DISPUTES

Init.

*I*

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 11:50:14 on 07/01/2013 under Order No.3320282264_1 which expires on 11/01/2013, and is not for resale.
User Notes:                                                                                    (1937075788)

# EXHIBIT B

 **UTICA NATIONAL INSURANCE GROUP**                                                    PAGE      1

UTICA MUTUAL INSURANCE COMPANY
180 GENESEE STREET
NEW HARTFORD, NY 13413

U1267
KUENY INSURANCE
958 EASTON ROAD
WARRINGTON, PA 18976
(215) 918-1002

**POLICY NUMBER:** CPP 4406070
RENEWAL OF
CPP 4406070
**NAMED INSURED:** VOEGELE MECHANICAL INC
SEE SCHEDULE OF NAMED INSUREDS
**ADDRESS:** 2170 BENNETT ROAD
PHILADELPHIA, PA 19116

FORM OF BUSINESS: ORGANIZATION OTHER THAN PARTNERSHIP OR JOINT VENTURE

BUSINESS DESCRIPTION: PLUMBING CONTRACTOR

POLICY PERIOD: FROM    03-01-16    TO    03-01-17    12:01 A.M. Standard Time at your address shown above.

In return for the payment of the premium and subject to all the terms of this policy, we agree with you to provide the insurance as stated in this policy.

## COMMERCIAL GENERAL LIABILITY COVERAGE PART - DECLARATIONS

### LIMITS OF INSURANCE

| | | |
|---|---|---|
| General Aggregate Limit (Other Than Products-Completed Operations) | $ | 2,000,000 |
| Products-Completed Operations Aggregate Limit | $ | 2,000,000 |
| Personal and Advertising Injury Limit | $ | 1,000,000 |
| Each Occurrence Limit | $ | 1,000,000 |
| Damage To Premises Rented To You Limit | $ | 100,000 |
| Medical Expense Limit (Any One Person) | $ | 5,000 |

LOCATIONS OF ALL PREMISES OTHER THAN THE ADDRESS SHOWN ABOVE WHICH YOU OWN, RENT OR OCCUPY ARE LISTED ON COMMERCIAL GENERAL LIABILITY DECLARATIONS - CONTINUED

AUDIT PERIOD:   ANNUAL
FORMS AND ENDORSEMENTS APPLYING
TO THIS COVERAGE PART:

**ADVANCE PREMIUM**       $     66,802.00

SEE 8-S-1018

**TOTAL ADVANCE PREMIUM**    $     66,802.00

_Tony Sachtig_
Authorized Representative

CPP CG  01 5 4406070

8-D-CG  Ed. 7-1999     Includes copyrighted material of Insurance Services Office, Inc., with its permission. Copyright, Insurance Services Office, Inc., 1982, 1984

UNIBILL NO. 100851501                                    03-04-16    YOUR BILL WILL FOLLOW

POLICY NUMBER:   CPP 4406070

COMMERCIAL AUTO
COMMERCIAL GENERAL LIABILITY
COMMERCIAL INLAND MARINE
COMMERCIAL PROPERTY
BUSINESSOWNERS
CRIME

# SUPPLEMENTAL DECLARATIONS

Named Insured:   VOEGELE MECHANICAL INC

Schedule of Named Insureds

VOEGELE MECHANICAL INC
SEE SCHEDULE OF NAMED INSUREDS
VM DESIGN ASSOCIATES, INC
JOSEPH T. VOEGELE & COLLEEN VOEGELE
THE VOEGELE GROUP, INC.

CA/CG/CIM/CP/CR/BP

POLICY NUMBER: CPP 4406070

COMMERCIAL AUTO LIABILITY
COMMERCIAL GENERAL LIABILITY
COMMERCIAL INLAND MARINE
COMMERCIAL PROPERTY
BUSINESSOWNERS
CRIME

# SUPPLEMENTAL DECLARATIONS

Named Insured: VOEGELE MECHANICAL INC

Forms and Endorsements applying to this Coverage Part and made part of this policy at time of issue:

| FORM | EDITION | TITLE |
| --- | --- | --- |
| 8E3555 | 02/06 | CONTRACTORS LIABILITY EXTENSION ENDORSEMENT |
| 8E3548 | 07/11 | GENERAL LIABILITY EXTENSION ENDORSEMENT |
| 8E2639 | 11/00 | BLANKET ADDITIONAL INSURED - CONTRACTORS |
| 8D1014 | 09/04 | EMPLOYEE BENEFIT PROGRAMS LIABILITY COVERAGE PART DEC |
| 8C1014 | 09/04 | EMPLOYEE BENEFIT PROGRAMS LIABILITY COVERAGE FORM |
| CG2503 | 05/09 | DESIGNATED CONSTRUCTION PROJECT(S) GENERAL AGGREGATE LIMIT |
| 8E2720 | 07/98 | LIABILITY EXCLUSION: COMPUTER AND OTHER ELECTRONIC-RELATED P |
| CG2147 | 12/07 | EMPLOYEE RELATED PRACTICES EXCLUSION |
| CG2037 | 04/13 | ADDITIONAL INSURED-OWNERS, LESSEES OR CONTRACTORS-COMPLETED |
| 8E3773 | 03/11 | PROVIDE NOTICE OF CANCELLATION TO ANOTHER ENTITY |
| 8E3552 | 01/06 | ADDITIONAL INSURED- BY CONTRACT AGREEMENT OR PERMIT |
| CG2167 | 12/04 | FUNGI OR BACTERIA EXCLUSION |
| CG2026 | 04/13 | ADDITIONAL INSURED-DESIGNATED PERSON OR ORGANIZATON |
| 8E3773 | 03/11 | PROVIDE NOTICE OF CANCELLATION TO ANOTHER ENTITY |
| 8E3773 | 03/11 | PROVIDE NOTICE OF CANCELLATION TO ANOTHER ENTITY |
| CG2170 | 01/15 | CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM |
| CG2106 | 05/14 | EXCLUSION-ACCESS OR DISCLOSURE OF CONFIDENTIAL/PERSONAL INFO |
| CG2001 | 04/13 | PRIMARY AND NONCONTRIBUTORY OTHER INSURANCE CONDITION |
| CG0001 | 04/13 | COMMERCIAL GENERAL LIABILITY COVERAGE FORM |
| CG2426 | 04/13 | AMENDMENT OF INSURED CONTRACT DEFINITION |
| 8E3202 | 01/02 | ASBESTOS EXCLUSION |
| IL0021 | 09/08 | NUCLEAR ENERGY LIABILITY |
| IL0246 | 09/07 | PENNSYLVANIA CHANGES - CANCELLATION AND NONRENEWAL |
| IL0985 | 01/15 | DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE |
| 8E3502 | 01/04 | EXCLUSION- SILICA LIABILITY HAZARD |
| IL0910 | 07/02 | PENNSYLVANIA NOTICE |
| IL0017 | 11/98 | COMMON POLICY CONDITIONS |
| 8E1574 | 07/88 | PENNSYLVANIA AMENDATORY ENDORSEMENT ADDITIONAL CANCELLATION |
| 8S1021 | 09/90 | SUPPLEMENTAL DECLARATIONS - SCHEDULE OF NAMED INSUREDS |

COMMERCIAL GENERAL LIABILITY DECLARATIONS-CONTINUED        PAGE        4

**POLICY NUMBER:**   CPP 4406070

| Item No. Locations/Classifications | Code No. St.-Terr. | Premium Basis | Rates OTHER | Rates PR/CO | Advance Premium OTHER | Advance Premium PR/CO |
|---|---|---|---|---|---|---|
| 001A PLUMBING - COMMER-<br>CIAL AND INDUSTRIAL | 98482<br>PA-501 | PAYROLL<br>2244000 | PER THOUSAND<br>0016.002 | 0008.849 | $    35,908 | $    19,855 |
| 2170 BENNETT RD<br>PHILADELPHIA, PA | | | | | | |
| 002A HEATING OR COMBINED<br>HEATING AND AIR CON-<br>DITIONING SYSTEMS OR<br>EQUIPMENT - DEALERS<br>OR DISTRIBUTORS AND<br>INSTALLATION, SERV-<br>ICING OR REPAIR -<br>NO LIQUIFIED PETROL-<br>EUM GAS (LPG) EQUIP-<br>MENT SALES OR WORK | 95647<br>PA-501 | PAYROLL<br>439416 | PER THOUSAND<br>0012.422 | 0008.115 | $    5,459 | $    3,566 |
| 001B 8E3555<br>CONTRACTORS LIABILIT<br>Y EXTENSION ENDORSEM<br>ENT | 44444<br>PA-501 | | | | $    125 | |
| 002B 8E3548<br>GENERAL LIABILITY EX<br>TENSION ENDORSEMENT | 44444<br>PA-501 | | | | $    1,296 | |
| 003B 8E2639<br>BLANKET ADDITIONAL I<br>NSURED - CONTRACTORS | 49950<br>PA-501 | | | | $    150 | |
| 004B 8D1014<br>EMPLOYEE BENEFIT PRO<br>GRAMS LIABILITY COVE<br>RAGE PART DEC | 92100<br>PA-501 | | | | $    393 | |
| 052B CG2037<br>ADDITIONAL INSURED-O<br>WNERS, LESSEES OR CO<br>NTRACTORS-COMPLETED<br>OPERATION | 44444<br>PA-501 | | | | $    25 | |
| 084B CG2026<br>ADDITIONAL INSURED-D<br>ESIGNATED PERSON OR<br>ORGANIZATON | 49950<br>PA-501 | | | | $    25 | |

ITEM LETTER CODE

A = HAZARD
B = FORM
C = FLAT CHARGE

Total Advance Other and PR/CO   $    43,381   $    23,421

TOTAL ADVANCE PREMIUM        $    66,802

8-D-CG (S) Ed. 01-92

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CONTRACTORS LIABILITY EXTENSION ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

## SCHEDULE OF COVERAGES

| COVERAGE | PAGE |
|---|:---:|
| 1. Waiver of Subrogation | 1 |
| 2. Expected or Intended Injury or Damage | 1 |
| 3. Unintentional Failure to Disclose Hazards | 1 |
| 4. Expanded Bodily Injury Definition | 2 |
| 5. Liberalization | 2 |
| 6. Impaired Property | 2 |
| 7. Property In Your Care, Custody or Control | 2 |

**1. WAIVER OF SUBROGATION**

Under **SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS,** the following replaces **Transfer Of Rights Of Recovery Against Others To Us:**

If the insured has rights to recover all or part of any payment we have made under this policy, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

We waive any right of recovery we may have under such a transfer of rights against any person or organization holding a waiver under a written contract with the insured if such contract was executed prior to the loss which generated such right of recovery.

**2. EXPECTED OR INTENDED INJURY OR DAMAGE**

Under Paragraph **2. Exclusions** of **SECTION - I COVERAGE A,** the **Expected Or Intended Injury** exclusion is replaced by the following:

**Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" or "property damage" resulting from the use of reasonable force to protect persons or property.

**3. UNINTENTIONAL FAILURE TO DISCLOSE HAZARDS**

The following is added to **SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS:**

**Unintentional Failure To Disclose Hazards**

Failure of the insured to disclose all hazards existing as of the inception date of the policy shall not prejudice the rights of the insured as respects the insurance afforded by this policy if such failure or omission is not intentional.

 Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright, Utica Mutual Insurance Company, 2006.

4. **EXPANDED BODILY INJURY DEFINITION**

Under the **Definitions** Section, "bodily injury" is replaced by the following:

"Bodily injury" means:

a. Bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time; or

b. Shock, mental anguish or mental injury, including death resulting therefrom, to a person who sustained bodily injury, sickness or disease, provided the shock, mental anguish or mental injury is a consequence of the bodily injury, sickness or disease.

