# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UTICA MUTUAL INSURANCE CO.,** | : | **CIVIL ACTION** |
| *Plaintiff,* | : | |
| | : | |
| **v.** | : | **No. 18-3959** |
| | : | |
| **VOEGELE MECHANICAL, INC., *et al.,*** | : | |
| *Defendants.* | : | |

## OPINION

## I.    Introduction

This case arises from a demand for arbitration with the American Arbitration

Association filed by Pine Run Retirement Community ("Pine Run") against

Defendant McDonald Building Company ("McDonald") regarding a remodeling

project that Pine Run alleged McDonald defectively performed.  McDonald sought

to join its subcontractor Voegele Mechanical, Inc. ("Voegele") as a party to the

arbitration asserting that McDonald qualified as an additional insured under

Voegele's commercial general liability policy with Plaintiff Utica Mutual

Insurance Company ("Utica").  Utica subsequently filed this declaratory action

seeking a declaration from this Court that it owes no obligation to defend or

indemnify its named insured, Voegele[1], or alleged additional insured, McDonald.

*See* ECF No. 1.

---

[1] After Voegele filed for bankruptcy, the arbitration was limited to the available
insurance coverage under Voegele's policy with Utica, and the parties were

1

This matter comes before the Court on Utica and McDonald's cross motions for summary judgment (ECF Nos. 30 & 31).[2] For the following reasons, Utica's Motion for Summary Judgment will be granted, and McDonald's Motion for Summary Judgment will be denied.

## II.  Background

Pine Run contracted with McDonald to complete renovations at its facilities that included the replacement and installation of new packaged terminal air conditioner ("PTAC") units and the integration of new construction and replacement components with existing construction. Under the construction agreement, McDonald assumed the duties of a construction manager. McDonald subsequently subcontracted the replacement and installation of the PTAC units to Voegele. The agreement between McDonald and Voegele (the "subcontract") delimitated the scope of Voegele's work. Pursuant to the subcontract, Voegele was obligated to obtain broad form commercial general liability coverage. Accordingly, Utica insured Voegele under a commercial general liability policy that provided coverage and contained additional insured provisions for contractors' completed operations.

prohibited from seeking the assets of Voegele. Consequently, Voegele no longer has any interest in the outcome of this declaratory judgment action. ECF No. 30-1 at ¶ 3 (Stipulation of Undisputed Facts).

[2] The parties agreed that this matter would be disposed of on cross motions for summary judgment. *See* ECF No. 18.

On May 29, 2018, Pine Run commenced an AAA arbitration action (the

"AAA Complaint") against McDonald pursuant to the construction agreement

wherein Pine Run alleged, among other things, that McDonald negligently and/or

defectively supervised and performed the replacement and installation of the

PTAC units at Pine Run resulting in "substantial and widespread water infiltration

and mold in patient rooms at the Health Center."

Specifically, the AAA arbitration statement of claims alleges the following: [3]

4.      On June 28, 2013, Pine Run and McDonald entered into the
American Institute of Architect's Agreement Between Owner and
Construction Manager as Constructor ALAI Document A133 — 2009
("the Construction Agreement"), (See Exhibit A)

. . .

10.     Under the Construction Agreement, McDonald was required to
serve as construction manager and constructor for a project that
included extensive renovations to Pine Run's existing five-story Health
Center.

11.     As part of the project, McDonald undertook extensive
renovations to the facility.

12.     The renovations included:

        a.      Enclosing the original fourth-floor balconies with
        facades and roofs;

        b.      Replacing facade cladding on portions of the fifth-
        floor exterior walls;

---

[3] The following facts recited are those stipulated to by the parties as undisputed.
ECF No. 30-1 at ¶ 3 (Stipulation of Undisputed Facts).

c. Installing new and replacing original window systems;

d. Replacing storefronts and entrances;

e. Installing and replacing all original PTAC2 units and sleeve penetrating the existing and new perimeter walls; and

f. Integrating the new construction and replacement components with the original construction.

...

15. McDonald also "warrant[ed] that the Work will conform to the requirements of the Contract Documents and will be free from defects, except for those inherent in the quality of the Work the Contract Documents require or permit. Work, materials, or equipment not conforming to these requirements may be considered defective." (See id, at § 3.5; Exhibit A).

...

## B. An Independent Third Party – TBS – Determined that McDonald's Negligent Installation of the PTAC Units Cause Water Damage to Patient Rooms

18. After installation of the PTAC units, a Pine Run housekeeper noticed water damage in three patient rooms (Rooms 413, 415, 420).