5. **LIBERALIZATION**

If we adopt any revision that would broaden the coverage under this Coverage Part without additional premium within 45 days prior to or during the policy period, the broadened coverage will immediately apply to this Coverage Part.

6. **IMPAIRED PROPERTY**

a. Under the **Definitions** Section, the definition of "impaired property" does not apply.

b. Exclusions m. and n. under **SECTION I - COVERAGE A** are replaced by the following:

m. **Loss Of Use Of Tangible Property**

Loss of use of tangible property which has not been physically injured or destroyed, resulting from:

(1) A delay in or lack of performance by you or anyone on your behalf of any contract or agreement; or

(2) The failure of "your product" or "your work" to meet the level of performance, quality, fitness or durability warranted or represented by or on your behalf.

This exclusion does not apply to loss of use of other tangible property resulting from the sudden or accidental physical injury to or destruction of:

(1) "Your product"; or

(2) "Your work";

after such product or work has been put to its intended use.

n. **Recall Of Products, Work Or Other Property**

Damage claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

(1) "Your product";

(2) "Your work"; or

(3) Any property of which "your product" or "your work" forms a part;

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

7. **PROPERTY DAMAGE LIABILITY - ELEVATORS, BORROWED EQUIPMENT and LIMITED COVERAGE FOR DAMAGE TO PERSONAL PROPERTY IN YOUR CARE, CUSTODY OR CONTROL**

a. Under Paragraph **2. Exclusions** of **SECTION - I COVERAGE A**, part **(4)** of the **Damage To Property** exclusion applies as follows:

(1) This exclusion always applies to "property damage" to property of others which occurs at premises you own, rent or control.

(2) With respect to "property damage" to personal property of others which occurs away from premises you own, rent or control, this exclusion will apply only when the "property damage" is:

(a) To property which you have contracted to install;

(b) The direct result of the property being raised, lowered or otherwise moved by a crane;

(c) To "mobile equipment" or an "auto";

(d) To that particular part of property which you are attempting to service or repair; or

(e) Covered by other insurance which will pay for the "property damage."

(3) This exclusion does not apply to "property damage" to borrowed equipment while not being used to perform operations at the job site.

b. Parts **(3)**, **(4)** and **(6)** of the **Damage To Property** exclusion do not apply to the use of elevators.

c. The insurance afforded by this section is excess over any valid and collectible property insurance (including any deductible portion thereof) available to the insured whether primary, excess, contingent or on any other basis, and the **OTHER INSURANCE** condition is deemed changed accordingly.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# GENERAL LIABILITY EXTENSION ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

1. **INCIDENTAL MALPRACTICE**

   a. The definition of "bodily injury" in **SECTION V - DEFINITIONS** is amended to include injury arising out of rendering or failing to render medical or paramedical services to persons by any physician, dentist, nurse, emergency medical technician or paramedic who is employed by you to provide such services.

   b. Paragraph **2.a.(1)(d)** of **SECTION II - WHO IS AN INSURED** does not apply to nurses, emergency medical technicians or paramedics described in paragraph **a.** above.

   c. Part **(1)** of the **Employers Liability** exclusion under Paragraph **2. Exclusions,** of **SECTION - I COVERAGE A** does not apply to injury to the emotions or reputation of a person arising out of such services.

   This Incidental Malpractice Coverage does not apply if you are engaged in the business or profession of providing services described in paragraph **a.** above.

2. **EXTENDED PROPERTY DAMAGE**

   Under Paragraph **2. Exclusions** of **SECTION - I COVERAGE A,** the **Expected Or Intended Injury** exclusion is replaced by the following:

   **Expected Or Intended Injury**

   "Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" or "property damage" resulting from the use of reasonable force to protect persons or property.

3. **NONOWNED AIRCRAFT AND WATERCRAFT**

   Under Paragraph **2. Exclusions** of **SECTION - I COVERAGE A,** the **Aircraft, Auto or Watercraft** is replaced by the following:

   **Aircraft, Auto or Watercraft**

   "Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading."

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

(1) An aircraft that is:

   (a) Hired, chartered or loaned to an insured with a paid crew; and

   (b) Not owned by an insured;

(2) A watercraft while ashore on premises you own or rent;

(3) A watercraft you do not own that is:

   (a) Less than 51 feet long; and

   (b) Not being used to carry persons or property for a charge;

Exceptions **(1)** and **(3)** to this exclusion **g.** do not apply, and exclusion **g.** is fully applicable, to any aircraft or watercraft to which any other insurance covering "bodily injury" or "property damage" is available to the insured. This is so whether the other insurance applies on a primary, excess, contingent or any other basis.

(4) Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

(5) Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

(6) "Bodily injury" or "property damage" arising out of:

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

Copyright, Utica Mutual Insurance Company, 2007.

(a) The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged; or

(b) The operation of any of the machinery or equipment listed in Paragraph **f.(2)** or **f.(3)** of the definition of "mobile equipment".

4. **PROPERTY DAMAGE LIABILITY - ELEVATORS, BORROWED EQUIPMENT and LIMITED COVERAGE FOR DAMAGE TO PERSONAL PROPERTY IN YOUR CARE, CUSTODY OR CONTROL**

a. Under Paragraph **2. Exclusions** of **SECTION - I COVERAGE A**, part (4) of the **Damage To Property** exclusion applies as follows:

   (1) This exclusion always applies to "property damage" to property of others which occurs at premises you own, rent or control.

   (2) With respect to "property damage" to personal property of others which occurs away from premises you own, rent or control, this exclusion will apply only when the "property damage" is:

      (a) To property which you have contracted to install;

      (b) The direct result of the property being raised, lowered or otherwise moved by a crane;

      (c) To "mobile equipment" or an "auto";

      (d) To that particular part of property which you are attempting to service or repair; or

      (e) Covered by other insurance which will pay for the "property damage."

   (3) This exclusion does not apply to "property damage" to borrowed equipment while not being used to perform operations at the job site.

b. Parts **(3)**, **(4)** and **(6)** of the **Damage To Property** exclusion do not apply to the use of elevators.

c. The insurance afforded by this section is excess over any valid and collectible property insurance (including any deductible portion thereof) available to the insured whether primary, excess, contingent or on any other basis, and the **OTHER INSURANCE** condition is deemed changed accordingly.

5. **CONTRACTUAL PERSONAL AND ADVERTISING INJURY**

   Under Paragraph **2. Exclusions** of **SECTION - I COVERAGE B**, the **Contractual Liability** exclusion is deleted. However, the coverage provided by this section will not apply if **COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY** is excluded by any of the exclusions or other provisions of the Coverage Form or by any endorsement.

6. **FIRE, LIGHTNING OR EXPLOSION DAMAGE**

a. The last paragraph of **SECTION I - COVERAGE A** (after the exclusions) is replaced by the following:

   Exclusions **c.** through **n.** do not apply to damage by fire, lightning or explosion to premises rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in **SECTION III - LIMITS OF INSURANCE.**

b. Paragraph **6.** of Section III - Limits Of Insurance is replaced by the following:

   6. Subject to **5.** above, the greater of:

      (1) $500,000; or

      (2) The Damage To Premises Rented To You Limit shown in the Declarations;

   is the most we will pay under Coverage A for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, lightning or explosion, while rented to you, or temporarily occupied by you with permission of the owner. The Damage To Premises Rented To You Limit applies to all loss or damage caused by or resulting from fire, lightning, or explosion; or any combination of these causes

c. Under **SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS, OTHER INSURANCE**, the **Excess Insurance** provision pertaining to fire insurance for premises rented to you or temporarily occupied by you with permission of the owner is replaced by the following:

   That is Fire and Extended Coverage insurance for premises rented to you or temporarily occupied by you with permission of the owner;

7. **SUPPLEMENTARY PAYMENTS**

   Under **SUPPLEMENTARY PAYMENTS - COVERAGES A AND B:**

   a. The most we will pay for the cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies is increased by $2,250.

   b. The most we will pay for actual loss of earnings because of time off from work is increased by $250.

8. **BROADENED COVERAGE - EMPLOYEES/ VOLUNTEERS**

   The following replaces paragraph **2.a.** under **SECTION II - WHO IS AN INSURED:**

   2. Each of the following is also an insured:

      a. Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these:

         (1) "Employees" is an insured for:

            (a) "Personal and advertising injury":

               (i) To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

               (ii) To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph **(1)(a)(i)** above;

               (iii) For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraphs **(1)(a)(i)** or **(ii)** above; or

               (iv) Arising out of his or her providing or failing to provide professional health care services. However, if you have "employees" who are pharmacists in your retail druggist or drugstore operation, they are insured with respect to their providing or failing to provide professional health care services.

            (b) "Property damage" to property:

               (i) Owned, occupied or used by,

               (ii) Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by

               you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

         (2) "Volunteer workers" is an insured for:

            (a) "Bodily injury" or "personal and advertising injury":

               (i) To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

               (ii) To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph **(2)(a)(i)** above;

**(iii)** For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraphs (2)(a)(i) or (ii) above; or

**(iv)** Arising out of his or her providing or failing to provide professional health care services.

**(b)** "Property damage" to property:

**(i)** Owned, occupied or used by,

**(ii)** Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by

you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

**9. NEWLY FORMED OR ACQUIRED ORGANIZATIONS**

Paragraph 3. under **SECTION II - WHO IS AN INSURED**, is replaced by the following:

**3.** Any organization you newly acquire or form; other than a partnership, joint venture or limited liability company; and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

**a.** Coverage under this provision is afforded only until the 180th day after you acquire or form the organization or the end of the policy period, whichever is earlier; and

**b.** Coverage under this provision does not apply to:

**(1)** "Bodily injury" or "property damage" that occurred; or

**(2)** "Personal and advertising injury" arising out of an offense committed;

before you acquired or formed the organization.

**10. SUBSIDIARIES**

The following is added under **SECTION II - WHO IS AN INSURED:**

**a.** Any organization, not shown in the Declarations as a Named Insured, which is a legally incorporated entity, if you own more than 50% of the outstanding securities representing the present right to vote for the election of its directors; or

**b.** Any organization, not shown in the Declarations as a Named Insured, which is a legally incorporated entity, if more than 50% of the outstanding securities representing the present right to vote for the election of its directors is owned by an organization described in paragraph 10.a. above; is also an insured.

The insurance afforded under paragraphs **10.a.** and **10.b.** applies only if no other insurance of any kind is available to such entity for this kind of liability.

**11. ADDITIONAL INSUREDS - BY CONTRACT, AGREEMENT OR PERMIT - INCLUDING LESSOR OF LEASED EQUIPMENT, OWNER OF LEASED LAND, MANAGERS OR LESSORS OF PREMISES, ENGINEERS, ARCHITECTS AND SURVEYORS AND VENDORS**

The following is added to **SECTION II - WHO IS AN INSURED:**

**a.** **Additional Insureds - By Contract, Agreement or Permit**

**(1)** Any person or organization with whom you have entered into a written contract, agreement or permit requiring you to provide insurance such as is afforded by this Commercial General Liability Coverage Form will be an additional insured, but only:

**(a)** To the extent that such additional insured is held liable for acts or omissions committed by you or your subcontractors during the performance of your ongoing operations for the additional insured.

**(b)** With respect to property owned or used by, or rented or leased to, you.

The insurance afforded any additional insured under this paragraph **11.a.(1)** will be subject to all applicable exclusions or limitations described in paragraphs **11.b.(1), (2), (3)** and **(4)** and in **11.c.(1), (2), (3), (4), (5)** and **(6)** below.