19. Pine Run found similar damage in other rooms that have PTAC units installed by McDonald.

20. In November 2016, the ongoing problem was evidenced by the PTAC unit in Room 531 leaking into Room 426.

21. Pine Run engaged an independent third party, TBS to investigate and determine the cause of the water damage observed in patient rooms.

22. TBS determined that McDonald improperly installed the packing, fabricated pans, flashing and related material during the installation of the new PTAC units:

The water testing included testing of the metal PTAC sleeve (Test Location #1) and the exterior louver (Test Location #2). We tested to the metal PTAC sleeve first to determine if the metal sleeve had any deficiencies that may be contributing to the water infiltration noted on the interior. We noted water was able to flow through the metal PTAC sleeve when the weeps were sealed. This water discharged to the exterior, at various points and the space below, through a gap in the floor system. 'There may be water infiltration occurring behind the original louver, We believe that water collected in the pan does not drain continuously to the exterior due to the lack of the 2" end dam at the metal flashing pan and sealant at the leading edge of the metal flashing pan.

We note that the new GE PTAC unit was installed in the rough opening of the previous PTAC unit. We believe that the previous PTAC unit was larger than the new GE PTAC unit. In order to install the new GE PTAC unit, wood blocking, sealant and metal flashing was installed at the exterior wall behind the original louver. However, we are not able to confirm the installation of exterior sheathing and the tie-in of the weather resistive barrier. We were able to observe daylight within the wood blocking assembly. We also were able to note daylight below the PTAC unit from the interior.

We were able to review the GE PTAC unit installation instructions as provided in submittal package 15740-01-01, dated 13 September 2013. We are unaware of any other shop drawings or other submittals for the PTAC installation, The installation instructions recommend providing a metal pan with 2" end dam extending the depth of the flashing pan. The metal PTAC sleeve is to be installed on top of this pan in a bed of sealant. We did not observe the 2" end dam or the bed of sealant at the PTAC sleeve at Test Location #1 and #2 as recommended by the GE installation instructions.

The water test at Location #2 was conducted to test the original louver in an event of a rainstorm. Our nozzle, held

5

at 60 degrees was intended to replicate a rain storm event. Within 10 minutes of testing, we noted 2 quarts of water in a bucket in the space below Room 415, The path of water was similar to the Test Location #1. We believe that the water is traveling through the gap in the floor at the wood blocking pack out. From our tests we conclude that the wood blocking assembly installed to pack out and seal the reduced rough opening at the new PTAC unit is not water tight.

(See January 19, 2016 TBS Report at pp. 4-5; Exhibit B).

23. TBS recommended further investigation that included forensic removal of the PTAC and associated components to understand McDonald's installation and to generate project-specific details to remedy the situation. (See id. at p. 5).

...

25. The forensic removal and inspection of McDonald's work further confirmed that McDonald had defectively installed the PTAC unit, resulting in leakage. As TBS observed:

The forensic removal of the existing exterior finishes demonstrated the lack of continuity of the weather resistive barrier and connection to the metal flashing systems. In addition, the lack of properly sealed metal flashing at the right jamb provided areas for the water intrusion observed by Pine Run Retirement Community. Our water testing, conducted on January 5, 2016, showed that water traveled through the gaps at the wood blocking and into the gap/hole at the floor. This water traveled through the gap/hole in the floor and appeared in space below Room 413. The forensic removal uncovered improperly terminated flashings. We noted gaps and a path for water to travel. In addition, there was no connection of the weather resistive barrier into the rough opening or the PTAC unit.

6

> This lack of continuity of the between the weather resistive barrier and the PTAC flashing allows for water intrusion into the wall assembly.

(See TBS March 31, 2016 Report at p. 2; Exhibit B).

. . .

28. On June 29, 2016, TBS returned to Pine Run to visually inspect two additional PTAC locations on the second and third floors of the Health Center.

29. TBS determined that McDonald engaged in the same negligent workmanship and installation of these PTAC units:

> During our visit, we reviewed existing conditions of the PTAC units at Rooms 224 and 322. In our limited visual review of the units in these rooms, we noted similar conditions to those noted in our report dated January 19, 2016. Such conditions include: no sealant noted below the bottom pan flashing, gaps in the perimeter sealant, and noted paths to daylight from the interior. While we understand that no water infiltration issues have been reported, our limited visual inspection of the PTAC units in Rooms 224 and 322 revealed similar issues to those outlined in our previous report dated January 19, 2016 which include: no sealant at the base of the flashing pan, no upturned leg on the metal pan flashing per GE's recommended installation instructions, and a lack of continuity in the weather resistive barrier. We recommend that these issues be addressed in a similar fashion to the remedial work detailed for the PTAC unit at Room 518, We recommend reviewing other PTAC locations throughout the facility to ensure a water tight condition exists at the PTA C units.