**(2)** Such insurance as is provided by paragraph **11.a.(1)** for any additional insured will be primary, if so required by the written contract, agreement or permit. Any other insurance available to such person or organization shall be excess over this insurance.

**(3)** A person's or organization's status as an additional insured in connection with a written contract, agreement or permit under paragraphs **11.a.(1), (2) and (3)** ends when your operations for that additional insured are completed or the written contract, agreement or permit is terminated or expires.

**b.   Additional Exclusions or Limitations**

**(1)   Lessor of Leased Equipment**

If an equipment lessor is an additional insured as a result of the provisions of paragraphs **11.a.(1), (2)** and **(3)** above, the following additional exclusion applies:

This insurance does not apply to "bodily injury" or "property damage" arising out of the sole negligence of such additional insured.

**(2)   Owner of Leased Land**

If an owner or other interest from whom land has been leased is an additional insured as a result of the provisions of paragraphs **11.a.(1), (2)** and **(3)** above, the following additional exclusions apply:

This insurance does not apply to:

**(a)** Any "occurrence" that takes place after you cease to lease that land; or

**(b)** Structural alterations, new construction or demolition operations performed by or for the owner or other interest from whom the land was leased.

**(3)   Managers or Lessors of Premises**

If a manager or lessor of premises you rent or lease is an additional insured as a result of the provisions of paragraphs **11.a.(1), (2)** and **(3)** above, the following additional exclusions apply:

This insurance does not apply to:

**(a)** Any "occurrence" that takes place after you cease to be a tenant in those premises; or

**(b)** Structural alterations, new construction or demolition operations performed by or for the manager or lessor of those premises.

**(4)   Engineers, Architects or Surveyors**

If an engineer, architect or surveyor is an additional insured as a result of the provisions of paragraphs **11.a.(1), (2)** and **(3)** above, the following additional exclusions apply:

This insurance does not apply to "bodily injury," "property damage," "personal and advertising injury" arising out of the rendering or failing to render any professional services by or for you, including:

**(a)** The preparing, approving, or failing to approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

**(b)** Giving directions or instructions, or failing to give them, if that is the primary cause of injury.

**(5)   Vendors of "Your Products"**

If a vendor of "your products" is an additional insured under this Coverage Part, such insurance as is provided to the additional insured applies only with respect to "bodily injury" or "property damage" arising out of "your products" which are distributed or sold in the regular course of the vendor's business and subject to the following additional exclusions:

**(a)** This insurance afforded the vendor does not apply to:

**(i)** "Bodily injury" or "property damage" for which the vendor is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability that the vendor would have in the absence of the contract or agreement;

**(ii)** Any express warranty unauthorized by you;

**(iii)** Any physical or chemical change in the product made intentionally by the vendor;

**(iv)** Repackaging, unless unpacked solely for the purpose of inspection, demonstration, testing or the substitution of parts under instructions from the manufacturer, and then repackaged in the original container;

(v) Any failure to make such inspections, adjustments, tests or servicing as the vendor has agreed to make or normally undertakes to make in the usual course of business, in connection with the distribution or sale of the products;

(vi) Demonstration, installation, servicing or repair operations, except such operations performed at the vendor's premises in connection with the sale of the product; or

(vii) Products which, after distribution or sale by you, have been labeled or relabeled or used as a container, part or ingredient of any other thing or substance by or for the vendor.

(b) This insurance afforded the vendor does not apply to any person or organization from whom you have acquired such products, or any ingredient, part or container entering into, accompanying or containing such products.

No insurance will be provided under this Vendors coverage if "bodily injury" or "property damage" under the "products-completed operations hazard" is excluded by any of the exclusions or other provisions of this Coverage Form or by any endorsement.

c. Such insurance as is afforded for any additional insured under paragraph **11.a.** or **b.** above is subject to all applicable exclusions of 2. Exclusions, **COVERAGE A** (Section I), other than exclusion **b. Contractual Liability**, to all exclusions or limitations stated with the coverage language, and to the following additional exclusions:

This insurance does not apply to:

(1) The independent acts or omissions of such additional insured.

(2) Any liability arising from injury or damage in connection with a contract or agreement executed or permit issued subsequent to:

(a) The occurrence of any "bodily injury" or "property damage"; or

(b) The commission of any offense which caused "personal and advertising injury."

(3) Construction or demolition activities within 50 feet of any railroad property and affecting any railroad bridge or trestle, track, road-bed, tunnel, underpass or crossing.

(4) Any liability arising from injury or damage in connection with a permit issued by a state or political subdivision if the liability is from operations performed for the state or political subdivision.

(5) Any liability from "bodily injury" or "property damage" arising out of "your work" which is included in the "products-completed operations hazard."

This additional exclusion **11.c.(5)** does not apply with respect to such Vendors coverage as is provided under **11.b.(5)** above.

(6) Any person or organization included as an insured under any other provision of Section **II - Who Is An Insured** or included as an additional insured by any endorsement to this policy.

**12. INSUREDS - NONOWNED WATERCRAFT**

The following is added to **SECTION II - WHO IS AN INSURED:**

With respect to any watercraft you do not own that is:

**a.** Less than 51 feet long; and

**b.** Not being used to carry persons or property for a charge;

any person who uses or is responsible for the use of such watercraft, with your express or implied consent, is an insured.

Any other person or organization responsible for the conduct of such person is also an insured, but only with respect to liability arising out of the operation or use of the watercraft, and only if no other insurance of any kind is available to that person or organization for this liability. However, no person or organization is an insured with respect to:

(1) "Bodily injury" to a co-"employee" of the person operating or using the watercraft; or

(2) "Property damage" to property owned by, rented to, in the charge of or occupied by you or the employer of any person who is an insured under this provision.

**13. MEDICAL PAYMENTS**

Paragraph **7.** of **SECTION III - LIMITS OF INSURANCE** is replaced by the following:

**7.** Subject to **5.** above, the most we will pay under Coverage **C** for all medical expenses because of "bodily injury" sustained by any one person is the Medical Expense Limit which is the greater of:

    **a.** $15,000; or

    **b.** The Medical Expense Limit shown in the Declarations.

**14. PRIORITY CONDITION**

The following paragraph is added to **SECTION III - LIMITS OF INSURANCE:**

**8.** In the event a claim or "suit" is brought against more than one insured, due to "bodily injury" or "property damage" from the same "occurrence", or "personal and advertising injury" from the same offense, the Limits of Insurance will apply in the following order:

    **a.** You;

    **b.** Your "executive officers", directors, stockholders or "employees", and

    **c.** Any other insureds in any order that we choose.

**15. DUTIES IN THE EVENT OF OCCURRENCE, OFFENSE, CLAIM OR SUIT**

Under **SECTION IV - COMMERCIAL LIABILITY CONDITIONS, DUTIES IN THE EVENT OF OCCURRENCE, OFFENSE, CLAIM OR SUIT** is replaced by the following:

**Duties In The Event Of Occurrence, Offense, Claim Or Suit**

**a.** You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

    **(1)** How, when and where the "occurrence" or offense took place;

    **(2)** The names and addresses of any injured persons and witnesses; and

    **(3)** The nature and location of any injury or damage arising out of the "occurrence" or offense.  .

This paragraph **a.** applies only if one of the following knows of the "occurrence" or offense:

    **(1)** You;

    **(2)** A partner or member, if you are a partnership or joint venture;

    **(3)** A member or manager, if you are a limited liability company; or

    **(4)** An "executive officer" or insurance manager, if you are an organization other than a partnership, joint venture or limited liability company.

**b.** If a claim is made or "suit" is brought against any insured, you must:

    **(1)** Immediately record the specifics of the claim or "suit" and the date received; and

    **(2)** Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

This paragraph **b.** will be considered to have been violated only if the violation occurs after the claim or "suit" is known to:

    **(1)** You;

    **(2)** A partner or member, if you are a partnership or joint venture;

    **(3)** A member or manager, if you are a limited liability company; or

    **(4)** An "executive officer" or insurance manager, if you are an organization other than a partnership, joint venture or limited liability company.

**c.** You and any other involved insured must:

    **(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

    **(2)** Authorize us to obtain records and other information;

    **(3)** Cooperate with us in the investigation, or settlement of the claim or defense against the "suit"; and

    **(4)** Assist us, upon our request, in the enforcement of any right against any person or organization that may be liable to the insured because of injury or damage to which this insurance may also apply.

**d.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

16. **WAIVER OF TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US**

Under **SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS**, the following replaces **Transfer Of Rights Of Recovery Against Others To Us**:

If the insured has rights to recover all or part of any payment we have made under this policy, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

We waive any right of recovery we may have under such a transfer of rights against any person or organization holding a waiver under a written contract with the insured if such contract was executed prior to the loss which generated such right of recovery.

17. **NOTICE TO COMPANY**

The following is added to **SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS:**

**Notice To Company**

If the insured reports an "occurrence" or offense to its Workers Compensation insurer and such "occurrence" or offense later becomes a claim under this Coverage Part, failure to report such "occurrence" or offense to us at the time of the "occurrence" or offense will not be considered a violation of the **Duties in the Event of Occurrence, Offense, Claim or Suit** Condition, only if:

a. Such failure or omission is not intentional; and

b. You notify us as soon as practicable when you become aware that the "occurrence" or offense has become a liability claim.

18. **UNINTENTIONAL FAILURE TO DISCLOSE HAZARDS**

The following is added to **SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS:**

**Unintentional Failure To Disclose Hazards**

Failure of the insured to disclose all hazards existing as of the inception date of the policy shall not prejudice the rights of the insured as respects the insurance afforded by this policy if such failure or omission is not intentional.

19. **COVERAGE TERRITORY**

Under the **Definitions** Section, "coverage territory" is replaced by the following:

"Coverage territory" means:

a. The United State of America (including its territories and possessions), Puerto Rico and Canada;

b. International waters or airspace, provided the injury or damage does not occur in the course of travel or transportation to or from any place not included in **a.** above; or

c. All other parts of the world if:

1) The injury or damage arises out of:

a) Goods or products made or sold by you in the territory described in **a.** above;

b) The activities of a person whose home is in the territory described in **a.** above, but is away for a short time on your business; or

c) "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication; and

2) The insured's responsibility to pay damages is determined in a "suit" on the merits, in:

a) The territory described in **a.** above;

b) The Commonwealth of the Bahamas, Bermuda, Cayman Islands, and British Virgin Islands; or in a settlement we agree to.

20. **BODILY INJURY DEFINITION**

Under the **Definitions** Section, "bodily injury" is replaced by the following:

"Bodily injury" means:

a. Bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time; or

b. Shock, mental anguish or mental injury, including death resulting therefrom, to a person who sustained bodily injury, sickness or disease, provided the shock, mental anguish or mental injury is a consequence of the bodily injury, sickness or disease.

21. **PERSONAL AND ADVERTISING INJURY LIABILITY EXTENSION**

Under the **Definitions** Section, "personal and advertising injury" is replaced by the following: "Personal and advertising injury" means injury including mental anguish, shock or humiliation other than "bodily injury" arising out of one or more of the following offenses:

1. False arrest, detention or imprisonment;

2. Malicious prosecution or abuse of process;

3. Wrongful entry into, or eviction of a person from, a room, dwelling or premises that the person occupies;

4. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

5. Oral or written publication, in any manner, of material that violates a person's right of privacy;

6. The use of another's advertising idea in your "advertisement";

7. Infringing upon another's copyright, trade dress or slogan in your "advertisement"; or

8. Discrimination.

As used in this form, discrimination means the act of differentiation based on age, race, color, sex, religion, national origin, physical handicap or sexual preference which violates any applicable federal, state or local statute which pertains to discrimination.