(See TBS Report dated August 3, 2016; Exhibit B).

30. Despite the fact that an independent third party has determined that McDonald defectively installed the PTAC units, McDonald has refused to correct the defects at its cost as required by the Construction Agreement.

...

## D.  Pine Run Continues to Discover Additional Water Penetration at Multiple Other PTAC Locations

32.  Pine Run's continued inspection of the property has revealed water penetration at multiple other PTAC locations.

33.  Functional drainage flashing and weather-resistive barrier seals at the PTAC sleeve are deficient, allowing water and air penetration.

34.  No weather-resistive barrier exists behind the stucco finish on the plywood panel at the fifth floor PTAC units.

35.  The fifth floor PTAC sleeve flashing is deficient, allowing water infiltration at the fourth floor ceiling.

36.  Pine Run believes, and therefore alleges, that the systemic defects in McDonald's installation of the PTACs was so fundamentally deficient that there is water damage at all PTAC locations.

## E.  Pine Run Discovers Other Construction Defects

37.  McDonald's defective installation of the PTAC units prompted Pine Run to perform additional inspections of the Health Center to determine if other construction work performed by McDonald was defective.

38.  These inspections revealed multiple, substantial construction defects resulting in extensive damage to the facility, including:

a.  Metal base flashing between the third floor brick wall and the fourth floor fiber cement cladding is deficient.

b.  The weather-resistive barrier installed behind the fiber cement cladding uses improper flashing tape and flashing details at the terminations.

c.  The fourth floor windows were improperly installed and poorly sealed, the fifth floor window flashing is deficient.

d.    Deficient or missing insulation and non-conforming soffit construction was identified in the fourth floor at the wall interface, increasing air infiltration and poor thermal performance.

e.    Missing moisture barrier at the fourth floor soffit.

f.    Discontinuity of the moisture barrier behind the fifth floor metal column covers allows water penetration.

g.    Roof expansion joints are discontinuous at the fourth floor and fifth floor roof edge, which do not accommodate anticipated movement and expose the roof components to damage and water infiltration.

h.    Failure along the fifth floor roof gravel stop.

i.    Multiple leaks in the fourth floor patient room ceilings, resulting in mold and other evidence of water-related deterioration of interior building components.

j.    Fourth floor roof bases flashing and termination bars are improperly anchored into Gypsum sheathing and not a structural material.

k.    The as-built gutter attachment at the fourth floor roof is not in compliance with industry standards.

l.    Perimeter fire safeing(sic) is missing at the edge of the fifth floor slab.

39.    Further testing revealed substantial and widespread water infiltration and mold in patient rooms throughout the Health Center.

40.    McDonald's negligent and faulty work also caused damage to the Health Center's Roof. There is roof damage caused by leakage from the PTAC installation in Room 518. Room 518 is immediately above Room 413, There is a flat roof wrapped from Room 413 up to Room 518. When a roofer cut into the flat roof membrane to investigate the damage caused by the leak, not only was the leak from Room 518 identified, but sawdust and other waste construction materials which should have been cleaned out before the membrane was installed were

9

discovered, so that the membrane would not seal to the plywood base. The water underneath the roof from the PTAC leak had frozen and cracked the roof which now needs to be replaced.

F. **Damages**

44. As a result of McDonald's negligent defective installation of the PTAC units and refusal to correct the defects, Pine Run has incurred, and continues to incur, significant damages.

45. Pine Run estimates that it will cost at least $1.8 million just to repair McDonald's faulty work and to remediate the defective building conditions. Remediating the mold in the patient rooms alone will take more than a year and will result in a considerable disruption to Pine Run's ongoing operations.

(A copy of the arbitration demand is attached hereto as Exhibit "A").

----

As a result of those factual allegations setting forth instances of, among other things, the defective and negligent installation of the PTAC units, Pine Run asserted three causes of action: breach of contract (Count I), breach of implied warranties (Count II), and breach of expressive warranties (Count III). ECF No. 30-4.

Pine Run's claimed damages attributable to the alleged defective and negligent installation of the PTAC units include: repairing the installed PTAC units; remediating damage to the existing buildings due to water infiltration; remediating mold caused by water infiltration; disruption of ongoing business operations; and substantial testing and inspection-related expenses. ECF No. 30-4 at ¶¶44-46.