But discrimination does not include acts of differentiation that cause injury to:

A person arising out of any:

a. (1) Refusal to employ that person;

(2) Termination of that person's employment; or

(3) Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

b. The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in paragraphs (1), (2) or (3) above as directed.

Paragraphs a. and b. above apply:

(1) Whether the "insured" may be liable as an employer or in any other capacity; and

(2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

## 22. IMPAIRED PROPERTY

a. Under the **Definitions** Section, the definition of "impaired property" does not apply.

b. Exclusions **m.** and **n.** under **SECTION I - COVERAGE A** are replaced by the following:

m. **Loss Of Use Of Tangible Property**

Loss of use of tangible property which has not been physically injured or destroyed, resulting from:

(1) A delay in or lack of performance by you or anyone on your behalf of any contract or agreement; or

(2) The failure of "your product" or "your work" to meet the level of performance, quality, fitness or durability warranted or represented by on your behalf.

This exclusion does not apply to loss of use of other tangible property resulting from the sudden or accidental physical injury to or destruction of:

(1) "Your product"; or

(2) "Your work";

after such product or work has been put to its intended use.

n. **Recall Of Products, Work Or Other Property**

Damage claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

(1) "Your product";

(2) "Your work"; or

(3) Any property of which "your product" or "your work" forms a part;

If such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

## 23. LIBERALIZATION

If we adopt any revision that would broaden the coverage under this Coverage Part without additional premium within 45 days prior to or during the policy period, the broadened coverage will immediately apply to this Coverage Part.

POLICY NUMBER:   CPP 4406070                    COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# BLANKET ADDITIONAL INSURED - CONTRACTORS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

**Total Advance Premium $   $150.**

(Information required to complete the Schedule, if not shown on this endorsement, will be shown in the Declarations.)

1. WHO IS AN INSURED (Section II) is amended to include as an insured any person or organization (called additional insured), but only:

   a. To the extent that such additional insured is held liable for your acts or omissions arising out of and in the course of ongoing operations performed by you or your subcontractors for such additional insured; and

   b. Arising out of a written contract with such additional insured which was executed prior to:

      (1) The occurrence of any "bodily injury" or "property damage"; or

      (2) The commission of any offense which caused "personal and advertising injury."

2. Such insurance as is provided by this endorsement for any additional insured does not apply to "bodily injury," "property damage," "personal and advertising injury" arising out of:

   a. The independent acts or omissions of such additional insured.

   b. The rendering of or failure to render any professional services if the additional insured is an architect, engineer or surveyor.

   "Professional services," as used in this exclusion, include:

      (1) Preparing, approving, or failing to prepare or approve: maps, shop drawings, opinions, reports, surveys, field orders, change orders, drawings or specifications;

      (2) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

      (3) Supervisory, inspection, architectural or engineering activities.

   c. Construction or demolition operations within 50 feet of any railroad property and affecting any railroad bridge or trestle, track, road-bed, tunnel, underpass or crossing.

   d. "Bodily injury" or "property damage," arising out of "your work," which is included in the "products-completed operations hazard."

3. Such insurance as is provided by this endorsement for any additional insured will be primary, if so required by any contract described in part 1. above. Any other insurance available to such person or organization shall be excess over this insurance.

8-E-2639  Ed. 11-2000  Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright, Utica Mutual InsuranceCompany, 2000.                    **CG**

The following spaces preceded by an asterisk (*) need not be completed if this Coverage Part and the Policy have the same effective date.

| ATTACHED TO AND FORMING PART OF POLICY NO. | *EFFECTIVE DATE OF COVERAGE FORM | *ISSUED TO |
|---|---|---|
| CPP 4406070 | | |

*POLICY PERIOD:   FROM                              TO                              At 12:01 A.M. Standard Time at your
mailing address shown above

In return for the payment of the premium, and subject to all the terms of this policy, we agree with you to provide the insurance as stated in this policy.

# EMPLOYEE BENEFIT PROGRAMS  LIABILITY COVERAGE PART DECLARATIONS

### LIMITS OF INSURANCE

| | | |
|---|---|---|
| **EACH LOSS** | $  1,000,000 | |
| **AGGREGATE LIMIT** | $  3,000,000 | For Each Annual Policy Year |
| **DEDUCTIBLE** | $ 1,000 | Each Loss (Per Deductible Provision in Section IV Of the Coverage Form) |

**RETROACTIVE DATE:**        03/01/11

This insurance does not apply to wrongful acts which took place before the Retroactive Date, if any, shown above. No Retroactive Date applies if "None" appears above.

**ADVANCE PREMIUM**

| Number of Employees | Rate per Employee | Estimated Advance Premium |
|---|---|---|
| First 5,000 | | $ |
| Next 5,000 | | $ |
| Over 10,000 | | $ |
| **Minimum Premium**   $        $393. | **Total Estimated Advance Premium** | $ |

**OPTIONAL EXTENDED REPORTING PERIOD PREMIUM (if applicable)**
In Section VI - Extended Reporting Periods, we agree to provide an Optional Extended Reporting Period under certain conditions. The estimated premium for such an Optional Extended Reporting Period is:     $     $570.

**OTHER APPLICABLE FORMS AND ENDORSEMENTS †:**

_____ **

_Tony Sychtig_

(Authorized Representative)

† Forms and endorsements applicable to this Coverage Part omitted if shown elsewhere in the policy.
** Entry optional if shown in Common Policy Declarations.
THESE DECLARATIONS AND THE POLICY DECLARATIONS, TOGETHER WITH THE COMMON POLICY CONDITIONS, COVERAGE FORM(S) AND FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART  THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

8-D-1014  Ed. 09-2004                                                                                      Page 1 of 2

### SEE OVER FOR IMPORTANT CLAIMS-MADE COVERAGE NOTICE

---

**The Coverage Form which provides Employee Benefit Programs Liability Coverage applies on a claims-made basis.**

---

The following provides a general description of this coverage and is subject to the terms and provisions of the actual Coverage Form.

**A.** The Coverage Form will not apply to any losses from wrongful acts which take place before the Retroactive Date, if any, or after the expiration of the policy period.

**B.** The Coverage Form will apply to losses from wrongful acts which take place after the Retroactive Date, if any, but before the beginning of the policy period **only if** the insured did not know of the incident before the beginning of the policy period **and** if any claim is made according to **D.** below.

**C.** The Coverage Form will not apply to any loss for which claim is first made after the expiration of the policy period or any Automatic or Optional Extended Reporting Period described in the Extended Reporting Period Section of the Coverage Form.

**D.** The Coverage Form will apply only to claims which are first made:

  **1.** During the policy period;

  **2.** During the ninety (90) day Automatic Extended Reporting Period described in the Extended Reporting Period Section of the Coverage Form;

  **3.** During the five year Automatic Extended Reporting Period described in the Extended Reporting Period Section of the Coverage Form for claims arising out of incidents reported, under the policy provision, no later than ninety (90) days after the end of the policy period; or

  **4.** During the Optional Extended Reporting Period of unlimited duration described in the Extended Reporting Period Section of the Coverage Form.

    **a.** We will send you a written notice within thirty (30) days after any termination of coverage of costs for and provisions of Extended Reporting Periods.

    **b.** The Optional Extended Reporting Period must be requested by the insured in writing, by the later of ninety (90) days after the termination of coverage or thirty days after the date of mailing of the company's notice to the insured of costs for and provisions of Extended Reporting Periods, in order to allow claims to be made against the policy coverage after the expiration of any Automatic Extended Reporting Period.

**E.** For the first three years of claims-made coverage, premium will be comparatively lower than for occurrence coverage, and will increase for each renewal of those policies. Claims-made prices will still be somewhat lower than occurrence prices for mature accounts (in their fourth or later years). The purchase of Optional Extended Reporting Periods, as described above, requires additional premium payments.

8-D-1014   Ed. 09-2004

BUSINESSOWNERS
COMMERCIAL GENERAL LIABILITY

# EMPLOYEE BENEFIT PROGRAMS LIABILITY COVERAGE FORM

### THIS INSURANCE PROVIDES CLAIMS-MADE COVERAGE.
### Please read the entire form carefully.

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we," "us" and "our" refer to the Company providing this insurance.

The word "insured" means any person or organization qualifying as such under SECTION II - WHO IS AN INSURED.

Other words and phrases that appear in quotation marks have special meaning. Refer to SECTION VII - DEFINITIONS.

## SECTION I - EMPLOYEE BENEFIT PROGRAMS LIABILITY COVERAGE

1. **Insuring Agreement**
   a. We will pay for all "loss" resulting from a "claim" made by any of your employees, former employees, or their beneficiaries or legal representatives, for a "wrongful act" to which this insurance applies. We will have the right and duty to defend an "insured" against any "suit" seeking such "loss" even if any allegations of the "suit" are groundless, false, or fraudulent. However, we will have no duty to defend an insured against any "suit" seeking "loss" to which this insurance does not apply. At our discretion, we may investigate any allegation of a "wrongful act" and settle any "claim" or "suit" that may result. But:
      (1) The amount we will pay for damages is limited as described in Section IV - Limits Of Insurance; and
      (2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of "loss."

   No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments.

   b. This insurance does not apply to "wrongful acts," which took place before the Retroactive Date, if any, shown in Declarations for this Coverage Part or which take place after the "policy period." This insurance applies only to "loss" from "wrongful acts" which take place:
      (1) In the Coverage Form Territory described in Section III;

   (2) During the "policy period" and "claim" for damages is first made against any insured during the "policy period"; or
   (3) Prior to the "policy period," but on or after the Retroactive Date, if any, shown in the Declarations for this Coverage Part, if prior to the effective date of this Coverage Part:
      (i) The insured did not give notice to any prior insurer of such "wrongful act"; and
      (ii) The insured had no knowledge of such "wrongful act" likely to give rise to a "claim" hereunder; and
      (iii) "Claim" for damages is first made against any insured during the "policy period."

   c. A "claim" by any person or organization seeking "loss" will be deemed to have been made at the earlier of the following times:
      (1) When notice of such "claim" is received and recorded by any insured or by us, whichever comes first; or
      (2) When we make settlement in accordance with Paragraph 1.a. above.

   d. All "claims" for "loss" based on or arising out of a single "wrongful act" or all "interrelated wrongful acts" of one or more insureds will be deemed to be one "claim" and to have been made at the time the first of those "claims" is made against any insured.

2. **Exclusions**
   This insurance does not apply to:
   a. Any dishonest, fraudulent, malicious, or criminal conduct of an insured. This exclusion applies only to insureds who participated in, acted with knowledge of, or acquiesced to such conduct.

b. Any "claim" for libel or slander.

c. Bodily injury to, or sickness, disease, or death of any person, or to injury to or destruction of tangible property, including the loss of use thereof.

d. Any "claim" for failure of performance of contract by any insurer; including failure of any "employee benefit program".

e. Any "claim" based upon the insured's failure to comply with any law concerning workers compensation, unemployment compensation, social security, disability benefits or any similar law.

f. Any "claim" based upon the termination of any "employee benefit program".

g. Any "claim" based upon: (1) Failure of stock shares to perform as represented by an insured; or (2) Advice given by an insured to an employee to participate or not to participate in stock subscription plans; or (3) The investment or non-investment of funds.

h. Any "claim" arising from liability assumed or contracted for by the named insured.

i. "Loss" based upon or attributable to an insured gaining personal profit or advantage to which the insured is not legally entitled.

j. Any "wrongful act" if insurance for such "loss" is provided by any other Coverage Part attached to this policy or by any other insurance policy issued by any member company of the Utica National Insurance Group. This exclusion does not apply to an Excess Liability Policy written specifically to apply in excess of the limits of this Coverage Part.

k. "Loss" from any obligation arising from an insured's activities in a fiduciary capacity as respects any employee benefit plan. As used in this exclusion, fiduciary means a person or entity which:

   (1) Exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets; or

   (2) Renders investments advice, direct or indirect, with respect to any money or other property of such plan, or has authority or responsibility to do so.

l. "Loss" arising out of wrongful termination of employment, discrimination, humiliation or other employment-related practices or policies.