10

There is no separate complaint joining Voegele as an additional respondent

to the arbitration, yet pursuant to subsection 17.3[4] of Article 17 "Dispute

Resolution" of McDonald's subcontract with Voegele, Voegele agreed to be joined

as a party in any litigation, arbitration or proceeding involving the contractor. ECF

No. 30-5.

The subcontract was effective as of June 25, 2013, and designated Voegele

as McDonald's "Subcontractor" with regard to HVAC work to be done at Pine Run

– Health Center for Pine Run Retirement Community and, specifically, installation

of the PTAC units. ECF No. 30-5 at p. 2. Voegele's scope of work under the

subcontract included, but was not limited to:

> [A]ll items necessary to furnish and install HVAC Systems for Pine
> Run Retirement Community – Health Center Renovations project. The
> work shall include, but not be limited to, providing all labor,
> supervision, materials, engineering, equipment, transportation,
> permit/fees, applicable taxes, insurance, patent fees, warranties,
> guarantees required to perform the complete work as shown or
> described in the Contract Documents. This scope of work takes
> precedence over all other Contract Documents.
>
> ***
>
> H. As this Project involves construction within an occupied
> building, this Subcontractor is to exercise care to protect existing
> conditions such as buildings, roads, walls, drives, trees, vehicles,

---

[4] 17.3 Subcontractor agrees to be joined as a party in any litigation, arbitration, or
proceeding involving the Contractor and any third party that involves any issue or
fact arising out of or related in any way to the Subcontract and its performance
thereunder and hereby expressly consents to the jurisdiction of the court where
such litigation, arbitration, or proceeding is instituted.

utilities, etc. from damage due to your Work. Repair or replace any such items damaged to the entire satisfaction of MBC and Pine Run Retirement Community at no additional cost.

\*\*\*

AA. Furnish and install PTAC units including but not limited to piping, wall sleeves, etc. per the documents and as described in the specifications.

ECF No. 30-5 at pp. 22-24.

Further, pursuant to Article 9 "Insurance," Voegele's obligations to

McDonald included:

[O]btain[ing] and maintain[ing], at Subcontractor's expense, the insurance coverages required in this Article and in accordance with the requirements and limits set forth on Exhibit D, attached hereto and made a part hereof.

*Id.* at p. 8. In pertinent part, Exhibit D of the Contract reads:

## COMMERCIAL GENERAL AND UMBRELLA LIABILITY INSURANCE:

Sub-Contractor shall maintain commercial general liability (CGL), and if necessary, commercial umbrella insurance with a limit of not less than $5,000,000.00 each occurrence. If such CGL insurance contains a general aggregate limit, it shall apply separately to the project.

CGL insurance shall be written on ISO occurrence form CG 00 01 (or substitute form providing equivalent coverage) and shall cover liability arising from premises, contractual liability, operations, independent contractors, products-completed operations, personal injury and advertising injury, broad form property damage and liability assumed under an insured contract (including the tort liability of another assumed in a business contract).

Owner, McDonald Building Company, LLC, their agents, directors, officers, employees, subsidiaries and affiliates, and any other parties as

designated in the contract documents shall be included as an additional insured under the CGL, using ISO Additional Insured Endorsement CG 20 10 (03/97 edition) or CG 20 10 (10/01 edition) AND CG 20 37 (10/01 edition) or a substitute providing equivalent coverage, and under the commercial umbrella, if any. All insurance certificates shall contain an affirmative statement that there is no CG 24 26 endorsement (Amendment of Insured Contractor Definition) or any other provision excluding coverage for the Contractor's Sole Negligence which has been assumed by Contract if not otherwise prohibited by law. Sub-Contractor's insurance is to be endorsed to reflect it is primary and non-contributory and that any other insurance or self-insurance programs afforded to, or maintained by Owner or McDonald Building Company, LLC or other additional insureds shall be excess only and shall not be called upon to contribute with this insurance.

*Id.* at p. 31.

Utica issued a Commercial Package Policy to Voegele as its first named

insured for the policy period of March 1, 2016 through March 1, 2017. *See* ECF

No. 30-6.[5] The insuring agreement for the policy reads, in pertinent part, as

follows:

## COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1. Insuring Agreement

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any

---

[5] Utica insured Voegele from March 1, 2011 through March 1, 2017. Utica refers to the last policy period as that appears to be the time frame when the damage became apparent as alleged in the AAA complaint. The pertinent language from the insuring agreement and definition cited supra is identical in all of the policies.

"suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. . . .

b.     This insurance applies only to "bodily injury" or "property damage" only if:

(1)     The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

(2)     The "bodily injury" or "property damage" occurs during the policy period; . . .