3. **Supplementary Payments**

   We will pay, with respect to any "claim" or "suit" we defend:

   a. All expenses we incur.

   b. The cost of bonds to release attachments, but only for bond amounts within the applicable Limit of Insurance. We do not have to furnish these bonds.

   c. All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the "claim" or "suit," including actual loss of earnings up to $250 a day because of time off from work.

   d. All costs taxed against the insured in the "suit."

   e. Pre-judgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any pre-judgment interest based on that period of time after the offer.

   f. All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in the court the part of the judgment that is within the applicable Limit of Insurance.

   These payments will not reduce the Limits of Insurance.

## SECTION II - WHO IS AN INSURED

1. If you are designated in the Declarations as:

   a. An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

   b. A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

   c. An organization other than a partnership or joint venture, you are an insured. Your directors and stockholders are also insured, but only with respect to their liability as stockholders or directors.

2. Each of your employees and executive officers are also insureds, but only if such employee is authorized to act in the "administration" of the insured's "employee benefit programs."

   No person or organization is an insured with respect to the conduct of any current or past partnership or joint venture that is not shown as a Named Insured in the Declarations.

## SECTION III - COVERAGE FORM TERRITORY

This Coverage Part applies only to "wrongful acts" which take place within the United States of America, its territories or possessions or Canada. We will only defend "claims" or "suits" which are made in the territory described above.

## SECTION IV - LIMITS OF INSURANCE

1. The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:
   a. Insureds;
   b. "Claims" made or "suits" brought; or
   c. Persons or organizations making "claims" or bringing "suits."

2. The Aggregate Limit For Each Annual Policy Year is the most we will pay for damages because of "losses" covered by this form.

3. a. Subject to 2. above, the Each Loss limit is the most we will pay for all "loss" from any one "wrongful act" or all "interrelated wrongful acts" of one or more insureds; and
   b. Only one deductible amount applies to all such "loss."

4. The limits of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the "policy period" shown in the Declarations, unless the "policy period" is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

5. The deductible amount of $1,000 as stated in the Declarations, shall be deducted from the amount of each "loss" covered by this Coverage Part. We will be liable only for damages in excess of the deductible. We may pay any part or all of the deductible amount to settle a "claim" or "suit" and you agree to promptly reimburse us for such part of the deductible amount paid by us

## SECTION V - EMPLOYEE BENEFIT PROGRAMS LIABILITY CONDITIONS

1. **Bankruptcy**
   Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

2. **Duties in the Event of Wrongful Act, Claim or Suit**
   a. You must see to it that we are notified as soon as practicable of any "wrongful act" which may result in a "claim". To the extent possible, notice should include:
      (1) How, when and where the "wrongful act" took place;
      (2) The names and addresses of any persons involved in the "wrongful act" and witnesses; and
      (3) The nature of the harm resulting from the "wrongful act."

      Notice of a "wrongful act" is not notice of a "claim".

   b. If a "claim" is received by any insured, you must:
      (1) Immediately record the specifics of the "claim" and the date received; and
      (2) Notify us as soon as practicable.

      You must see to it that we receive written notice of the "claim" as soon as practicable.

   c. You and any other involved insured must:
      (1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "claim" or "suit."
      (2) Authorize us to obtain records and other information;
      (3) Cooperate with us in the investigation, settlement or defense of the "claim" or "suit"; and
      (4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of "loss" to which this insurance may also apply.

   d. No insureds will, except at their own cost, voluntarily make a payment, assume any obligation or incur any expense without our consent.

3. **Legal Action Against Us**
   No person or organization has a right under this Coverage Part:
   a. To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or
   b. To sue us on this Coverage Part unless all of its terms have been fully complied with.

   A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured obtained after an actual trial; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable Limit of Insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

**4. Other Insurance**

If the other valid and collectible insurance is available to the insured for a "loss" we cover under this Coverage Part, our obligations are limited as follows:

**a. Primary Insurance**

This insurance is primary except when **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in **c.** below.

**b. Excess Insurance**

This insurance is excess over any other insurance, whether primary, excess, contingent or on any other basis available to the insured for any "wrongful act" which took place prior to the "policy period."

When this insurance is excess, we will have no duty to defend any "claim" or "suit" that any other insurer has a duty to defend. If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

When this insurance is excess over other insurance, we will pay only our share of the amount of "loss," if any, that exceeds the sum of:

**(1)** The total amount that all such other insurance would pay for the "loss" in the absence of this insurance; and

**(2)** The total of all deductible and self-insured amounts under all that other insurance.

We will share the remaining "loss," if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c. Method of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable Limit of Insurance or none of the "loss" remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method each insurer's share is based on the ratio of its applicable Limit of Insurance to the total applicable Limits of Insurance of all insurers.

**5. Premium**

**a.** We will compute all premiums for this Coverage Part in accordance with our rules and rates.

**b.** Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each annual period of this policy the first Named Insured shall furnish the company with a statement of the total number of employees at the end of the "policy period." The earned premium shall be computed on the average number of employees at the beginning and end of such period in accordance with the rates set forth in the Declarations. If the premium so computed exceeds the estimated advance premium paid, the first Named Insured shall pay the excess to the company; if less, the company shall return to the first Named Insured the excess portion paid, subject to the minimum premium for this insurance stated in the Declarations.

**c.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**6. Representations**

By accepting this policy, you agree:

**a.** The statements in the Declarations are accurate and complete;

**b.** Those statements are based upon representations you made to us; and

**c.** We have issued this policy in reliance upon your representations.

**7. Separation of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned to the first Named Insured, this insurance applies:

**a.** As if each Named Insured were the only Named Insured; and

**b.** Separately to each insured against whom "claim" is made or "suit" is brought.

**8. Transfer of Rights of Recovery Against Others to Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**9. When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**10. Your Right to Claim and Wrongful Act Information**

We will provide the first Named Insured shown in the Declarations the following information relating to this and any preceding "employee benefit programs" claims made Coverage Part we have issued to you during the previous three years:

a. A list of other record of each "wrongful act" not previously reported to any other insurer, of which we were notified in accordance with paragraph **2.a.** of this Section. We will include the date and brief description of the "wrongful act" if that information was in the notice we received.

b. A summary by policy year, of payments made and amounts reserved, stated separately, under the applicable Aggregate Limit for Each Annual Policy Year.

Amounts reserved are based on our judgment. They are subject to change and should not be regarded as ultimate settlement values.

If we cancel or elect not to renew this Coverage Part, we will provide such information no later than 30 days before the date of policy termination. In other circumstances, we will provide this information only if we receive a written request from the first Named Insured within 60 days after the end of the policy period. In this case, we will provide this information within 45 days of receipt of the request.

We compile "claim" and "wrongful act" information for our own business purposes and exercise reasonable care in doing so. In providing this information to the first Named Insured, we make no representations or warranties to insureds, insurers, or others to whom this information is furnished by or on behalf of any insured. Cancellation or nonrenewal will be effective even if we inadvertently provide inaccurate information.

## SECTION VI - EXTENDED REPORTING PERIODS

1. We will provide an Automatic Extended Reporting Period as described in paragraph **3.**, or if you purchase it, an Optional Extended Reporting Period Endorsement as described in paragraph **4.** in the event of any "termination of coverage."

2. Any "claim" first made during an Extended Reporting Period will be deemed to have been made on the last day of the "policy period," provided that the "claim" is for "loss" from "wrongful acts" which took place before the end of the "policy period" of this policy (but not before any applicable Retroactive Date).

Extended Reporting Periods:

a. Do not extend the "policy period" or change the scope of coverage provided;

b. Apply only to the coverage terminated or reduced; and

c. Apply only as excess insurance over any other valid and collectible insurance available to the insured, whether primary, excess, contingent, or on any other basis, whose policy period begins or continues after the Extended Reporting Period takes effect.

3. The Automatic Extended Reporting Period is provided without additional charge. This period starts with the end of the "policy period" and lasts until the earliest of the following:

a. Five years for "claims" arising out of a "wrongful act" reported to us, not later than 90 days after the end of the "policy period," in accordance with paragraph **2.a.** of Section V - Employee Benefit Programs Liability Conditions;

b. The date of purchase of (and payment of required premium for) the Optional Extended Reporting Period described in this Coverage Part; or

c. Ninety days.

The Automatic Extended Reporting Period may not be cancelled.

4. If you purchase the Optional Extended Reporting Period Endorsement, the Extended Reporting Period will be of unlimited duration. This period starts on the later of the following dates:

a. The end of the "policy period"; or

b. The date of purchase of (and payment of required premium for) the Optional Extended Reporting Period described in this Coverage Part, as limited by the time allowed for such purchase.

5. a. We will notify you in writing within thirty (30) days after the date of "termination of coverage" of costs for and provisions of the Extended Reporting Periods unless we cancel for nonpayment of premium or fraudulent activities of an insured.

b. You will have until the later of sixty (60) days after the date of "termination of coverage," or thirty (30) days after the date of mailing of the Extended Reporting Period notice provided for above, to request the Optional Extended Reporting Period. Your request must be submitted to us in writing with your premium payment.

c. The Optional Extended Reporting Period Endorsement will not take effect unless the additional premium is paid when due. If that premium is paid when due, the Endorsement may not be cancelled.

d. We will determine the actual premium for the Optional Extended Reporting Period Endorsement in accordance with our rules and rates.

e. The premium for the Optional Extended Reporting Period Endorsement is shown in the Declarations or in any endorsement changing the premium because of any change in the nature or extent of the risk during the "policy period." The premium for the Optional Extended Reporting Period will be fully earned when the endorsement takes effect.

6. The Optional Extended Reporting Period Endorsement will also amend paragraph **4.b.** of Section **V** - Employee Benefit Programs Liability Conditions (Other Insurance) so that the insurance provided will be excess over any other valid and collectible insurance available to the insured, whether primary, excess, contingent, or on any other basis, whose policy period begins or continues after the Optional Extended Reporting Period Endorsement takes effect.

7. Extended Reporting Periods do not reinstate or increase the Limits of Insurance applicable to any "claim" to which this Coverage Part applies, except to the extent described in paragraph **8.** of this Section.

8. If you purchase the Optional Extended Reporting Period Endorsement:

a. We will provide a single aggregate limit of insurance for the entire Optional Extended Reporting Period equal to the dollar amount entered in the Declarations as the Aggregate Limit For Each Annual Policy Year for the final year of the terminated Employee Benefit Programs Liability Coverage Part.

b. Paragraph **2.** of Section **IV** - Limits of Insurance will be amended to reflect the aggregate as described in **a.** above.

c. The Each Loss limit shown in the Declarations will continue to apply, as set forth in paragraph **3.** of Section **IV** - Limits of Insurance.