ECF No. 30-6 at Bates No. 00039.

The policy contains the following Additional Insured – Owners, Lessees or

Contractors – Completed Operations Endorsement:

### ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS – COMPLETED OPERATIONS

A.     Section II – Who is An Insured is amended to include as an additional insured the person(s) or organization(s) shown In the Schedule, but only with respect to liability for "bodily injury" or "property damage" caused, in whole or In part, by "your work'" at the location designated and described in the Schedule of this endorsement performed for that additional Insured and included In the "products-completed operations hazard".

1.     The insurance afforded to such additional insured only applies to the extent permitted by law; and

2.     If coverage provided to the additional Insured Is required by a contract or agreement, the insurance afforded to such additional Insured will not be broader than that which you are required by the contract or agreement to provide for such additional Insured.

B.     With respect to the insurance afforded to these additional insureds, the following is added to Section III - Limits Of Insurance:

14

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

1. Required by the contract or agreement; or

2. Available under the applicable Limits of Insurance shown in the Declarations;

whichever Is less.

This endorsement shall not increase the applicable Limits of Insurance shown In the Declarations.

*Id.* at 00030.

The policy also contains the following Primary and Noncontributory –

Other Insurance Condition Endorsement:

PRIMARY AND NONCONTRIBUTORY – OTHER INSURANCE CONDITION

The following is added to the Other Insurance Condition and superseded any provision to the contrary:

Primary And Noncontributory Insurance

This Insurance is primary to and will not seek contribution from any other Insurance available to an additional insured under your policy provided that:

(1) The additional insured is Named Insured under such other insurance; and

(2) You have agreed in writing in a contract or agreement that this Insurance would be primary and would not seek contribution form any other insurance available to the additional insured.

*Id.* at 00038.

The policy defines "occurrence" as an accident, "including continuous or

repeated exposure to substantially the same general harmful conditions." *Id.* at

00053. The policy contains the following definition: "Insured contract," as

amended by Endorsement:

f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization, provided the "bodily injury" or "property damage" is caused, in whole or in part, by you or by those acting on your behalf. However, such part of a contract or agreement shall only be considered an "insured contract" to the extent your assumption of the tort liability is permitted by law. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

*Id.* at 00055.

The policy contains, in relevant part, the following definition of "Products-

completed operations hazard":

16. "Products-completed operations hazard":

a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

(1) Products that are still in your physical possession; or

(2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

(a) When all of the work called for in your contract has been completed.

(b)     When all of the work to be done at the job
        site has been completed if your contract
        calls for work at more than one job site.

(c)     When that part of the work done at a job site
        has been put to its intended use by any
        person or organization other than another
        contractor or subcontractor working on the
        same project.

Work that may need service, maintenance,
correction, repair or replacement, but which is
otherwise complete, will be treated as completed.

*Id.* at 00053.

The policy contains the following definition of "Property damage":

17.     "Property damage" means:

a.      Physical injury to tangible property, including all
        resulting loss of use of that property. All such loss of use
        shall be deemed to occur at the time of the physical
        injury that caused it; or

b.      Loss of use of tangible property that is not physically
        injured. All such loss of use shall be deemed to occur at
        the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not
tangible property.

*Id.* at 00053.

The policy contains the following definition of "Your work":

22.     "Your work":

(a)     Means:

        (1)     Work or operations performed by you or on your
                behalf; and

        (2)     Materials, parts or equipment furnished In
                  connection with such work or operations.

   b.    Includes:

        (1)     Warranties or representations made at any time
                  with respect to the fitness, quality, durability,
                  performance or use of "your work"; and

        (2)     The providing of or failure to provide warnings or
                  instructions.

*Id.* at 00054.

## III. Standard of Review

Summary judgment "is appropriate where the moving party has established

'that there is no genuine dispute as to any material fact and the movant is entitled

to judgment as a matter of law.'" *Burton v. Teleflex, Inc.*, 707 F.3d 417, 425 (3d

Cir. 2013) (quoting Fed. R. Civ. P. 56(a)). "A fact is material if it might affect the

outcome of the suit under the governing law." *Id.* When reviewing a motion for

summary judgment, the court views "the facts in the light most favorable to the

non-moving party and draws all reasonable inferences in that party's favor." *Id.*

"[T]he non-moving party must present more than a mere scintilla of evidence" and

must present evidence on which a jury could reasonably find for that party. *Id.*

(internal quotation and citation omitted). Additionally, "[s]ummary judgment is

appropriate when the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law." *Wright v. Corning*, 679 F.3d 101, 105 (3d Cir. 2012) (internal quotation and citations omitted).