9. If, in the event of any "termination of coverage," you elect to purchase the Optional Extended Reporting Period Endorsement:

a. Any return premium due you for the "termination of coverage" will be credited to the premium due for the Optional Extended Reporting Period Endorsement; and

b. Any additional premium or Retained Amount due us for the period the policy was in force must be fully paid before any payments can be applied to the premium due for the Optional Extended Reporting Period Endorsement.

## SECTION VII - DEFINITIONS

1. "Administration" means the following acts provided that they are authorized by the Named Insured:

a. Giving or failure to give counsel to employees with respect to the "employee benefit programs";

b. Interpreting the "employee benefit programs";

c. The handling of records in connection with the "employee benefit programs"; or

d. Effecting enrollment, termination or cancellation of employees under the "employee benefit programs".

However, "administration" does not include handling payroll deductions.

2. "Claim" means a written notice, including service of "suit" or demand for arbitration, received by one or more insureds which alleges a "wrongful act" or asks for money or services.

3. "Employee benefit programs" means:

a. Pension and profit sharing plans;

b. Individual Retirement Account (IRA) plans;

c. Salary reduction plans under Internal Revenue Code 401(k), 403(b), or any amendments thereto;

d. Employee stock subscription plans;

e. Savings Plans;

f. Group plans for life, health, dental, disability, automobile, homeowners and legal advice insurance;

g. Social Security system benefits;

h. Workers compensation and unemployment insurance;

i. Travel and vacation plans; and

j. Educational tuition reimbursement plans.

4. "Interrelated wrongful acts" means "wrongful acts" which arise out of and have as a common basis:

a. Related circumstances, situations, events, transactions or facts;

b. A series of related circumstances, situations, events, transactions or facts; or

c. A common pattern of conduct.

5. "Loss" means any amount which an insured becomes legally obligated to pay as damages for any "claim" to which this insurance applies and shall include judgments and settlements. To the extent allowed by law, "loss" shall include punitive or exemplary damages. "Loss" shall not include:

a. Fines or penalties imposed by law; and

b. Matters which may be deemed uninsurable under the law pursuant to which the policy shall be construed.

6. "Policy Period" means that period stated in the Declarations.

   a. If this Coverage Part is issued subsequent to the issuance of the policy, the "policy period" will commence only as of the effective date of this Coverage Part.

   b. If this Coverage Part or the policy to which it is attached is cancelled the "policy period" will end with that termination date.

   c. If there is a "termination of coverage" as described in parts b. or c. of the definition of "termination of coverage", the "policy period" will be understood to end on the date of such change, but only with respect to such changed coverage.

7. "Suit" means a civil proceeding in which "loss" from a "wrongful act" is alleged. "Suit" includes:

   a. An arbitration proceeding in which such "loss" is claimed and to which the insured must submit or does submit with our consent; or

   b. Any other alternative dispute resolution proceeding in which such "loss" is claimed and to which the insured submits with our consent.

8. "Termination of coverage" means:

   a. Cancellation or nonrenewal of the policy;

   b. Decrease in limits, reduction of coverage, increased deductible or self-insured retention, new exclusion; or

   c. Other change in coverage less favorable to the insured.

9. "Wrongful Act" means any breach of duty, neglect, error, omission, misstatement or misleading statement in the "administration" of your "employee benefit programs."

POLICY NUMBER:   CP   4406070

COMMERCIAL GENERAL LIABILITY
CG 25 03 05 09

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# DESIGNATED CONSTRUCTION PROJECT(S) GENERAL AGGREGATE LIMIT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

**Designated Construction Project(s):**
  PLUMBING AND HVAC CONTRACTOR

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A.** For all sums which the insured becomes legally obligated to pay as damages caused by "occurrences" under Section I - Coverage A, and for all medical expenses caused by accidents under Section I - Coverage C, which can be attributed only to ongoing operations at a single designated construction project shown in the Schedule above:

  **1.** A separate Designated Construction Project General Aggregate Limit applies to each designated construction project, and that limit is equal to the amount of the General Aggregate Limit shown in the Declarations.

  **2.** The Designated Construction Project General Aggregate Limit is the most we will pay for the sum of all damages under Coverage A, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard", and for medical expenses under Coverage C regardless of the number of:

    **a.** Insureds;

    **b.** Claims made or "suits" brought; or

    **c.** Persons or organizations making claims or bringing "suits".

  **3.** Any payments made under Coverage A for damages or under Coverage C for medical expenses shall reduce the Designated Construction Project General Aggregate Limit for that designated construction project. Such payments shall not reduce the General Aggregate Limit shown in the Declarations nor shall they reduce any other Designated Construction Project General Aggregate Limit for any other designated construction project shown in the Schedule above.

  **4.** The limits shown in the Declarations for Each Occurrence, Damage To Premises Rented To You and Medical Expense continue to apply. However, instead of being subject to the General Aggregate Limit shown in the Declarations, such limits will be subject to the applicable Designated Construction Project General Aggregate Limit.

Copyright, Insurance Services Office, Inc., 2008

B. For all sums which the insured becomes legally obligated to pay as damages caused by "occurrences" under Section I - Coverage A, and for all medical expenses caused by accidents under Section I - Coverage C, which cannot be attributed only to ongoing operations at a single designated construction project shown in the Schedule above:

1. Any payments made under Coverage A for damages or under Coverage C for medical expenses shall reduce the amount available under the General Aggregate Limit or the Products-completed Operations Aggregate Limit, whichever is applicable; and

2. Such payments shall not reduce any Designated Construction Project General Aggregate Limit.

C. When coverage for liability arising out of the "products-completed operations hazard" is provided, any payments for damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard" will reduce the Products-completed Operations Aggregate Limit, and not reduce the General Aggregate Limit nor the Designated Construction Project General Aggregate Limit.

D. If the applicable designated construction project has been abandoned, delayed, or abandoned and then restarted, or if the authorized contracting parties deviate from plans, blueprints, designs, specifications or timetables, the project will still be deemed to be the same construction project.

E. The provisions of Section III - Limits Of Insurance not otherwise modified by this endorsement shall continue to apply as stipulated.

Copyright, Insurance Services Office, Inc., 2008
CG 25 03 05 09   ☐

**THIS ENDORSEMENT MODIFIES THE POLICY. PLEASE READ IT CAREFULLY.**

# LIABILITY EXCLUSION: COMPUTER AND OTHER ELECTRONIC- RELATED PROBLEMS

This endorsement modifies the insurance provided under the policy; and the following exclusions apply to all insurance provided under the policy:

This insurance does not apply to any claim, injury, loss, damage, or damages (whether or not the form which describes the coverage defines such term or terms) caused directly or indirectly by, or arising directly or indirectly from or as a consequence of any of the following, regardless of any other cause or event that contributes concurrently or in any sequence to the claim, injury, loss, damage, or damages:

1. Actual or alleged failure, malfunction or inadequacy of:
   a. Any of the following, whether belonging to an insured or to others:
      (1) Computer hardware, including microprocessors;
      (2) Computer application software or other electronic media and records;
      (3) Computer operating systems and related software;
      (4) Computer networks;
      (5) Microprocessors (computer chips) not part of any computer system; or
      (6) Any other computerized or electronic equipment or components; or

   b. Any other products, services, data or functions; whether belonging to or provided by the insured or others; that directly or indirectly use or rely upon, in any manner, any of the items listed in Paragraph **1. a.** of this endorsement;

   due to the inability to correctly recognize, process, distinguish, interpret or accept one or more dates or times. An example is the inability of computer software to recognize dates in or after the year 2000.

2. Your, or anyone on your behalf, providing or failing to provide any advice, consultation, design, evaluation, inspection, installation, maintenance, repair, modification, replacement or supervision for the purpose of:
   a. Defining, correcting or testing for any potential or actual problem described in Paragraph **1.** of this endorsement; or
   b. Correcting any deficiencies or changing any features of any items described in Paragraph **1.** of this endorsement.

COMMERCIAL GENERAL LIABILITY
CG 21 47 12 07

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EMPLOYMENT-RELATED PRACTICES EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2.,** **Exclusions** of Section **I - Coverage A - Bodily Injury And Property Damage Liability:**

This insurance does not apply to:

"Bodily injury" to:

**(1)** A person arising out of any:

**(a)** Refusal to employ that person;

**(b)** Termination of that person's employment; or

**(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in Paragraphs **(a)**, **(b)**, or **(c)** above is directed.

This exclusion applies:

**(1)** Whether the injury-causing event described in Paragraphs **(a)**, **(b)** or **(c)** above occurs before employment, during employment or after employment of that person;

**(2)** Whether the insured may be liable as an employer or in any other capacity; and

**(3)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**B.** The following exclusion is added to Paragraph **2.,** **Exclusions** of Section **I - Coverage B - Personal And Advertising Injury Liability:**

This insurance does not apply to:

"Personal and advertising injury" to:

**(1)** A person arising out of any:

**(a)** Refusal to employ that person;

**(b)** Termination of that person's employment; or

**(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "personal and advertising injury" to that person at whom any of the employment-related practices described in Paragraphs **(a)**, **(b)**, or **(c)** above is directed.

This exclusion applies:

**(1)** Whether the injury-causing event described in Paragraphs **(a)**, **(b)** or **(c)** above occurs before employment, during employment or after employment of that person;

**(2)** Whether the insured may be liable as an employer or in any other capacity; and

**(3)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

Copyright ISO Properties, Inc., 2006

POLICY NUMBER:   CPP 4406070

**COMMERCIAL GENERAL LIABILITY**
**CG 20 37 04 13**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED - OWNERS, LESSEES OR CONTRACTORS - COMPLETED OPERATIONS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

## SCHEDULE

| Name Of Additional Insured Person(s) Or Organization(s) | Location And Description Of Completed Operations |
|---|---|
| ALL PERSON(S) OR ORGANIZATIONS YOU HAVE A WRITTEN CONTRACT IN PLACE WITH PRIOR TO A LOSS | ALL LOCATIONS |
| REQUIRING THAT THEY BE NAMED AS ADDITIONAL INSURED UNDER THIS POL. | |
| | |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A. Section II - Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury" or "property damage" caused, in whole or in part, by "your work" at the location designated and described in the Schedule of this endorsement performed for that additional insured and included in the "products-completed operations hazard".

However:

1. The insurance afforded to such additional insured only applies to the extent permitted by law; and

2. If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**B.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III - Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

1. Required by the contract or agreement; or

2. Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

Missing Form: O20838

Missing Form: O20839

COMMERCIAL GENERAL LIABILITY
CG 21 67 12 04

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# FUNGI OR BACTERIA EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph 2. **Exclusions** of Section I - Coverage A - Bodily Injury And Property Damage Liability:

**2. Exclusions**

This insurance does not apply to:

**Fungi Or Bacteria**

**a.** "Bodily injury" or "property damage" which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

**b.** Any loss, cost or expenses arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

This exclusion does not apply to any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for bodily consumption.

**B.** The following exclusion is added to Paragraph 2. **Exclusions** of Section I - Coverage B - Personal And Advertising Injury Liability:

**2. Exclusions**

This insurance does not apply to:

**Fungi Or Bacteria**

**a.** "Personal and advertising injury" which would not have taken place, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury.

**b.** Any loss, cost or expense arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

**C.** The following definition is added to the **Definitions** Section:

"Fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi.