## IV. Discussion

Utica argues, among other things, that it is entitled to summary judgment and a declaration that it owes no obligation to defend or indemnify McDonald in the underlying arbitration action because the four corners of the arbitration complaint allege contractual and warranty claims against McDonald for supposed improper or defective work at Pine Run, which does not qualify as an "occurrence" as defined in the general liability policy. ECF No. 30-2 at p. 2. The Court agrees.

"[A] liability insurer's duty to defend an insured and its duty to indemnify are distinct, though related obligations." *Sapa Extrusions, Inc. v. Liberty Mut. Ins. Co.*, No. 18-2206, 2019 WL 4384187, at *4, __ F.3d __ (3d Cir. Sept. 13, 2019) (citing *Kvaerner U.S., Inc. v. Commercial Union Ins. Co.*, 908 A.2d 888, 896 n.7 (Pa. 2006)). "Both are creations of contract." *Id.* (citing *Donegal Mut. Ins. Co. v. Baumhammers*, 938 A.2d 286, 290–91 (Pa. 2007); *Genaeya Corp. v. Harco Nat. Ins. Co.*, 991 A.2d 342, 347 (Pa. Super. 2010)).

"[I]n the context of a declaratory judgment action to determine an insurer's obligations, Pennsylvania courts consistently apply what is known as the 'four-corners rule.'" *Id.* (citing *Lupu v. Loan City LLC*, 903 F.3d 382, 389–90 (3d Cir. 2018) (collecting cases)). "That is, when a policyholder is sued, 'an insurer's duty

19

to defend is triggered, if at all, by the factual averments contained in [the underlying] complaint[.]'" *Id.* (citing *Kvaerner*, 908 A.2d at 896; *Am. & Foreign Ins. Co. v. Jerry's Sport Ctr., Inc.*, 2 A.3d 526, 541 (Pa. 2010); *Mut. Ben. Ins. Co. v. Haver*, 725 A.2d 743, 745–46 (Pa. 1999) ("A carrier's duties to defend and indemnify an insured in a suit brought by a third party depend upon a determination of whether the third party's complaint triggers coverage."); *Ramara, Inc. v. Westfield Ins. Co.*, 814 F.3d 660, 673 (3d Cir. 2016)). "And '[i]f the allegations of the underlying complaint potentially could support recovery under the policy, there will be coverage at least to the extent that the insurer has a duty to defend its insured in the case.'" *Id.* (citing *Ramara*, 814 F.3d at 673; *Jerry's Sport Ctr.*, 2 A.3d at 541).

"If triggered, the duty to defend also carries 'a conditional obligation to indemnify in the event the insured is held liable for a claim covered by the policy.'" *Id.* (citing *Gen. Accident Ins. Co. of Am. v. Allen*, 547 Pa. 693, 692 A.2d 1089, 1095 (1997)). In other words, "[t]he initial *allegations* in the underlying complaint that may trigger the insurer's duty to defend must eventually mature into provable *facts* to spark a duty to indemnify." *Id.* at *5 (citation omitted). "[B]ecause the duty to defend is 'broader' than the duty to indemnify, if a court determines that the former does not exist, neither does the latter." *Id.* (citing *Kvaerner*, 908 A.2d at 896 n.7; *Ramara*, 814 F.3d at 673).

20

Accordingly, the Court must decide whether a duty to defend exists by first reviewing the language of the insurance policy to determine when it provides coverage and then examining the AAA Complaint to ascertain whether its allegations constitute the type of instances that will trigger coverage. *Lenick Constr., Inc. v. Selective Way Ins. Co.*, 737 F. App'x 92, 94 (3d Cir. 2018) (citation omitted). "When interpreting an insurance policy, we first look to the terms of the policy." *Indalex Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 83 A.3d 418, 420 (Pa. Super. 2013). "When the language of the policy is clear and unambiguous, we must give effect to that language." *Id.* (citing *Donegal Mut. Ins. Co. v. Baumhammers*, 595 Pa. 147, 938 A.2d 286, 290 (2007) (quoting *Kvaerner*, 908 A.2d at 897))). "However, when a provision in the policy is ambiguous, the policy is to be construed in favor of the insured . . . ." *Id.* (quotations omitted). "Also, we do not treat the words in the policy as mere surplusage and, if at all possible, we construe the policy in a manner that gives effect to all of the policy's language." *Id.* (citations omitted).