    Copyright, ISO Properties, Inc., 2003

POLICY NUMBER:   CPP  4406070

**COMMERCIAL GENERAL LIABILITY**
CG 20 26 04 13

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED - DESIGNATED PERSON OR ORGANIZATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

## SCHEDULE

| Name Of Additional Insured Person(s) Or Organization(s): |
|---|
| CITY OF PHILADELPHIA<br>DEPT OF LICENSES & INSPECTIONS<br>1401 JFK BLVD<br>PHILADELPHIA, PA 19102 |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A. Section II - Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by your acts or omissions or the acts or omissions of those acting on your behalf:

1. In the performance of your ongoing operations; or

2. In connection with your premises owned by or rented to you.

However:

1. The insurance afforded to such additional insured only applies to the extent permitted by law; and

2. If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**B.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III - Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

1. Required by the contract or agreement; or

2. Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

Copyright Insurance Services Office, Inc., 2012

COMMERCIAL GENERAL LIABILITY
CG 21 70 01 15

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

A. If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

1. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

B. The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for injury or damage that is otherwise excluded under this Coverage Part.

Copyright, Insurance Services Office, Inc., 2015

COMMERCIAL GENERAL LIABILITY
CG 21 06 05 14

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION - ACCESS OR DISCLOSURE OF CONFIDENTIAL OR PERSONAL INFORMATION AND DATA-RELATED LIABILITY - WITH LIMITED BODILY INJURY EXCEPTION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

A. Exclusion **2.p.** of Section I - Coverage A - Bodily Injury And Property Damage Liability is replaced by the following:

**2. Exclusions**

This insurance does not apply to:

**p. Access Or Disclosure Of Confidential Or Personal Information And Data-related Liability**

Damages arising out of:

**(1)** Any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information; or

**(2)** The loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of that which is described in Paragraph **(1)** or **(2)** above.

However, unless Paragraph **(1)** above applies, this exclusion does not apply to damages because of "bodily injury".

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

B. The following is added to Paragraph **2. Exclusions** of Section I - Coverage B - Personal And Advertising Injury Liability:

**2. Exclusions**

This insurance does not apply to:

**Access Or Disclosure Of Confidential Or Personal Information**

"Personal and advertising injury" arising out of any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of any access to or disclosure of any person's or organization's confidential or personal information.

Copyright, Insurance Services Office, Inc., 2013

COMMERCIAL GENERAL LIABILITY
CG 20 01 04 13

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# PRIMARY AND NONCONTRIBUTORY - OTHER INSURANCE CONDITION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

The following is added to the **Other Insurance** Condition and supersedes any provision to the contrary:

**Primary And Noncontributory Insurance**

This insurance is primary to and will not seek contribution from any other insurance available to an additional insured under your policy provided that:

(1) The additional insured is a Named Insured under such other insurance; and

(2) You have agreed in writing in a contract or agreement that this insurance would be primary and would not seek contribution from any other insurance available to the additional insured.

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section II - Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section V - Definitions.

## SECTION I - COVERAGES

## COVERAGE A - BODILY INJURY AND PROPERTY DAMAGE LIABILITY

### 1. Insuring Agreement

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

   **(1)** The amount we will pay for damages is limited as described in Section III - Limits Of Insurance; and

   **(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

   No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments - Coverages **A** and **B**.

**b.** This insurance applies to "bodily injury" and "property damage" only if:

   **(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

   **(2)** The "bodily injury" or "property damage" occurs during the policy period; and

   **(3)** Prior to the policy period, no insured listed under Paragraph **1.** of Section II - Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

**c.** "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph **1.** of Section II - Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

**d.** "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1.** of Section II - Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

   **(1)** Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

   **(2)** Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

   **(3)** Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

**e.** Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

 Copyright Insurance Services Office, Inc., 2012

**2. Exclusions**

This insurance does not apply to:

**a. Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

**b. Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

(1) That the insured would have in the absence of the contract or agreement; or

(2) Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorneys' fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

(a) Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

(b) Such attorneys' fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

**c. Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

(1) Causing or contributing to the intoxication of any person;

(2) The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

(3) Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in:

(a) The supervision, hiring, employment, training or monitoring of others by that insured; or

(b) Providing or failing to provide transportation with respect to any person that may be under the influence of alcohol;

if the "occurrence" which caused the "bodily injury" or "property damage", involved that which is described in Paragraph (1), (2) or (3) above.

However, this exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages. For the purposes of this exclusion, permitting a person to bring alcoholic beverages on your premises, for consumption on your premises, whether or not a fee is charged or a license is required for such activity, is not by itself considered the business of selling, serving or furnishing alcoholic beverages.

**d. Workers' Compensation And Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

**e. Employer's Liability**

"Bodily injury" to:

(1) An "employee" of the insured arising out of and in the course of:

(a) Employment by the insured; or

(b) Performing duties related to the conduct of the insured's business; or

(2) The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph (1) above.

This exclusion applies whether the insured may be liable as an employer or in any other capacity and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

    Copyright Insurance Services Office, Inc., 2012    CG 00 01 04 13

**f. Pollution**

(1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

(a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

(i) "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests;

(ii) "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

(b) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

(c) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

(i) Any insured; or

(ii) Any person or organization for whom you may be legally responsible; or

(d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

(i) "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

(ii) "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

(e) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

 Copyright Insurance Services Office, Inc., 2012

(2) Any loss, cost or expense arising out of any:

    (a) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

    (b) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

**g. Aircraft, Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

(1) A watercraft while ashore on premises you own or rent;

(2) A watercraft you do not own that is:

    (a) Less than 26 feet long; and

    (b) Not being used to carry persons or property for a charge;

(3) Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

(4) Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

(5) "Bodily injury" or "property damage" arising out of:

    (a) The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged; or

    (b) The operation of any of the machinery or equipment listed in Paragraph **f.(2)** or **f.(3)** of the definition of "mobile equipment".

**h. Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

(1) The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

(2) The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

**i. War**

"Bodily injury" or "property damage", however caused, arising, directly or indirectly, out of:

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**j. Damage To Property**

"Property damage" to:

(1) Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

(2) Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

(3) Property loaned to you;

Copyright Insurance Services Office, Inc., 2012

CG 00 01 04 13

**(4)** Personal property in the care, custody or control of the insured;

**(5)** That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs **(1)**, **(3)** and **(4)** of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of seven or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section III - Limits Of Insurance.

Paragraph **(2)** of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs **(3)**, **(4)**, **(5)** and **(6)** of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

**k. Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l. Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m. Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n. Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**(1)** "Your product";

**(2)** "Your work"; or

**(3)** "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**o. Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

**p. Electronic Data**

Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

However, this exclusion does not apply to liability for damages because of "bodily injury".

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**q. Recording And Distribution Of Material Or Information In Violation Of Law**

"Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**(3)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

**(4)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

Exclusions **c.** through **n.** do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section **III - Limits Of Insurance.**

## COVERAGE B - PERSONAL AND ADVERTISING INJURY LIABILITY

### 1. Insuring Agreement

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section **III - Limits Of Insurance;** and

**(2)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C.**

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments - Coverages **A** and **B.**

**b.** This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

### 2. Exclusions

This insurance does not apply to:

**a. Knowing Violation Of Rights Of Another**

"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

**b. Material Published With Knowledge Of Falsity**

"Personal and advertising injury" arising out of oral or written publication, in any manner, of material, if done by or at the direction of the insured with knowledge of its falsity.

**c. Material Published Prior To Policy Period**

"Personal and advertising injury" arising out of oral or written publication, in any manner, of material whose first publication took place before the beginning of the policy period.

**d. Criminal Acts**

"Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

**e. Contractual Liability**

"Personal and advertising injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

**f. Breach Of Contract**

"Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

**g. Quality Or Performance Of Goods - Failure To Conform To Statements**

"Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

**h. Wrong Description Of Prices**

"Personal and advertising injury" arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

   Copyright Insurance Services Office, Inc., 2012   **CG 00 01 04 13**

**i. Infringement Of Copyright, Patent, Trademark Or Trade Secret**

"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement".

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

**j. Insureds In Media And Internet Type Businesses**

"Personal and advertising injury" committed by an insured whose business is:

(1) Advertising, broadcasting, publishing or telecasting;

(2) Designing or determining content of web sites for others; or

(3) An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs **14.a.**, **b.** and **c.** of "personal and advertising injury" under the Definitions section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

**k. Electronic Chatrooms Or Bulletin Boards**

"Personal and advertising injury" arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

**l. Unauthorized Use Of Another's Name Or Product**

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

**m. Pollution**

"Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**n. Pollution-related**

Any loss, cost or expense arising out of any:

(1) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(2) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

**o. War**

"Personal and advertising injury", however caused, arising, directly or indirectly, out of:

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**p. Recording And Distribution Of Material Or Information In Violation Of Law**

"Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

(1) The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

(2) The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

(3) The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

(4) Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

Copyright Insurance Services Office, Inc., 2012

## COVERAGE C - MEDICAL PAYMENTS

### 1. Insuring Agreement

**a.** We will pay medical expenses as described below for "bodily injury" caused by an accident:

**(1)** On premises you own or rent;

**(2)** On ways next to premises you own or rent; or

**(3)** Because of your operations;

provided that:

**(a)** The accident takes place in the "coverage territory" and during the policy period;

**(b)** The expenses are incurred and reported to us within one year of the date of the accident; and

**(c)** The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

**b.** We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

**(1)** First aid administered at the time of an accident;

**(2)** Necessary medical, surgical, X-ray and dental services, including prosthetic devices; and

**(3)** Necessary ambulance, hospital, professional nursing and funeral services.

### 2. Exclusions

We will not pay expenses for "bodily injury":

**a. Any Insured**

To any insured, except "volunteer workers".

**b. Hired Person**

To a person hired to do work for or on behalf of any insured or a tenant of any insured.

**c. Injury On Normally Occupied Premises**

To a person injured on that part of premises you own or rent that the person normally occupies.

**d. Workers' Compensation And Similar Laws**

To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

**e. Athletics Activities**

To a person injured while practicing, instructing or participating in any physical exercises or games, sports, or athletic contests.

**f. Products-Completed Operations Hazard**

Included within the "products-completed operations hazard".

**g. Coverage A Exclusions**

Excluded under Coverage **A**.

## SUPPLEMENTARY PAYMENTS - COVERAGES A AND B

**1.** We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

**a.** All expenses we incur.

**b.** Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

**c.** The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

**d.** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

**e.** All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

**f.** Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

Copyright Insurance Services Office, Inc., 2012

CG 00 01 04 13

g. All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

2. If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

a. The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

b. This insurance applies to such liability assumed by the insured;

c. The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

d. The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

e. The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

f. The indemnitee:

(1) Agrees in writing to:

(a) Cooperate with us in the investigation, settlement or defense of the "suit";

(b) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

(c) Notify any other insurer whose coverage is available to the indemnitee; and

(d) Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

(2) Provides us with written authorization to:

(a) Obtain records and other information related to the "suit"; and

(b) Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph **2.b.(2)** of Section I - Coverage **A** - Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when we have used up the applicable limit of insurance in the payment of judgments or settlements or the conditions set forth above, or the terms of the agreement described in Paragraph **f.** above, are no longer met.

## SECTION II - WHO IS AN INSURED

1. If you are designated in the Declarations as:

a. An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

b. A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

c. A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

d. An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

e. A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

2. Each of the following is also an insured:

   a. Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

     (1) "Bodily injury" or "personal and advertising injury":

       (a) To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

       (b) To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph (1)(a) above;

       (c) For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraph (1)(a) or (b) above; or

       (d) Arising out of his or her providing or failing to provide professional health care services.

     (2) "Property damage" to property:

       (a) Owned, occupied or used by;

       (b) Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by;

     you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

   b. Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

   c. Any person or organization having proper temporary custody of your property if you die, but only:

     (1) With respect to liability arising out of the maintenance or use of that property; and

     (2) Until your legal representative has been appointed.

   d. Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

3. Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

   a. Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

   b. Coverage A does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

   c. Coverage B does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

## SECTION III – LIMITS OF INSURANCE

1. The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

   a. Insureds;

   b. Claims made or "suits" brought; or

   c. Persons or organizations making claims or bringing "suits".