As previously discussed, the Utica Policy states that the insurance policy applies to "property damage" only if the "property damage is caused by an "occurrence." ECF No. 30-6. "Occurrence" is defined as an "accident . . .

including continuous or repeated exposure to substantially the same general harmful conditions." *Id.* The insurance policy does not define "accident." *Id.*

"Words of common usage in an insurance policy are construed according to their natural, plain, and ordinary sense." *Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co.*, 908 A.2d 888, 897 (Pa. 2006) (citing *Madison Construction Co. v. Harleysville Mutual Insurance Co.*, 735 A.2d 100, 108 (Pa. 1999)). Accordingly, courts "may consult the dictionary definition of a word to determine its ordinary usage." *Id.*

Indeed, in interpreting a commercial general liability contract with identical language to the provisions at issue in this case that also failed to define "accident," the Pennsylvania Supreme Court in *Kvaerner* took notice that the dictionary defined "accident" as "'[a]n unexpected and undesirable event,' or 'something that occurs unexpectedly or unintentionally.'" *Id.* (quoting Webster's II New College Dictionary 6 (2001)). In *Kvaerner*, Bethlehem Steel hired Kvaerner Metals to construct a coke oven battery. *Id.* at 891. Bethlehem later discovered problems with the battery and sued Kvaerner for breach of contract. *Id.* Kvaerner sought defense and indemnity under two occurrence-based commercial general liability policies. *Id.* at 891-92. When the insurer disclaimed coverage, Kvaerner sued for

22

declaratory judgment. *Id.* at 892. The policies at issue in that case contained the same "accident" definition of "occurrence" as the policy in the instant case. *Id.*

The Pennsylvania Supreme Court, having taken notice of the dictionary definition of "accident" noted that "[t]he key term in the ordinary definition of 'accident' is 'unexpected.' This implies a degree of fortuity that is not present in a claim for faulty workmanship." *Id.* So, the court reasoned that "provisions of a general liability policy provide coverage if the insured work or product *actively malfunctions*, causing injury to an individual or damage to another's property." *Id.* at 898 (quotations and citations omitted). But, "[c]ontractual claims of poor workmanship d[o] not constitute the active malfunction needed to establish coverage under the policy." *Id.* Indeed, the court noted the application and limitations of commercial general liability policies: "The coverage is for tort liability for physical damages to others and not for contractual liability of the insured for economic loss because the product or completed work is not that for which the damaged person bargained." *Id.* at 899, n.10 (quotation and citation omitted).

Accordingly, the court held that because Bethlehem had alleged "only property damage from poor workmanship to the work product itself," Kvaerner's "faulty workmanship [did] not constitute an 'accident' as required to set forth an occurrence under the [commercial general liability] policies." *Id.* at 900. Thus, the

23

insurer "had no duty to defend or indemnify Kvaerner in the action brought by Bethlehem." *Id.*

*Kvaerner*'s reasoning was extended by the Pennsylvania Superior Court in *Millers Capital Ins. Co. v. Gambone Bros. Dev. Co.*, 941 A.2d 706 (Pa. Super. 2008), which held that "natural and foreseeable acts . . . which tend to exacerbate the damage, effect, or consequences caused *ab initio* by faulty workmanship also cannot be considered sufficiently fortuitous to constitute an 'occurrence' or 'accident' for the purposes of an occurrence based [commercial general liability] policy." *Sapa Extrusions, Inc. v. Liberty Mut. Ins. Co.*, No. 18-2206, 2019 WL 4384187, at \*8, n.6, ___ F.3d ___ (3d Cir. Sept. 13, 2019) (quotations and citations omitted).

In *Specialty Surfaces Int'l, Inc. v. Continental Cas. Co.*, 609 F.3d 223 (3d Cir. 2010), a manufacturer of synthetic turf was hired as a subcontractor to construct football fields for a high school. *Id.* at 227. A different contractor prepared the base for each field and the subcontractor installed the turf and a third-party drainage system. *Id.* The high school sued the subcontractor for breach of warranty alleging that the drainage systems in the fields had been defectively construed and installed. *Id.* at 227-28. Because of the resultant water damage, the high school asserted that the fields were unstable and the subgrade was ruined. *Id.* at 228. The high school later amended the complaint to add breach of contract and

24

negligence claims. *Id.* The subcontractor requested coverage under an occurrence-based commercial general liability policy that also defined "occurrence" as an "accident." *Id.* at 227–28. The insurer first disclaimed coverage but then agreed to defend the subcontractor when the high school added the negligence claim in the amended complaint. *Id.* at 228–29. The subcontractor eventually sued for a declaratory judgment that the insurer had to defend and indemnify on all claims. *Id.* at 229.