2. The General Aggregate Limit is the most we will pay for the sum of:

   a. Medical expenses under Coverage C;

   b. Damages under Coverage A, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

   c. Damages under Coverage B.

 Copyright Insurance Services Office, Inc., 2012 CG 00 01 04 13

3. The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage **A** for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

4. Subject to Paragraph **2.** above, the Personal And Advertising Injury Limit is the most we will pay under Coverage **B** for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

5. Subject to Paragraph **2.** or **3.** above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

   **a.** Damages under Coverage **A**; and

   **b.** Medical expenses under Coverage **C**

   because of all "bodily injury" and "property damage" arising out of any one "occurrence".

6. Subject to Paragraph **5.** above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage **A** for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner.

7. Subject to Paragraph **5.** above, the Medical Expense Limit is the most we will pay under Coverage **C** for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

## SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS

1. **Bankruptcy**

   Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

2. **Duties In The Event Of Occurrence, Offense, Claim Or Suit**

   **a.** You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

   **(1)** How, when and where the "occurrence" or offense took place;

   **(2)** The names and addresses of any injured persons and witnesses; and

**(3)** The nature and location of any injury or damage arising out of the "occurrence" or offense.

**b.** If a claim is made or "suit" is brought against any insured, you must:

   **(1)** Immediately record the specifics of the claim or "suit" and the date received; and

   **(2)** Notify us as soon as practicable.

   You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

**c.** You and any other involved insured must:

   **(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

   **(2)** Authorize us to obtain records and other information;

   **(3)** Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

   **(4)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

**d.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

3. **Legal Action Against Us**

   No person or organization has a right under this Coverage Part:

   **a.** To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

   **b.** To sue us on this Coverage Part unless all of its terms have been fully complied with.

   A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

 Copyright Insurance Services Office, Inc., 2012

**4. Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as follows:

**a. Primary Insurance**

This insurance is primary except when Paragraph **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph **c.** below.

**b. Excess Insurance**

**(1)** This insurance is excess over:

**(a)** Any of the other insurance, whether primary, excess, contingent or on any other basis:

**(i)** That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

**(ii)** That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

**(iii)** That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

**(iv)** If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion **g.** of Section **I** - Coverage **A** - Bodily Injury And Property Damage Liability.

**(b)** Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured.

**(2)** When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

**(3)** When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

**(a)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

**(b)** The total of all deductible and self-insured amounts under all that other insurance.

**(4)** We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c. Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**5. Premium Audit**

**a.** We will compute all premiums for this Coverage Part in accordance with our rules and rates.

**b.** Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

**c.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**6. Representations**

By accepting this policy, you agree:

**a.** The statements in the Declarations are accurate and complete;

Copyright Insurance Services Office, Inc., 2012

CG 00 01 04 13

b. Those statements are based upon representations you made to us; and

c. We have issued this policy in reliance upon your representations.

**7. Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

a. As if each Named Insured were the only Named Insured; and

b. Separately to each insured against whom claim is made or "suit" is brought.

**8. Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**9. When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**SECTION V - DEFINITIONS**

1. "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

a. Notices that are published include material placed on the Internet or on similar electronic means of communication; and

b. Regarding web sites, only that part of a web site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

2. "Auto" means:

a. A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

b. Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.

However, "auto" does not include "mobile equipment".

3. "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

4. "Coverage territory" means:

a. The United States of America (including its territories and possessions), Puerto Rico and Canada;

b. International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in Paragraph a. above; or

c. All other parts of the world if the injury or damage arises out of:

(1) Goods or products made or sold by you in the territory described in Paragraph a. above;

(2) The activities of a person whose home is in the territory described in Paragraph a. above, but is away for a short time on your business; or

(3) "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication;

provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in Paragraph a. above or in a settlement we agree to.

5. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

6. "Executive officer" means a person holding any of the officer positions created by your charter, constitution, bylaws or any other similar governing document.

7. "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

8. "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

b. You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

Copyright Insurance Services Office, Inc., 2012

9. "Insured contract" means:

a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

b. A sidetrack agreement;

c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

e. An elevator maintenance agreement;

f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph f. does not include that part of any contract or agreement:

(1) That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

(2) That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

(a) Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

(b) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

(3) Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in (2) above and supervisory, inspection, architectural or engineering activities.

10. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

11. "Loading or unloading" means the handling of property:

a. After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

b. While it is in or on an aircraft, watercraft or "auto"; or

c. While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

12. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

a. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

b. Vehicles maintained for use solely on or next to premises you own or rent;

c. Vehicles that travel on crawler treads;

d. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

(1) Power cranes, shovels, loaders, diggers or drills; or

(2) Road construction or resurfacing equipment such as graders, scrapers or rollers;

e. Vehicles not described in Paragraph a., b., c. or d. above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

(1) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

(2) Cherry pickers and similar devices used to raise or lower workers;

f. Vehicles not described in Paragraph a., b., c. or d. above maintained primarily for purposes other than the transportation of persons or cargo.

   Copyright Insurance Services Office, Inc., 2012   CG 00 01 04 13

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

(1) Equipment designed primarily for:

(a) Snow removal;

(b) Road maintenance, but not construction or resurfacing; or

(c) Street cleaning;

(2) Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

(3) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

14. "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

a. False arrest, detention or imprisonment;

b. Malicious prosecution;

c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

d. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

e. Oral or written publication, in any manner, of material that violates a person's right of privacy;

f. The use of another's advertising idea in your "advertisement"; or

g. Infringing upon another's copyright, trade dress or slogan in your "advertisement".

15. "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

16. "Products-completed operations hazard":

a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

(1) Products that are still in your physical possession; or

(2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

(a) When all of the work called for in your contract has been completed.

(b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

(c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

b. Does not include "bodily injury" or "property damage" arising out of:

(1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

(2) The existence of tools, uninstalled equipment or abandoned or unused materials; or

(3) Products or operations for which the classification, listed in the Declarations or in a policy Schedule, states that products-completed operations are subject to the General Aggregate Limit.

17. "Property damage" means:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

 Copyright Insurance Services Office, Inc., 2012

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

18. "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

**a.** An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

**b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

19. "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

20. "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

21. "Your product":

**a.** Means:

(1) Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

(a) You;

(b) Others trading under your name; or

(c) A person or organization whose business or assets you have acquired; and

(2) Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

**b.** Includes:

(1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

(2) The providing of or failure to provide warnings or instructions.

**c.** Does not include vending machines or other property rented to or located for the use of others but not sold.

22. "Your work":

**a.** Means:

(1) Work or operations performed by you or on your behalf; and

(2) Materials, parts or equipment furnished in connection with such work or operations.

**b.** Includes:

(1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

(2) The providing of or failure to provide warnings or instructions.

Copyright Insurance Services Office, Inc., 2012

**CG 00 01 04 13**

COMMERCIAL GENERAL LIABILITY
CG 24 26 04 13

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# AMENDMENT OF INSURED CONTRACT DEFINITION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

The definition of "insured contract" in the **Definitions** section is replaced by the following:

"Insured contract" means:

  **a.** A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

  **b.** A sidetrack agreement;

  **c.** Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

  **d.** An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

  **e.** An elevator maintenance agreement;

  **f.** That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization, provided the "bodily injury" or "property damage" is caused, in whole or in part, by you or by those acting on your behalf. However, such part of a contract or agreement shall only be considered an "insured contract" to the extent your assumption of the tort liability is permitted by law. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph f. does not include that part of any contract or agreement:

  **(1)** That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

  **(2)** That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

    **(a)** Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

    **(b)** Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

  **(3)** Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in **(2)** above and supervisory, inspection, architectural or engineering activities.

 Copyright, Insurance Services Office, Inc., 2012

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ASBESTOS EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

I. The following exclusion is added to Paragraph 2., Exclusions of **Section I - Coverage A - Bodily Injury And Property Damage Liability** and Paragraph 2., Exclusions of **Section I - Coverage B - Personal And Advertising Injury Liability:**

A. This insurance does not apply to "bodily injury", "property damage", "personal and advertising injury" or "devaluation" related to the actual, alleged or threatened presence of, or exposure to "asbestos" in any form, or to toxic substances emanating from "asbestos". This includes ingestion, inhalation, absorption or other physical exposure to "asbestos". Such presence of, or exposure to, "asbestos" includes, but is not limited to:

1. The existence of or storing of "asbestos";

2. The abatement or removal of "asbestos" from any structures, materials, products, goods or manufacturing process;

3. The disposal of "asbestos"; or

4. Any structures, manufacturing processes, or products containing "asbestos".

B. We shall have no obligation under this coverage for any loss, defense costs, or other costs or expenses arising out of any:

1. Claim, "suit", judgment, settlement, obligation, request, demand, order, or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, neutralize, or in any way respond to, or assess the actual or alleged effects of "asbestos"; or

2. Claim, "suit", judgment, settlement, obligation, request or demand due to any actual, alleged, or threatened injury or damage from "asbestos" or testing for, monitoring, cleaning up, removing, containing, treating, or neutralizing, or in any way responding to or assessing the actual or alleged effects of, "asbestos"; or

3. Claim, "suit", judgment, settlement, obligation, request or demand to investigate which would not have occurred, in whole or in part, but for the actual or alleged presence of or exposure to "asbestos".

C. This exclusion applies regardless of who manufactured, produced, installed, used, owned, stored or controlled the "asbestos".

II. The following definitions are added to the **Definitions** Section:

"Asbestos" means asbestos, asbestos fibers, asbestos products and asbestos materials, or any products, goods or materials containing asbestos or asbestos fibers, products or materials.

"Devaluation" means any claim, demand or "suit" that alleges diminution, impairment or reduction in the value of property.

8-E-3202 Ed. 1-2002     Includes copyrighted material of Insurance Services Office, Inc.,
with its permission.
Copyright, Utica Mutual Insurance Company, 2002.

IL 00 21 09 08

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
### (Broad Form)

This endorsement modifies insurance provided under the following:

COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

1. The insurance does not apply:

A. Under any Liability Coverage, to "bodily injury" or "property damage":

(1) With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

(2) Resulting from the "hazardous properties" of "nuclear material" and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

B. Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

C. Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:

(1) The "nuclear material" (a) is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or (b) has been discharged or dispersed therefrom;

(2) The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured"; or

(3) The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (3) applies only to "property damage" to such "nuclear facility" and any property thereat.

2. As used in this endorsement:

"Hazardous properties" includes radioactive, toxic or explosive properties.

"Nuclear material" means "source material", "special nuclear material" or "by-product material".

Copyright ISO Properties, Inc., 2007

"Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

"Waste" means any waste material (a) containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and (b) resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

"Nuclear facility" means:

(a) Any "nuclear reactor";

(b) Any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing "spent fuel", or (3) handling, processing or packaging "waste";

(c) Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "Insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

(d) Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

 Copyright ISO Properties, Inc., 2007

COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION - SILICA LIABILITY HAZARDS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

The insurance provided under **Section I - Coverage A - Bodily Injury And Property Damage Liability** and **Coverage B - Personal And Advertising Injury Liability** does not apply to any "occurrence", notice, claim or "suit" arising out of or resulting from:

(1) The actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of silica dust or silica particles in any form at any time, or any toxic material arising out of or resulting from silica dust or silica particles at any time; or

(2) Any loss, cost or expense for the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of silica dust or silica particles in any form by any insured or by any other person or entity.

8-E-3502 Ed. 01-2004     Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright, Utica Mutual Insurance Company, 2004.     **CG**