On appeal, the Third Circuit relied in part on *Kvaerner* in concluding that under Pennsylvania law, "[i]n order for a claim to trigger coverage, there must be a causal nexus between the property damage and an 'occurrence,' i.e., a fortuitous event." *Id.* at 231. Moreover, the court reasoned that "[f]aulty workmanship, even when cast as a negligence claim, does not constitute such an event; nor do natural and foreseeable events like rainfall." *Id.* Accordingly, the court held that the insurer was not bound to defend or indemnify the subcontractor against the original complaint and that the addition of the negligence claim made no difference reasoning that the alleged damage to the subgrade, which was not installed by the subcontractor, did not amount to an "occurrence" because it was "foreseeable." *Id.* at 239 (citing *Millers Capital Ins. Co.*, 941 A.2d at 713).

In the instant case, Pine Run's claims are framed as breach of contract (Count I), breach of implied warranties (Count II), and breach of express

25

warranties (Count III). However, it is well-settled law in Pennsylvania that it is the nature of the allegations themselves, not the particular cause of action that is pled in the complaint that determines whether coverage has been triggered. *Sapa Extrusions, Inc. v. Liberty Mut. Ins. Co.*, No. 18-2206, 2019 WL 4384187, at *7, __ F.3d __ (3d Cir. Sept. 13, 2019) (citing *Mutual Benefit Ins. Co. v. Haver*, 725 A.2d 743 (Pa. 1999)). McDonald does not dispute the fact that the AAA Complaint claims are framed as breach of contract and breach of implied and expressed warranties. ECF No. 33 at p. 4. However, McDonald contends that the Complaint contains numerous, specific allegations of negligence sufficient to support a tort action, especially in regard to the installation of the PTAC units, which constitute an "occurrence." *Id.* Utica, on the other hand, contends that the contractual and warranty claims in the AAA Complaint do not constitute an "occurrence" as defined in the Utica policy and thus, do not trigger Utica's duty to defend. ECF No. 30-2 at p. 4.

At bottom, the AAA Complaint alleges faulty workmanship. The gravamen of Pine Run's suit is that "[a]s a result of McDonald's negligent defective installation of the PTAC units and refusal to correct the defects, Pine Run has incurred, and continues to incur, significant damages." ECF No. 30-4 at ¶ 44. For example, "McDonald improperly installed the packing, fabricated pans, flashing and related material during the installation of the new PTAC units," which

26

allegedly caused, among other things, damage to the Pine Run's roof and mold growth. *Id.* at ¶¶ 22 & 40 ("The water underneath the roof from the PTAC leak had frozen and cracked the roof which now needs to be replaced."). The auxiliary allegations in the AAA Complaint relate to the other renovation work that McDonald was contracted to complete for Pine Run, but those allegations also focus entirely on the overarching claim that McDonald performed its contracted-for services defectively. As a result, Pine Run "estimates that it will cost $1.8 million just to repair McDonald's faulty work and to remediate the defective building conditions." *See generally, id.*

Thus, Pine Run's allegations do not amount to an "occurrence"—that is, an unforeseeable, "fortuitous event." McDonald protests this analysis, asserting that third-party property damage triggers coverage under the commercial general liability policy, but the discussed cases "hold that any distinction between damage to the work product alone versus damage to other property is irrelevant so long as both foreseeably flow from faulty workmanship." *Sapa Extrusions, Inc. v. Liberty Mut. Ins. Co.*, No. 18-2206, 2019 WL 4384187, at *10, __ F.3d __ (3d Cir. Sept. 13, 2019). It is certainly foreseeable that the faulty installation of air conditioning units and windows could lead to water damage and the growth of mold. It flies in the face of logic to say that Pine Run's alleged damage was the result of an "accident" rather than the faulty workmanship of both McDonald and Voegele,

mainly Voegele in the form of its subcontracted-for work and McDonald in the form of deficient oversight as the general contractor for this project. As it is axiomatic that the Utica policy coverage is not triggered by the AAA Complaint, Utica has no duty to defend McDonald or Voegele in the arbitration proceeding.[6] Accordingly, as Utica has no duty to defend either party, Utica is also not required to indemnify either party in relation to the same proceeding.

## V. Conclusion

For the foregoing reasons, Plaintiff Utica Mutual Insurance Company's Motion for Summary Judgment will be granted and Defendant McDonald Building Company's Motion for Summary Judgment will be denied. An appropriate Order follows.

DATED: **10-15-2019**

BY THE COURT:

CHAD F. KENNEY, J.

---

[6] Because the Court has determined that the AAA Complaint claims do not constitute an "occurrence" under the Utica Policy, the Court need not consider whether McDonald is an additional insured under the agreement.

28